_____
(Maker)

Accepted:

_____
(Payee)

A-2

EXHIBIT B

SECURITY AGREEMENT

This Agreement made and entered into this _____ day of _____, 19__, by and between _____ ("Pledgor") and _____ ("Pledgee"), sets forth the terms and conditions governing the nonrecourse secured note (the "Note") executed this date by Pledgor as payor and Pledgee as payee.

1.    As security for the indebtedness evidenced by the Note, the Pledgor has pledged to the Pledgee that portion of the Pledgor's limited partnership interest in Aspen Ventures III, L.P., a Delaware limited partnership ("AVIII") purchased by Pledgor from Pledgee (not including that portion of such interest for which Pledgor has made capital contributions), which portion is hereinafter referred to as the Collateral. Terms used in this Agreement have the meaning given them in the AVIII Limited Partnership Agreement unless the context requires otherwise.

2.    The Pledgor shall retain and have at all times the following rights and obligations with respect to the Collateral:

(a)    General: The Pledgor shall retain and have full legal and beneficial ownership of the Collateral and shall have the benefit of any increases and bear the risk of any decreases in the value of the Collateral. The Pledgor shall have the sole right to vote with respect to the Collateral and to receive distributions with respect thereto. Any other payments or distributions on, or in respect of, the Collateral, including any distributions of Securities by AVIII, and any Securities issued as a result of any stock dividend on any shares pledged hereunder or as a result of any reclassification, stock split or other change in the capital stock of any corporation whose shares are pledged hereunder or as a result of any consolidation or merger of any such corporation with or into another or as a result of any exchange or conversion of any Security which is pledged hereunder, shall be delivered to the Pledgee and otherwise held as part of the Collateral or, in the case of such cash distributions applied as provided in paragraph 2(b). The Pledgor shall pay all taxes or other charges assessable against it upon or with respect to the Collateral or any income or distributions therefrom.

(b)    Certain Application of Cash. Any cash received by the Pledgee in respect of a withdrawal of Securities pursuant to paragraph 2(c)(i) or any cash payment on the Collateral to be paid over to the Pledgee pursuant to paragraph 2(a) shall be forthwith applied in payment of the principal of the Note.

(c)    Withdrawal of the Collateral:

(i) The Pledgor shall have the right at any time to pay in cash to the Pledgee the entire indebtedness evidenced by the Note and to terminate the Pledgee's security interest in the Collateral.

(ii) The Pledgor shall have the right to withdraw any of the Securities included in the Collateral, provided, however, that no such partial withdrawal may be made if it

would reduce the value of the remaining Collateral below one hundred and thirty-five percent (135%) of the balance of the Note remaining unpaid after any payment made by the Pledgor. The value of the Collateral shall be calculated pursuant to Article IX of the AVIII Limited Partnership Agreement.

3.      Upon payment of the Note in full, the Pledgee shall endorse the Note as discharged and satisfied in full, and shall execute all such documents as may be necessary to terminate the Pledgee's security interest in the Collateral.

4.      As holder of the Note and Pledgee of the Collateral, the Pledgee shall have the right, if the Note is not paid or satisfied on the date for payment set forth in the Note, to liquidate the Collateral and to apply the proceeds of such liquidation in payment, in whole or in part, of the indebtedness evidenced by the Note.

(a)      Any such liquidation may be effected in any reasonable manner, including a sale or sales for cash or an exchange for other Securities of any type or kind, or in any other manner, at a public or private sale, with or without notice of advertisement, as Pledgee may in its sole discretion determine.

(b)      Any purchaser (other than the Pledgee) of the Collateral at any such sale shall take the same free of any right of redemption and any other right or claim on the part of the undersigned, all of which rights and claims are hereby waived and released.

(c)      The Pledgee may be the purchaser at such sale but only at the fair market value of the Collateral.

5.      Holding of Collateral.  The Collateral shall be held by AVIII and, to the extent otherwise distributable to the Pledgor, by the Pledgee, in accord with the terms hereof, to assure performance by the undersigned of its obligations under the Note.  Title to all Collateral shall remain in the undersigned until such Collateral is liquidated by the Pledgee in accord with the terms hereof.  All of the right and interest of Pledgee in the Collateral shall terminate upon payment in full of all indebtedness evidenced by the Note.

6.      Notices:  All notices shall be given in accord with paragraph 10.5 of the AVIII Limited Partnership Agreement.

7.      Governing Laws:  This Agreement and the Note shall be governed by the laws of the State of Delaware as applied to agreements made and to be performed in Delaware between Delaware residents.

8.      Arbitration:  Any controversy arising out of or relating to this Agreement or the Note shall be resolved by arbitration in accord with paragraph 10.15 of the AVIII Limited Partnership Agreement.

9.      Pledgee's Rights:  Pledgee shall not be entitled hereunder to become at any time a substituted Limited Partner of AVIII.

_____, 19___.

Pledgor

By:_____

Accepted:

Pledgee

By _____

## SCHEDULE A

### SCHEDULE OF PARTNERS

| General Partner | Capital Commitment |
|---|---|
| Aspen Ventures Management III, L.L.C.<br>1000 Fremont Avenue, Suite 200<br>Los Altos, CA 94024 | $ 165,000 |

### Limited Partners

| | |
|---|---|
| Pauline Lo Alker<br>211 South Ridge Court<br>Danville, CA 94538 | $ 100,000 |
| James G. Bass<br>7 Shipwright Harbor<br>Annapolis, MD 21401 | 60,000 |
| Joel M. Becker<br>6932 Burnside Drive<br>San Jose, CA 95120 | 100,000 |
| Burger Family Trust Dated 3/25/98<br>2312 Branner Drive<br>Menlo Park, CA 94025 | 100,000 |
| Valorie Cook Carpenter, Trustee of the Valorie Cook<br>Carpenter Trust Dated 7/29/97<br>154 Bridgton Court<br>Los Altos, CA 94022 | 100,000 |
| Ronald Chaisson & Janis Agopian, co-trustees of the<br>Chaisson/Agopian Family Trust Dated February 9, 1998<br>9745 Wexford Circle<br>Granite Bay, CA 95746 | 500,000 |
| Alexander P. Cilento<br>1198 Jefferson Way<br>Laguna Beach, CA 92651 | 500,000 |

| | |
|---|---|
| The Louis & Jolene Cole 1988 Revocable Trust<br>Dated 11/7/88<br>13515 Fremont Road<br>Los Altos Hills, CA 94022 | 250,000 |
| Compudata, Inc.<br>46500 Fremont Blvd.<br>Suite 710<br>Fremont, CA 94538 | 1,000,000 |
| Robert L. Corey<br>10791 E. Fanfol Lane<br>Scottsdale, AZ 85258 | 100,000 |
| Crockett Living Trust UTD May 24, 1991, E. David Crockett and<br>Ann Rae Crockett, Co-Trustees UTD May 24, 1991<br>10898 Mora Drive<br>Los Altos Hills, CA 94024 | 1,000,000 |
| Crossfire Ventures, L.L.C.<br>P.O. Box 41280<br>San Jose, CA 95160<br>Attn: John Dunning | 250,000 |
| William DelBiaggio III<br>3000 Sand Hill Road<br>Building 2, Suite 110<br>Menlo Park, CA 94025 | 300,000 |
| Dr. Eugene C.Y. Duh<br>92 Hwa Fong Street<br>Kaohsiung, Taiwan 800 | 6,000,000 |
| Fairway Ventures<br>c/o 24230 Hillview Road<br>Los Altos Hills, CA 94024 | 150,000 |
| Harold V. Feeney<br>11030 Mora Drive<br>Los Altos, CA 94024 | 50,000 |
| Henry I. Feir Living Trust<br>301 Chestnut Street<br>San Francisco, CA 94133 | 100,000 |

| | |
|---|---|
| Allan R. Ferguson<br>P.O. Box 208<br>Meriden, NH  03770 | 100,000 |
| First Trust Corp F.B.O. Jerome W. Carlson IRA<br>95 Mount Vernon Lane<br>Atherton, CA  94027 | 100,000 |
| Robert J. Frankenberg, Trustee of the Frankenberg Family Trust<br>701 Sunburst Lane<br>Alpine, UT  84004 | 100,000 |
| The Fuller Foundation<br>135 N. Los Robles<br>Suite 660<br>Pasadena, CA  91101 | 100,000 |
| Killea Family Revocable Trust, dated 12-19-94<br>1520 Bellevue Avenue<br>Hillsborough, CA  94010 | 100,000 |
| Roger Koo<br>46500 Fremont Blvd.<br>Suite 710<br>Fremont, CA  94538 | 1,000,000 |
| Jean A. Kovacs and Brooks Stough<br>315 Ravelagh Road<br>Hillsborough, CA  94010 | 100,000 |
| Donald A. Lee<br>40 Ciervos Road<br>Portola Valley, CA  94028 | 100,000 |
| Salvador A. Liccardo and Laura S. Liccardo, Trustees of the<br>Liccardo 1983 Trust<br>13744 Howen Drive<br>Saratoga, CA  95070 | 100,000 |
| Richard S. Love, Trustee of the Love Living Trust<br>Agreement dated March 9, 1983<br>28100 Story Hill Lane<br>Los Altos Hills, CA  94022 | 100,000 |

Jeffrey M. Nash and Kathleen L. Nash, Trustees of the              100,000
Jeffrey M. Nash and Kathleen L. Nash Declaration of Trust
dated 3/18/80, as amended
1363 Caminito Batea
La Jolla, CA 92037

Craig D. Norris             100,000
841 Basking Lane
San Jose, CA 95138

Santa Clara University             1,000,000
500 El Camino Real
Santa Clara, CA 95053

Dale G. and Margo D. Seymour             100,000
11170 Mora Drive
Los Altos Hills, CA 94024

Silicon Valley Bancshares             250,000
3003 Tasman Drive HG 110
Santa Clara, CA 95054

John R. Simoneaux             200,000
9860 Wexford Circle
Granite Bay, CA 95746

Kimball W. Small, Trustee of the Small 1988 Living Trust             100,000
20131 Rancho Bella Vista
Saratoga, CA 95070

John M. and Linda C. Stedman             100,000
4834 Cresthaven Circle
Boise, ID 83704

Kevin J. Sullivan             100,000
70 Crescent Drive
Palo Alto, CA 94301

Thau Family Trust dated April 13, 1988             75,000
1016 Dartmouth Lane
Los Altos, CA 94024

Dan R. E. Thomas and Jeannie K.A. Thomas             300,000
2483 E. Bayshore Road
Suite 100
Palo Alto, CA 94303

| | |
|---|---:|
| Ricardo and Ellen Urrutia<br>14577 Via De Marcos<br>Saratoga, CA 95070 | 100,000 |
| David E. Vaughn<br>7167 Scarsdale Place<br>San Jose, CA 95120 | 100,000 |
| Venkatesh Family Living Trust<br>12117 Oak Park Court<br>Los Altos Hills, CA 94022 | 100,000 |
| Michael A. Volkema<br>19102 Rosemary Road<br>Spring Lake, MI 49456 | 150,000 |
| John W. Ward<br>37 Country Road<br>Mamaroneck, NY 10543 | 100,000 |
| Maurice Werdegar<br>450 Arlington Way<br>Menlo Park, CA 94025 | 100,000 |
| Thaddeus J. Whalen Jr.<br>19895 Glen Brae Drive<br>Saratoga, CA 95070 | 200,000 |
| Thaddeus J. Whalen III<br>14771 Aloha Avenue<br>Saratoga, CA 95070 | 200,000 |
| Donna L. Whitney, Trustee of the Donna L. Whitney Trust<br>10410 Albertsworth Lane<br>Los Altos, CA 94024 | 200,000 |
| Harry Wilker, Trustee of the Harry R. Wilker Revocable Trust<br>4014 LaCresta Avenue<br>Oakland, CA 94602 | 100,000 |
| <u>Total Limited Partners</u> | $16,335,000 |
| <u>Total All Partners</u> | <u>16,500,000</u> |

ANNEX A

SBA ANNEX PS

ANNEX B

VALUATION GUIDELINES

[Federal Register: June 2, 1994]

Appendix III To Part 107--Valuation Guidelines for SBICs

I. Introduction

This appendix describes the policies and procedures to which Licensees (SBICs and BICs) must conform in valuing their Loans and Investments and provides guidance as to the techniques and standards which are generally applicable to such valuations. The need for clearly defined valuation policies and procedures and understandable techniques arises in connection with the requirement that Licensees report the worth of their portfolios to investors and SBA. This information assists SBA in its assessment of the overall operational performance and financial condition of individual Licensees and of the industry.

II. Overall Guidelines

A. Definitions

1.Asset Value means the amount that the general partners or board of directors of a Licensee have established as a current value in accordance with its Valuation Policy.

2.Marketable Securities means securities for which market quotations are readily available and the market is not "thin", either in absolute terms, or relative to the potentially saleable holdings of the Licensee and other investors with saleable blocks of such securities. These securities are valued as follows: (a) For over-the-counter stocks, taking the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, taking the average of the close for the valuation date and the preceding two days. This classification does not include securities which are subject to resale restrictions, either under securities laws or contractual agreements, although other securities of the same class may be freely marketable.

3.Other Securities means all Loans and Investments not defined in paragraph A.(2) of this section. Such securities shall be valued at Asset Value. Most SBIC and SSBIC investments will fall in this classification.

4.Valuation Policy means the official document of a Licensee that definitively sets forth the Licensee's methods of valuing Loans and Investments in accordance with the requirements of Sec. 101(g) and this appendix.

B. Objective

The goal of a Licensee's valuation process is to value its Loans and Investments. However, the very nature of Licensees' investments sometimes makes the determination of fair market value problematical. In most cases there is no market for the investment at the time of valuation. Therefore, except where market quotations are readily available and the markets are

not "thin", the Boards of Directors or General Partners are necessarily responsible for determining in good faith the value of Loans and Investments.

Determination of value will depend upon the circumstances in each case. No exact formula can be devised that will be generally applicable to the multitude of different valuation issues that will arise. This is especially true for semiannual valuation updates of relatively new investments for which current results either exceed or do not meet the Small Concern's forecasts. A sound valuation should be based upon all of the relevant facts, with common sense and informed judgement influencing the process of weighing those facts and determining their significance in the aggregate.

C. General Considerations

The Asset Value of Loans and Investments will depend upon the circumstances of each individual case and will be based upon the nature of the asset and the stage of a company's existence.

In negotiating the terms and conditions of an investment with a Small Concern, the Licensee, in effect, establishes an initial valuation for the investment, which is cost. Cost shall be the Asset Value until there is a basis to increase or decrease the valuation.

Unrealized appreciation should be recognized when warranted, but should be limited to those investments that have a sustained economic basis for an increase in value. Temporary market fluctuations or a temporary increase in earnings should not be the cause or sole reason for appreciation.

Unrealized depreciation should be recorded when portfolio companies show sustained unfavorable financial performance. Continuous close scrutiny of Loans and Investments will provide insight into the business cycles and problems encountered by small business concerns. This insight will allow the Licensee to differentiate between a temporary downturn or setback and a long term problem indicating a measurable decline in Asset Value.

When a decline in Asset Value appears permanent, a complete or partial write-off of the asset (i.e., recording a realized loss rather than unrealized depreciation) should occur. Some of the more obvious indications of permanent impairment of an investment include the termination of business operations, a petition for bankruptcy protection or liquidation, or the absence of a verifiable forwarding address of the business or its proprietor(s). Less obvious situations may include the loss of major revenue accounts, the shut down of a critical distribution channel, an adverse legal or regulatory ruling, or the expiration of a priority claim on collateral in a distressed Small Concern. These and other possible circumstances should be assessed on a case-by-case basis, with supporting documentation on file.

### D. Valuation Responsibility

As specified in 13 CFR 107.101(g), the Licensee's Board of Directors or General Partners have the sole responsibility for determining Asset Value. In determining Asset Value, the Board of Directors or General Partners must satisfy themselves that all appropriate factors relevant to a good faith valuation have been considered and that the methods used are reasonable and prudent and are consistently applied. Although the Board of Directors or General Partners have the ultimate responsibility for determining Asset Value, they may appoint management or other persons to assist them in such determinations and to provide supporting data and make the necessary calculations pursuant to the Board's or General Partners' direction. It is essential that a careful, conservative, yet realistic approach be taken by Licensees in determining the Asset Value of each Loan and Investment.

As part of the annual audit of the Licensee's financial statements, the Licensee's independent public accountant has responsibility to review the Licensee's valuation procedures and implementation of such procedures including adequacy of documentation. The independent public accountant also has reporting responsibility regarding the results of this review. (See appendix I to this part, section III and section V, paragraphs I and J).

### E. Frequency of Valuation

Loans and Investments shall be valued individually and in the aggregate by the Board of Directors or General Partners at least semiannually--as of the end of the second quarter of Licensee's fiscal year and as of the end of Licensee's fiscal year, Provided however, That Licensees without Leverage need only perform valuations once a year. On a case-by-case basis, SBA may require valuations to be made more frequently. Only valuations performed as of the fiscal year-end are required to be reviewed by the Licensee's independent public accountant, as discussed in paragraph D of this section. Each Licensee shall forward a valuation report to SBA within 90 days of the end of its fiscal year in the case of annual valuations, and within thirty days following the close of other reporting periods. Material changes in valuations shall be reported not less often than quarterly within thirty days following the close of the quarter. Since the valuations will only be as sound as the timeliness of the financial information upon which they are based, Licensees shall require frequent financial statements from Small Concerns. Monthly financial statements are normally appropriate.

### F. Written Valuation Policy

Each Licensee shall establish a written Valuation Policy approved by its Board of Directors or General Partners that includes a statement of policies and procedures that are consistent with Section III of this appendix.

### G. Documentation

Each Licensee shall prepare and retain in its permanent files a valuation report as of each valuation date documenting, for each portfolio security, the cost, the current Fair Value and the previous Fair Value, plus the methodology and supporting data used to determine the value of each such portfolio security. The minutes of meetings of Boards of Directors or General Partners at which valuations are determined will contain a resolution confirming that the valuations of each portfolios security were determined in accordance with Licensee's duly adopted valuation procedures and will incorporate by reference the valuation report signed by each Director or General Partner along with any dissenting valuation opinions.

### H. Instructions

A model Valuation Policy is presented in Section III below. Licensees may adopt the model in its entirety or make appropriate modifications, additions or deletions. Any changes, however, must be generally consistent with the model.

A second version of the model Valuation Policy is presented in Section IV. This section repeats the language of Section III, but is expanded to include additional explanatory paragraphs. These paragraphs are commentary provided by SBA to assist Licensees in interpreting and applying some of the model valuation criteria. They may be adapted for inclusion in the Licensee's Valuation Policy, if desired.

### I. Approval

1.Any Licensee that utilizes the exact wording of Section III, without any additions, deletions, or changes will be presumed to have an acceptable Valuation Policy. It is acknowledged, however, that this wording may not be entirely applicable to all Licensees. If a Licensee wants to adopt a Valuation Policy that is different from Section III, the Licensee must obtain SBA's written approval of such Policy. If changes from the wording of Section III are minor, it is suggested that the Licensee indicate deletions with a caret (<caret>) and underline additions.

2.Applicants for either a Section 301(c) or 301(d) license must submit their Valuation Policies for approval as part of the licensing application process.

## III. Model Valuation Policy

### A. General

1.The General Partners have sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

2.Loans and Investments shall be valued individually and in the aggregate at least semi-annually--as of the end of the second quarter of the fiscal year and as of the end of

the fiscal year. Fiscal year-end valuations are audited as set forth in 13 CFR Part 107 Appendix III, Section II, paragraph D.

3.This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

B. Interest-Bearing Securities

1.Loans shall be valued in an amount not greater than cost, with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

2.When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

3.Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) Interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

4.The carrying value of interest-bearing securities shall not be adjusted for changes in interest rates.

5.The valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

C. Equity Securities--Private Companies

1.Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

2.Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

3.The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

4.Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of prior securities.

5.If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

6.Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or in the event of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

7.With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

8.Warrants should be valued at the excess of the value of the underlying security over the exercise price.

D. Equity Securities--Public Companies

1.Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

2.The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

3.When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

IV. Valuation Policy With Supplementary Information

A. General

1.The General Partners have sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

2.Loans and Investments shall be valued individually and in the aggregate at least semi-annually--as of the end of the second quarter of the fiscal year and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in 13 CFR Part 107, Appendix III, Section II, paragraph D.

3.This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

B. Interest-Bearing Securities

1.Loans shall be valued in an amount not greater than cost, with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

2.When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis

of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

3. Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) Interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

a. Licensees may rebut this presumption by providing evidence of collectibility satisfactory to SBA. Such evidence may include the existence of collateral, the value of which has been verified through an appraisal by an independent professional appraiser acceptable to SBA. Such an appraisal shall be at liquidation value (net of liquidation costs) and shall have been performed within the 12 months immediately preceding the valuation date. In considering whether collateral provides an appropriate basis for valuations, SBA will review the Licensee's operating history for evidence concerning its willingness and ability to pursue available remedies (including foreclosure) in default situations.

b. For those Licensees primarily involved in making loans, the use of a loan classification system is strongly encouraged to help manage portfolios and determine Asset Values, with loans that warrant extra attention being flagged by the Licensee's management. Such a ``watch list'' can also be used to report to the Board of Directors or General Partner(s). For each loan placed on the watch list, a reason or statement should describe the particular situation. Danger signals that should alert the Licensee to potential problems include delinquency, a lack of profitability, weak or decreasing equity, increasing debt load, a deteriorating cash position, an abnormal increase in accounts payable, inaccurate financial information, insurance cancellation, judgments and tax liens, family problems, loss of employees, collateral problems, slowdown in inventory turnover, poor maintenance of plant and equipment, and heavy reliance on short term debt.

c. Upon careful consideration of all the relevant factors, the Board of Directors or General Partners shall determine which loans require recognition of Unrealized Depreciation. It is a good rule of operation for a Licensee to perform downward valuations earlier rather than later. When the quality of a loan recovers, a higher Asset Value may subsequently be assigned.

4. The carrying value of interest-bearing securities shall not be adjusted for changes in interest rates.

5. The valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

a. Accepted methods for valuing convertible debentures generally involve one of two approaches. The first approach views the debenture as a debt obligation. Under this approach, the Licensee should utilize the loan valuation techniques described in this section above. The second approach considers the conversion of all convertible securities of the same class into their common stock equivalent, taking into account dilution, and a subsequent valuation of the Licensee's proportionate equity interest. Valuation of this equity interest should follow the equity valuation techniques described in Paragraph C. of this section.

b. Normally, the reported value is the higher of these two alternatives. However, Licensees should disregard higher equity values and retain lower debt-based valuations if there are circumstances which make conversion undesirable. When equity considerations govern the Asset Value assigned, all underlying factors should be disclosed.

C. Equity Securities--Private Companies

1. Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

2. Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

3. The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

4. Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of prior securities.

5. If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

6. Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or in the event of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

a. Under these conditions, valuation factors that may be considered include: (1) The utilization of a multiple of earnings, cash flow, or revenues, which are commensurate with the multiples which the market currently accords to comparable companies in similar businesses and industries, with an appropriate discount for conditions such as illiquidity or a minority position. Care should be taken to use only comparable companies, including not only business similarities but also similarities as to size, financial condition, and earnings outlook. However, in order for comparative market prices to be meaningful, data for a representative sample of similar companies must be available (2) Among the more important factors to be considered in a particular case are (i) the nature of the business, (ii) the risk involved, and (iii) the growth, stability or irregularity of earnings and cash flows. A company with a positive earnings trend and a favorable outlook may command a capitalization factor (multiplier) in the marketplace that will result in a stock valuation well above book value. When the gross value of a small concern is computed by applying a capitalization rate to pre-interest, pre-tax earnings, the value of equity securities is derived by subtracting the outstanding debt of the concern from the gross value. While capitalization rates do vary, an appropriate rate can be determined by analyzing rates for comparable companies in the same industry. Investigating similar companies in the same industry or geographic area can be done directly or through published material from sources such as the Value Line, Standard and Poor's, Robert Morris and Associates, or any other of the numerous sources available for comparative industry data (3) Another method discounts the present value of estimated future proceeds to a Licensee, including dividend income and sales of securities, using a discount rate that reflects the degree of risk of the equity interest (4) One may also utilize the recent sale prices of comparable blocks of the issuer's securities in arm's length transactions.

b. Equity interests or limited partnership interests without the benefit of stock certificates and which generally define a certain percentage of the profits to be allocated to each of the investors based on its relative contributions should be valued in a manner similar to the valuation methods described in this section.

7. With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

a. Liquidation value will depend on the decreasing value of wasting assets, the costs experienced by the business being liquidated, the expenses borne by the Licensee in order to be able to realize any liquidating value, the elapsed time until such net proceeds can be realized, the ranking of the Licensee's claims relative to other security interests and subordination agreements, and the probability of any ultimate realization of value.

b. Incorporating this approach as a normal step in valuation can provide improved understanding of the downside of an investment.

c. Licensees should recognize unrealized appreciation or depreciation, as appropriate, on Assets Acquired in Liquidation of Loans and Investments. In order to recognize Unrealized Appreciation, asset values must be verified by an appraisal which meets all the conditions specified in the preceding paragraph; provided, however, that if the assets acquired constitute a going concern, such assets may be appraised as a going concern rather than at liquidation value. Unrealized Appreciation may not be recognized if the Licensee does not benefit from such appreciation. For example, an asset acquired through foreclosure should not be carried at a value greater than the defaulted loan balance plus any expenses and penalties to which the Licensee is entitled.

8. Warrants should be valued at the excess of the value of the underlying security over the exercise price.

a. Valuation of debt with detachable warrants can be done similarly to convertible debt by treating the debt and warrants as a unit, or, alternatively, the debt can be valued on its own basis as a debt instrument, and the warrants separately. If the warrants are valued separately, the following factors must be taken into account: (1) Current value of issued shares (2) The differential between the exercise private and the underlying share values if the current share values are higher than the exercise price (3) Time until expiration dates are reached or dates of changes in terms of exercise prices (4) Number of shares into which the warrants are exercisable on various dates (5) Restrictions on sale of the underlying stock (6) Restrictions on the transferability of the warrants (7) Registration rights for the warrants or the underlying shares (8) Financial ability of the Licensee to perform the exercise of its rights or to sell its warrants (9) The ultimate desirability, if any, of exercising the rights given by the warrants.

D. Equity Securities--Public Companies

1. Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

a. However, securities are not deemed to be freely marketable in those situations where such securities are very thinly or infrequently traded, or may be lacking in truly representative market quotations, or where the market for such securities cannot absorb the quantity of shares which the Licensee and similar investors may want to sell.

b. In such cases, Asset Value must be determined by the Board of Directors or General Partners.

2. The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

3. When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

Dated: May 19, 1994.


Erskine B. Bowles,
Administrator

# EXHIBIT C

## ASPEN VENTURES III, L.P.

### FIRST AMENDMENT TO
### AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

This FIRST AMENDMENT TO THE AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "First Amendment") of Aspen Ventures III, L.P., a Delaware limited partnership (the "Partnership"), dated as of August 20, 1999 (the "Partnership Agreement"), is made and entered into as of April 1, 2002, by and among Aspen Venture Management III, L.L.C., a Delaware limited liability company, as general partner (the "General Partner") and the undersigned Limited Partners. Capitalized terms used herein and not otherwise defined in this First Amendment shall have the meanings set forth in the Partnership Agreement.

WHEREAS, the parties desire that the Partnership be permitted to admit additional persons to the Partnership as Limited Partners, which persons shall be set forth on a "Schedule of Series B Limited Partners" attached to the Partnership Agreement, and shall be admitted to the Partnership as Limited Partners in exchange for making capital contributions (any such contributions, the "Series B Contributions") to the Partnership at such times and in such amounts as provided below (such persons, and any other persons admitted to the Partnership as a Limited Partner after the date hereof (other than in connection with the transfer of an interest in the Partnership that is outstanding as of the date hereof), the "Series B Limited Partners");

WHEREAS, the parties desire that, in connection with the admission of the Series B Limited Partners and the contribution by them of the Series B Contributions to the Partnership, (a) the assets and liabilities of the Partnership shall be divided into two separate series for purposes of the Act:  (i) "Series A" which shall consist of the assets and liabilities of the Partnership as they existed immediately prior to the execution of this First Amendment, the capital contributions received with respect to each "Series A Limited Partner" (as defined below) and any other assets acquired and liabilities incurred in connection with the holding, management and disposition of such assets, and (ii) "Series B" which shall consist of the Series B Contributions and any other assets acquired and liabilities incurred in connection with the holding, management and disposition of such contributed capital, as well as the Partnership Capital Accounts and Partnership Percentages of each Series B Limited Partner and (b) the Limited Partners of the Partnership shall be divided into two separate groups consisting of (i) Series A Limited Partners, which shall be defined as those Limited Partners who held their interests in the Partnership immediately prior to the date of this First Amendment or who subsequently acquire an interest in the Partnership that was outstanding immediately prior to the date of this First Amendment and (ii) Series B Limited Partners, as defined above; and

WHEREAS, the General Partner and the undersigned Limited Partners holding in the aggregate Partnership Percentages equal to at least Two-Thirds in Interest of Limited Partners desire to amend the Partnership Agreement as set forth below;

NOW, THEREFORE THE PARTIES HERETO AGREE AS FOLLOWS:

1.     Series A and Series B.