LIMITED PARTNER:

_MICHAEL A. VOLKEMA_
Type or Print Name of Limited Partner

Taxpayer I.D. Number: _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_

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i)  Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes        _____ No

(ii)  Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

_____ Yes        _____ No

By: _Michael A. Volkema_

Title: _____

Capital Commitment: _$150,000_

Page to Aspen Ventures III, L.P. Agreement

LIMITED PARTNER:

JOHN W. WARD

Type or Print Name of Limited Partner

Taxpayer I.D. Number: 066 52 6802

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i) Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes        _____ No

(ii) Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?



_____ Yes        _____ No

By: _____

Title: _____

Capital Commitment: $100,000

LIMITED PARTNER:

_MAURICE WERDEGAR_

Type or Print Name of Limited Partner

Taxpayer I.D. Number: _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_

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i) Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes          _✓_ No

(ii) Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

_____ Yes          _✓_ No

By: _____

Title: _MAURICE WERDEGAR_

Capital Commitment: _$100,000_

LIMITED PARTNER:

_Thaddeus T Whalen Jr._
Type or Print Name of Limited Partner

Taxpayer I.D. Number: _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_

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

    (i)  Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

        _____ Yes     ✓ No

    (ii)  Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

        _____ Yes     ✓ No

By: _____

Title: _____

Capital Commitment: _$700,000_

LIMITED PARTNER:

_Thaddeus J. Whelan III_
Type or Print Name of Limited Partner

Taxpayer I.D. Number: _545 - 80-0085_

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i)  Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes        ✓ No

(ii)  Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

_____ Yes        ✓ No

By: _____

Title: _____

Capital Commitment: _$200,000.00_

ıure Page to Aspen Ventures III, L.P. Agreement

LIMITED PARTNER:

*Donna L. Whitney Trust*
*4/A DTD 05/22/96*
*Donna L. Whitney, Trustee*

Type or Print Name of Limited Partner

Taxpayer I.D. Number: _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_

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i) Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes    _X_ No

(ii) Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

_____ Yes    _X_ No

By: _Donna L. Whitney_

Title: _Trustee_

Capital Commitment: _$200,000_

LIMITED PARTNER:

HARRY WILKER
Type or Print Name of Limited Partner

Taxpayer I.D. Number: 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

The undersigned hereby executes this Agreement on behalf of the Limited Partner and represents as follows:

(i) Is such Limited Partner (a) an "employee benefit plan," as defined in Section 3(3) of ERISA, (b) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity whose underlying assets include plan assets by reason of a plan's investment in such Limited Partner?

_____ Yes        ✓ No

(ii) Is such Limited Partner (a) an employee benefit plan subject to Part 4 of Subtitle B of Title I of ERISA or (b) an entity whose underlying assets are considered "plan assets" of an employee benefit plan which is subject to Part 4 of Subtitle B of Title I of ERISA and which invested in such entity?

_____ Yes        ✓ No

By: Harry Roy Wilk

Title: _____

Capital Commitment: $100,000

EXHIBIT A

$_____, 19__

PROMISSORY NOTE

       For value received, the undersigned hereby promises to pay to _____ (the "Payee"), at the principal office of the Payee, the principal sum of _____ Dollars ($_____), in such coin or currency of the United States of America at the time of payment as is legal tender for the payment of public and private debts, according to the following terms and conditions:

1.  This Note is secured by the pledge of that portion of the undersigned's limited partnership interest in Aspen Ventures III, L.P., a Delaware limited partnership ("AVIII") acquired by the undersigned from Payee (not including that portion of such interest for which the undersigned has made capital contributions).

2.  The Note and that portion of the AVIII limited partnership interest pledged to secure it are subject to all of the terms and conditions of a security agreement of the same date between Payee and the undersigned, a copy of which agreement is attached hereto.

3.  This Note shall become due and payable on the date six months after the Date of Termination of AVIII (as defined in the AVIII Limited Partnership Agreement).

4.  Payee by acceptance hereof agrees for itself, its representatives, successors and assigns (1) that neither the undersigned, its partners, nor their executors, successors or assigns shall be personally liable on this Note, it being intended that the undersigned's obligation to pay the principal amount of this Note is included for the sole purpose of establishing the existence of the indebtedness represented hereby; and (2) that in the event of default, the Payee and any successor or assign shall look for payment solely to the portion of the undersigned's AVIII limited partnership interest purchased from the Payee (not including that portion of such interest for which the undersigned has made capital contributions) and will not make any claim or institute any action or proceeding against the undersigned, its partners or their heirs, executors, administrators, successors or assigns for the payment of this Note or for any deficiency remaining after application of the limited partnership interest securing this note, or otherwise; provided, however, that nothing herein contained shall be construed (i) to release or impair the right of the Payee to enforce its rights with respect to the limited partnership interest securing this Note or (ii) to preclude the application of such limited partnership interest to the payment of this Note in accordance with its terms.

GDSVF&H\107709.10                                    A-1

_____
(Maker)

Accepted:

_____
(Payee)

A-2

EXHIBIT B

SECURITY AGREEMENT

This Agreement made and entered into this _____ day of _____, 19__, by and between _____ ("Pledgor") and _____ ("Pledgee"), sets forth the terms and conditions governing the nonrecourse secured note (the "Note") executed this date by Pledgor as payor and Pledgee as payee.

1.    As security for the indebtedness evidenced by the Note, the Pledgor has pledged to the Pledgee that portion of the Pledgor's limited partnership interest in Aspen Ventures III, L.P., a Delaware limited partnership ("AVIII") purchased by Pledgor from Pledgee (not including that portion of such interest for which Pledgor has made capital contributions), which portion is hereinafter referred to as the Collateral. Terms used in this Agreement have the meaning given them in the AVIII Limited Partnership Agreement unless the context requires otherwise.

2.    The Pledgor shall retain and have at all times the following rights and obligations with respect to the Collateral:

(a)    General:  The Pledgor shall retain and have full legal and beneficial ownership of the Collateral and shall have the benefit of any increases and bear the risk of any decreases in the value of the Collateral. The Pledgor shall have the sole right to vote with respect to the Collateral and to receive distributions with respect thereto. Any other payments or distributions on, or in respect of, the Collateral, including any distributions of Securities by AVIII, and any Securities issued as a result of any stock dividend on any shares pledged hereunder or as a result of any reclassification, stock split or other change in the capital stock of any corporation whose shares are pledged hereunder or as a result of any consolidation or merger of any such corporation with or into another or as a result of any exchange or conversion of any Security which is pledged hereunder, shall be delivered to the Pledgee and otherwise held as part of the Collateral or, in the case of such cash distributions applied as provided in paragraph 2(b). The Pledgor shall pay all taxes or other charges assessable against it upon or with respect to the Collateral or any income or distributions therefrom.

(b)    Certain Application of Cash.  Any cash received by the Pledgee in respect of a withdrawal of Securities pursuant to paragraph 2(c)(i) or any cash payment on the Collateral to be paid over to the Pledgee pursuant to paragraph 2(a) shall be forthwith applied in payment of the principal of the Note.

(c)    Withdrawal of the Collateral:

(i)    The Pledgor shall have the right at any time to pay in cash to the Pledgee the entire indebtedness evidenced by the Note and to terminate the Pledgee's security interest in the Collateral.

(ii)    The Pledgor shall have the right to withdraw any of the Securities included in the Collateral, provided, however, that no such partial withdrawal may be made if it

would reduce the value of the remaining Collateral below one hundred and thirty-five percent (135%) of the balance of the Note remaining unpaid after any payment made by the Pledgor. The value of the Collateral shall be calculated pursuant to Article IX of the AVIII Limited Partnership Agreement.

3.     Upon payment of the Note in full, the Pledgee shall endorse the Note as discharged and satisfied in full, and shall execute all such documents as may be necessary to terminate the Pledgee's security interest in the Collateral.

4.     As holder of the Note and Pledgee of the Collateral, the Pledgee shall have the right, if the Note is not paid or satisfied on the date for payment set forth in the Note, to liquidate the Collateral and to apply the proceeds of such liquidation in payment, in whole or in part, of the indebtedness evidenced by the Note.

(a)     Any such liquidation may be effected in any reasonable manner, including a sale or sales for cash or an exchange for other Securities of any type or kind, or in any other manner, at a public or private sale, with or without notice of advertisement, as Pledgee may in its sole discretion determine.

(b)     Any purchaser (other than the Pledgee) of the Collateral at any such sale shall take the same free of any right of redemption and any other right or claim on the part of the undersigned, all of which rights and claims are hereby waived and released.

(c)     The Pledgee may be the purchaser at such sale but only at the fair market value of the Collateral.

5.     Holding of Collateral.  The Collateral shall be held by AVIII and, to the extent otherwise distributable to the Pledgor, by the Pledgee, in accord with the terms hereof, to assure performance by the undersigned of its obligations under the Note.  Title to all Collateral shall remain in the undersigned until such Collateral is liquidated by the Pledgee in accord with the terms hereof.  All of the right and interest of Pledgee in the Collateral shall terminate upon payment in full of all indebtedness evidenced by the Note.

6.     Notices:  All notices shall be given in accord with paragraph 10.5 of the AVIII Limited Partnership Agreement.

7.     Governing Laws:  This Agreement and the Note shall be governed by the laws of the State of Delaware as applied to agreements made and to be performed in Delaware between Delaware residents.

8.     Arbitration:  Any controversy arising out of or relating to this Agreement or the Note shall be resolved by arbitration in accord with paragraph 10.15 of the AVIII Limited Partnership Agreement.

9.     Pledgee's Rights:  Pledgee shall not be entitled hereunder to become at any time a substituted Limited Partner of AVIII.

Accepted:

Pledgee

By: _____

_____ , 19 ___

Pledgor

By: _____

CDSF&MI07709.10

SCHEDULE A

SCHEDULE OF PARTNERS

| General Partner | Capital Commitment |
|---|---|
| Aspen Ventures Management III, L.L.C.<br>1000 Fremont Avenue, Suite 200<br>Los Altos, CA 94024 | $  165,000 |

**Limited Partners**

| | |
|---|---|
| Pauline Lo Alker<br>211 South Ridge Court<br>Danville, CA 94538 | $  100,000 |
| James G. Bass<br>7 Shipwright Harbor<br>Annapolis, MD 21401 | 60,000 |
| Joel M. Becker<br>6932 Burnside Drive<br>San Jose, CA 95120 | 100,000 |
| Burger Family Trust Dated 3/25/98<br>2312 Branner Drive<br>Menlo Park, CA 94025 | 100,000 |
| Valorie Cook Carpenter, Trustee of the Valorie Cook<br>Carpenter Trust Dated 7/29/97<br>154 Bridgton Court<br>Los Altos, CA 94022 | 100,000 |
| Ronald Chaisson & Janis Agopian, co-trustees of the<br>Chaisson/Agopian Family Trust Dated February 9, 1998<br>9745 Wexford Circle<br>Granite Bay, CA 95746 | 500,000 |
| Alexander P. Cilento<br>1198 Jefferson Way<br>Laguna Beach, CA 92651 | 500,000 |

| | |
|---|---|
| The Louis & Jolene Cole 1988 Revocable Trust<br>Dated 11/7/88<br>13515 Fremont Road<br>Los Altos Hills, CA 94022 | 250,000 |
| Compudata, Inc.<br>46500 Fremont Blvd.<br>Suite 710<br>Fremont, CA 94538 | 1,000,000 |
| Robert L. Corey<br>10791 E. Fanfol Lane<br>Scottsdale, AZ 85258 | 100,000 |
| Crockett Living Trust UTD May 24, 1991, E. David Crockett and<br>Ann Rae Crockett, Co-Trustees UTD May 24, 1991<br>10898 Mora Drive<br>Los Altos Hills, CA 94024 | 1,000,000 |
| Crossfire Ventures, L.L.C.<br>P.O. Box 41280<br>San Jose, CA 95160<br>Attn: John Dunning | 250,000 |
| William DelBiaggio III<br>3000 Sand Hill Road<br>Building 2, Suite 110<br>Menlo Park, CA 94025 | 300,000 |
| Dr. Eugene C.Y. Duh<br>92 Hwa Fong Street<br>Kaohsiung, Taiwan 800 | 6,000,000 |
| Fairway Ventures<br>c/o 24230 Hillview Road<br>Los Altos Hills, CA 94024 | 150,000 |
| Harold V. Feeney<br>11030 Mora Drive<br>Los Altos, CA 94024 | 50,000 |
| Henry I. Feir Living Trust<br>301 Chestnut Street<br>San Francisco, CA 94133 | 100,000 |

Allan R. Ferguson                                                          100,000
P.O. Box 208
Meriden, NH 03770

First Trust Corp F.B.O. Jerome W. Carlson IRA                              100,000
95 Mount Vernon Lane
Atherton, CA 94027

Robert J. Frankenberg, Trustee of the Frankenberg Family Trust            100,000
701 Sunburst Lane
Alpine, UT 84004

The Fuller Foundation                                                     100,000
135 N. Los Robles
Suite 660
Pasadena, CA 91101

Killea Family Revocable Trust, dated 12-19-94                             100,000
1520 Bellevue Avenue
Hillsborough, CA 94010

Roger Koo                                                               1,000,000
46500 Fremont Blvd.
Suite 710
Fremont, CA 94538

Jean A. Kovacs and Brooks Stough                                          100,000
315 Ravelagh Road
Hillsborough, CA 94010

Donald A. Lee                                                             100,000
40 Ciervos Road
Portola Valley, CA 94028

Salvador A. Liccardo and Laura S. Liccardo, Trustees of the               100,000
Liccardo 1983 Trust
13744 Howen Drive
Saratoga, CA 95070

Richard S. Love, Trustee of the Love Living Trust                         100,000
Agreement dated March 9, 1983
28100 Story Hill Lane
Los Altos Hills, CA 94022

| | |
|---|---|
| Jeffrey M. Nash and Kathleen L. Nash, Trustees of the Jeffrey M. Nash and Kathleen L. Nash Declaration of Trust dated 3/18/80, as amended<br>1363 Caminito Batea<br>La Jolla, CA 92037 | 100,000 |
| Craig D. Norris<br>841 Basking Lane<br>San Jose, CA 95138 | 100,000 |
| Santa Clara University<br>500 El Camino Real<br>Santa Clara, CA 95053 | 1,000,000 |
| Dale G. and Margo D. Seymour<br>11170 Mora Drive<br>Los Altos Hills, CA 94024 | 100,000 |
| Silicon Valley Bancshares<br>3003 Tasman Drive HG 110<br>Santa Clara, CA 95054 | 250,000 |
| John R. Simoneaux<br>9860 Wexford Circle<br>Granite Bay, CA 95746 | 200,000 |
| Kimball W. Small, Trustee of the Small 1988 Living Trust<br>20131 Rancho Bella Vista<br>Saratoga, CA 95070 | 100,000 |
| John M. and Linda C. Stedman<br>4834 Cresthaven Circle<br>Boise, ID 83704 | 100,000 |
| Kevin J. Sullivan<br>70 Crescent Drive<br>Palo Alto, CA 94301 | 100,000 |
| Thau Family Trust dated April 13, 1988<br>1016 Dartmouth Lane<br>Los Altos, CA 94024 | 75,000 |
| Dan R. E. Thomas and Jeannie K.A. Thomas<br>2483 E. Bayshore Road<br>Suite 100<br>Palo Alto, CA 94303 | 300,000 |

| | |
|---|---:|
| Ricardo and Ellen Urrutia<br>14577 Via De Marcos<br>Saratoga, CA 95070 | 100,000 |
| David E. Vaughn<br>7167 Scarsdale Place<br>San Jose, CA 95120 | 100,000 |
| Venkatesh Family Living Trust<br>12117 Oak Park Court<br>Los Altos Hills, CA 94022 | 100,000 |
| Michael A. Volkema<br>19102 Rosemary Road<br>Spring Lake, MI 49456 | 150,000 |
| John W. Ward<br>37 Country Road<br>Mamaroneck, NY 10543 | 100,000 |
| Maurice Werdegar<br>450 Arlington Way<br>Menlo Park, CA 94025 | 100,000 |
| Thaddeus J. Whalen Jr.<br>19895 Glen Brae Drive<br>Saratoga, CA 95070 | 200,000 |
| Thaddeus J. Whalen III<br>14771 Aloha Avenue<br>Saratoga, CA 95070 | 200,000 |
| Donna L. Whitney, Trustee of the Donna L. Whitney Trust<br>10410 Albertsworth Lane<br>Los Altos, CA 94024 | 200,000 |
| Harry Wilker, Trustee of the Harry R. Wilker Revocable Trust<br>4014 LaCresta Avenue<br>Oakland, CA 94602 | 100,000 |
| Total Limited Partners | $16,335,000 |
| Total All Partners | 16,500,000 |

ANNEX A

SBA ANNEX PS

ANNEX B

VALUATION GUIDELINES

GDSVF&H\107709.10.

[Federal Register: June 2, 1994]

Appendix III To Part 107--Valuation Guidelines for SBICs

I. Introduction

　　This appendix describes the policies and procedures to which Licensees (SBICs and BICs) must conform in valuing their Loans and Investments and provides guidance as to the techniques and standards which are generally applicable to such valuations. The need for clearl defined valuation policies and procedures and understandable techniques arises in connection with the requirement that Licensees report the worth of their portfolios to investors and SBA. This information assists SBA in its assessment of the overall operational performance and financial condition of individual Licensees and of the industry.

II. Overall Guidelines

　　A. Definitions

　　　　1.Asset Value means the amount that the general partners or board of directors o a Licensee have established as a current value in accordance with its Valuation Policy.

　　　　2.Marketable Securities means securities for which market quotations are readily available and the market is not "thin", either in absolute terms, or relative to the potentially saleable holdings of the Licensee and other investors with saleable blocks of such securities. These securities are valued as follows: (a) For over-the-counter stocks, taking the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, taking the average of the close for the valuation date and the preceding two days. This classification does not include securities which are subject to resale restrictions, either under securities laws or contractual agreements, although other securities of the same class may be freely marketable.

　　　　3.Other Securities means all Loans and Investments not defined in paragraph A.(2) of this section. Such securities shall be valued at Asset Value. Most SBIC and SSBIC investments will fall in this classification.

　　　　4.Valuation Policy means the official document of a Licensee that definitively sets forth the Licensee's methods of valuing Loans and Investments in accordance with the requirements of Sec. 101(g) and this appendix.

　　B. Objective

　　The goal of a Licensee's valuation process is to value its Loans and Investments. However, the very nature of Licensees' investments sometimes makes the determination of fair market value problematical. In most cases there is no market for the investment at the time of valuation. Therefore, except where market quotations are readily available and the markets are

not "thin", the Boards of Directors or General Partners are necessarily responsible for determining in good faith the value of Loans and Investments.

Determination of value will depend upon the circumstances in each case. No exact formula can be devised that will be generally applicable to the multitude of different valuation issues that will arise. This is especially true for semiannual valuation updates of relatively new investments for which current results either exceed or do not meet the Small Concern's forecasts. A sound valuation should be based upon all of the relevant facts, with common sense and informed judgement influencing the process of weighing those facts and determining their significance in the aggregate.

C. General Considerations

The Asset Value of Loans and Investments will depend upon the circumstances of each individual case and will be based upon the nature of the asset and the stage of a company's existence.

In negotiating the terms and conditions of an investment with a Small Concern, the Licensee, in effect, establishes an initial valuation for the investment, which is cost. Cost shall be the Asset Value until there is a basis to increase or decrease the valuation.

Unrealized appreciation should be recognized when warranted, but should be limited to those investments that have a sustained economic basis for an increase in value. Temporary market fluctuations or a temporary increase in earnings should not be the cause or sole reason for appreciation.

Unrealized depreciation should be recorded when portfolio companies show sustained unfavorable financial performance. Continuous close scrutiny of Loans and Investments will provide insight into the business cycles and problems encountered by small business concerns. This insight will allow the Licensee to differentiate between a temporary downturn or setback and a long term problem indicating a measurable decline in Asset Value.

When a decline in Asset Value appears permanent, a complete or partial write-off of the asset (i.e., recording a realized loss rather than unrealized depreciation) should occur. Some of the more obvious indications of permanent impairment of an investment include the termination of business operations, a petition for bankruptcy protection or liquidation, or the absence of a verifiable forwarding address of the business or its proprietor(s). Less obvious situations may include the loss of major revenue accounts, the shut down of a critical distribution channel, an adverse legal or regulatory ruling, or the expiration of a priority claim on collateral in a distressed Small Concern. These and other possible circumstances should be assessed on a case by-case basis, with supporting documentation on file.

### D. Valuation Responsibility

As specified in 13 CFR 107.101(g), the Licensee's Board of Directors or General Partners have the sole responsibility for determining Asset Value. In determining Asset Value, the Board of Directors or General Partners must satisfy themselves that all appropriate factors relevant to a good faith valuation have been considered and that the methods used are reasonable and prudent and are consistently applied. Although the Board of Directors or General Partners have the ultimate responsibility for determining Asset Value, they may appoint management or other persons to assist them in such determinations and to provide supporting data and make the necessary calculations pursuant to the Board's or General Partners' direction. It is essential that a careful, conservative, yet realistic approach be taken by Licensees in determining the Asset Value of each Loan and Investment.

As part of the annual audit of the Licensee's financial statements, the Licensee's independent public accountant has responsibility to review the Licensee's valuation procedures and implementation of such procedures including adequacy of documentation. The independent public accountant also has reporting responsibility regarding the results of this review. (See appendix I to this part, section III and section V, paragraphs I and J).

### E. Frequency of Valuation

Loans and Investments shall be valued individually and in the aggregate by the Board of Directors or General Partners at least semiannually--as of the end of the second quarter of Licensee's fiscal year and as of the end of Licensee's fiscal year, Provided however, That Licensees without Leverage need only perform valuations once a year. On a case-by-case basis, SBA may require valuations to be made more frequently. Only valuations performed as of the fiscal year-end are required to be reviewed by the Licensee's independent public accountant, as discussed in paragraph D of this section. Each Licensee shall forward a valuation report to SBA within 90 days of the end of its fiscal year in the case of annual valuations, and within thirty days following the close of other reporting periods. Material changes in valuations shall be reported not less often than quarterly within thirty days following the close of the quarter. Since the valuations will only be as sound as the timeliness of the financial information upon which they are based, Licensees shall require frequent financial statements from Small Concerns. Monthly financial statements are normally appropriate.

### F. Written Valuation Policy

Each Licensee shall establish a written Valuation Policy approved by its Board of Directors or General Partners that includes a statement of policies and procedures that are consistent with Section III of this appendix.

### G. Documentation

Each Licensee shall prepare and retain in its permanent files a valuation report as of each valuation date documenting, for each portfolio security, the cost, the current Fair Value and the previous Fair Value, plus the methodology and supporting data used to determine the value of each such portfolio security. The minutes of meetings of Boards of Directors or General Partners at which valuations are determined will contain a resolution confirming that the valuations of each portfolios security were determined in accordance with Licensee's duly adopted valuation procedures and will incorporate by reference the valuation report signed by each Director or General Partner along with any dissenting valuation opinions.

### H. Instructions

A model Valuation Policy is presented in Section III below. Licensees may adopt the model in its entirety or make appropriate modifications, additions or deletions. Any changes, however, must be generally consistent with the model.

A second version of the model Valuation Policy is presented in Section IV. This section repeats the language of Section III, but is expanded to include additional explanatory paragraphs. These paragraphs are commentary provided by SBA to assist Licensees in interpreting and applying some of the model valuation criteria. They may be adapted for inclusion in the Licensee's Valuation Policy, if desired.

### I. Approval

1. Any Licensee that utilizes the exact wording of Section III, without any additions, deletions, or changes will be presumed to have an acceptable Valuation Policy. It is acknowledged, however, that this wording may not be entirely applicable to all Licensees. If a Licensee wants to adopt a Valuation Policy that is different from Section III, the Licensee must obtain SBA's written approval of such Policy. If changes from the wording of Section III are minor, it is suggested that the Licensee indicate deletions with a caret (<caret>) and underline additions.

2. Applicants for either a Section 301(c) or 301(d) license must submit their Valuation Policies for approval as part of the licensing application process.

## II. Model Valuation Policy

### A. General

1. The General Partners have sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

2. Loans and Investments shall be valued individually and in the aggregate at least semi-annually--as of the end of the second quarter of the fiscal year and as of the end of

the fiscal year. Fiscal year-end valuations are audited as set forth in 13 CFR Part 107 Appendix III, Section II, paragraph D.

3.This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

B. Interest-Bearing Securities

1.Loans shall be valued in an amount not greater than cost, with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

2.When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

3.Appropriate unrealized depreciation on past due interest which is converted in a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) Interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

4.The carrying value of interest-bearing securities shall not be adjusted for changes in interest rates.

5.The valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

C. Equity Securities--Private Companies

1.Investment cost is presumed to represent value except as indicated elsewhere these guidelines.

2.Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

3.The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

4.Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of prior securities.

5.If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

6.Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or in the event of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

7.With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

8.Warrants should be valued at the excess of the value of the underlying security over the exercise price.

D. Equity Securities--Public Companies

1. Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

2. The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

3. When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

IV. Valuation Policy With Supplementary Information

A. General

1. The General Partners have sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

2. Loans and Investments shall be valued individually and in the aggregate at leas semi-annually--as of the end of the second quarter of the fiscal year and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in 13 CFR Part 107, Appendix III, Section II, paragraph D.

3. This Valuation Policy is intended to provide a consistent, conservative basis fo establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

B. Interest-Bearing Securities

1. Loans shall be valued in an amount not greater than cost, with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

2. When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of t

of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

   3. Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) Interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

      a.  Licensees may rebut this presumption by providing evidence of collectibility satisfactory to SBA. Such evidence may include the existence of collateral, the value of which has been verified through an appraisal by an independent professional appraiser acceptable to SBA. Such an appraisal shall be at liquidation value (net of liquidation costs) and shall have been performed within the 12 months immediately preceding the valuation date. In considering whether collateral provides an appropriate basis for valuations, SBA will review the Licensee's operating history for evidence concerning its willingness and ability to pursue available remedies (including foreclosure) in default situations.

      b.  For those Licensees primarily involved in making loans, the use of a loan classification system is strongly encouraged to help manage portfolios and determine Asset Values, with loans that warrant extra attention being flagged by the Licensee's management.  Such a "watch list" can also be used to report to the Board of Directors or General Partner(s). For each loan placed on the watch list, a reason or statement should describe the particular situation. Danger signals that should alert the Licensee to potential problems include delinquency, a lack of profitability, weak or decreasing equity, increasing debt load, a deteriorating cash position, an abnormal increase in accounts payable, inaccurate financial information, insurance cancellation, judgments and tax liens, family problems, loss of employees, collateral problems, slowdown in inventory turnover, poor maintenance of plant and equipment, and heavy reliance on short term debt.

      c.  Upon careful consideration of all the relevant factors, the Board of Directors or General Partners shall determine which loans require recognition of Unrealized Depreciation. It is a good rule of operation for a Licensee to perform downward valuations earlier rather than later. When the quality of a loan recovers, a higher Asset Value may subsequently be assigned.

   4. The carrying value of interest-bearing securities shall not be adjusted for changes in interest rates.

5.The valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

     a. Accepted methods for valuing convertible debentures generally involve one of two approaches. The first approach views the debenture as a debt obligation. Under this approach, the Licensee should utilize the loan valuation techniques described in this section above. The second approach considers the conversion of all convertible securities of the same class into their common stock equivalent, taking into account dilution, and a subsequent valuation of the Licensee's proportionate equity interest. Valuation of this equity interest should follow the equity valuation techniques described in Paragraph C. of this section.

     b. Normally, the reported value is the higher of these two alternatives. However, Licensees should disregard higher equity values and retain lower debt-based valuations if there are circumstances which make conversion undesirable. When equity considerations govern the Asset Value assigned, all underlying factors should be disclosed.

C. Equity Securities—Private Companies

    1.Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

    2.Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

    3.The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

    4.Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of prior securities.

    5.If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

6.Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or in the event of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

a. Under these conditions, valuation factors that may be considered include: (1) The utilization of a multiple of earnings, cash flow, or revenues, which are commensurate with the multiples which the market currently accords to comparable companies in similar businesses and industries, with an appropriate discount for conditions such as illiquidity or a minority position. Care should be taken to use only comparable companies, including not only business similarities but also similarities as to size, financial condition, and earnings outlook. However, in order for comparative market prices to be meaningful, data for a representative sample of similar companies must be available (2) Among the more important factors to be considered in a particular case are (i) the nature of the business, (ii) the risk involved, and (iii) the growth, stability or irregularity of earnings and cash flows. A company with a positive earnings trend and a favorable outlook may command a capitalization factor (multiplier) in the marketplace that will result in a stock valuation well above book value. When the gross value of a small concern is computed by applying a capitalization rate to pre-interest, pre-tax earnings, the value of equity securities is derived by subtracting the outstanding debt of the concern from the gross value. While capitalization rates do vary, an appropriate rate can be determined by analyzing rates for comparable companies in the same industry. Investigating similar companies in the same industry or geographic area can be done directly or through published material from sources such as the Value Line, Standard and Poor's, Robert Morris and Associates, or any other of the numerous sources available for comparative industry data (3) Another method discounts the present value of estimated future proceeds to a Licensee, including dividend income and sales of securities, using a discount rate that reflects the degree of risk of the equity interest. (4) One may also utilize the recent sale prices of comparable blocks of the issuer's securities in arm's length transactions.

b. Equity interests or limited partnership interests without the benefit of stock certificates and which generally define a certain percentage of the profits to be allocated to each of the investors based on its relative contributions should be valued in a manner similar to the valuation methods described in this section.

7.With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and

a. Liquidation value will depend on the decreasing value of wasting assets, the costs experienced by the business being liquidated, the expenses borne by the Licensee in order to be able to realize any liquidating value, the elapsed time until such net proceeds can be realized, the ranking of the Licensee's claims relative to other security interests and subordination agreements, and the probability of any ultimate realization of value.

b. Incorporating this approach as a normal step in valuation can provide improved understanding of the downside of an investment.

c. Licensees should recognize unrealized appreciation or depreciation, as appropriate, on Assets Acquired in Liquidation of Loans and Investments. In order to recognize Unrealized Appreciation, asset values must be verified by an appraisal which meets all the conditions specified in the preceding paragraph; provided, however, that if the assets acquired constitute a going concern, such assets may be appraised as a going concern rather than at liquidation value. Unrealized Appreciation may not be recognized if the Licensee does not benefit from such appreciation. For example, an asset acquired through foreclosure should not be carried at a value greater than the defaulted loan balance plus any expenses and penalties to which the Licensee is entitled.

8. Warrants should be valued at the excess of the value of the underlying security over the exercise price.

a. Valuation of debt with detachable warrants can be done similarly to convertible debt by treating the debt and warrants as a unit, or, alternatively, the debt can be valued on its own basis as a debt instrument, and the warrants separately. If the warrants are valued separately, the following factors must be taken into account: (1) Current value of issued shares (2) The differential between the exercise private and the underlying share values if the current share values are higher than the exercise price (3) Time until expiration dates are reached or dates of changes in terms of exercise prices (4) Number of shares into which the warrants are exercisable on various dates (5) Restrictions on sale of the underlying stock (6) Restrictions on the transferability of the warrants (7) Registration rights for the warrants or the underlying shares (8) Financial ability of the Licensee to perform the exercise of its rights or to sell its warrants (9) The ultimate desirability, if any, of exercising the rights given by the warrant

D. Equity Securities--Public Companies

1. Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

a. However, securities are not deemed to be freely marketable in those situations where such securities are very thinly or infrequently traded, or may be lacking in truly representative market quotations, or where the market for such securities cannot absorb the quantity of shares which the Licensee and similar investors may want to sell.

b. In such cases, Asset Value must be determined by the Board of Directors or General Partners.

2. The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

3. When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

Dated: May 19, 1994.


Erskine B. Bowles,
Administrator

**EXHIBIT C**

**ASPEN VENTURES III, L.P.**

**FIRST AMENDMENT TO**
**AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

This FIRST AMENDMENT TO THE AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "First Amendment") of Aspen Ventures III, L.P., a Delaware limited partnership (the "Partnership"), dated as of August 20, 1999 (the "Partnership Agreement"), is made and entered into as of April 1, 2002, by and among Aspen Venture Management III, L.L.C., a Delaware limited liability company, as general partner (the "General Partner") and the undersigned Limited Partners. Capitalized terms used herein and not otherwise defined in this First Amendment shall have the meanings set forth in the Partnership Agreement.

WHEREAS, the parties desire that the Partnership be permitted to admit additional persons to the Partnership as Limited Partners, which persons shall be set forth on a "Schedule of Series B Limited Partners" attached to the Partnership Agreement, and shall be admitted to the Partnership as Limited Partners in exchange for making capital contributions (any such contributions, the "Series B Contributions") to the Partnership at such times and in such amounts as provided below (such persons, and any other persons admitted to the Partnership as a Limited Partner after the date hereof (other than in connection with the transfer of an interest in the Partnership that is outstanding as of the date hereof), the "Series B Limited Partners");

WHEREAS, the parties desire that, in connection with the admission of the Series B Limited Partners and the contribution by them of the Series B Contributions to the Partnership, (a) the assets and liabilities of the Partnership shall be divided into two separate series for purposes of the Act: (i) "Series A" which shall consist of the assets and liabilities of the Partnership as they existed immediately prior to the execution of this First Amendment, the capital contributions received with respect to each "Series A Limited Partner" (as defined below) and any other assets acquired and liabilities incurred in connection with the holding, management and disposition of such assets, and (ii) "Series B" which shall consist of the Series B Contributions and any other assets acquired and liabilities incurred in connection with the holding, management and disposition of such contributed capital, as well as the Partnership Capital Accounts and Partnership Percentages of each Series B Limited Partner and (b) the Limited Partners of the Partnership shall be divided into two separate groups consisting of (i) Series A Limited Partners, which shall be defined as those Limited Partners who held their interests in the Partnership immediately prior to the date of this First Amendment or who subsequently acquire an interest in the Partnership that was outstanding immediately prior to the date of this First Amendment and (ii) Series B Limited Partners, as defined above; and

WHEREAS, the General Partner and the undersigned Limited Partners holding in the aggregate Partnership Percentages equal to at least Two-Thirds in Interest of Limited Partners desire to amend the Partnership Agreement as set forth below;

NOW, THEREFORE THE PARTIES HERETO AGREE AS FOLLOWS:

1.    Series A and Series B.

(a)    Except to the extent specifically provided in this First Amendment or required under the SBIC Act, to the maximum extent permitted under the Act, (a) the interests in the Partnership with respect to Series A on the one hand, and Series B on the other hand, shall constitute separate series of partnership interests within the meaning of Section 17-218 of the Act, (b) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular series will be enforceable against the assets of such series only, and not against the assets of the Partnership generally or any other series thereof, and none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to any series shall be enforceable against the assets of such other series, (c) separate and distinct records shall be maintained for Series A and Series B, and assets associated with any particular series shall be accounted for separately from the other assets of the Partnership or any other series of the Partnership, and (d) the assets of one series shall not be commingled with the assets of any other series. The General Partner is hereby authorized to effect any such amendments to the Partnership's Certificate of Limited Partnership as are necessary to cause Series A and Series B to be treated as separate series of partnership interests under the Act. Notwithstanding the foregoing, it is hereby acknowledged that for purposes of the SBIC Act, the Partnership, including Series A and Series B, shall be treated as one Licensee.

(b)    To the extent recommended by the Partnership's tax advisors, the General Partner shall be authorized to take actions to cause Series A and Series B to be treated as separate partnerships for federal income tax purposes.

(c)    The allocation of Leverage (as defined in the SBA annex) and opportunities between Series A and Series B shall be as follows:

(i)    Any Outstanding Leverage as of the time immediately prior to the execution of this First Amendment shall be Leverage associated with Series A. As of the time that any Leverage is provided by the SBA to the Partnership after the execution of this First Amendment, the General Partner shall make a good faith determination as to whether such Leverage is properly allocable to Series A or Series B based on how the proceeds of such Leverage is utilized (e.g., whether such Leverage is utilized to purchase Series A assets or Series B assets), and such determination shall be binding upon the Series A Limited Partners and the Series B Limited Partners.

(ii)    After the date of this First Amendment, any investments made by the Partnership in a portfolio company, to the extent the Partnership has not previously made an investment in such portfolio company, shall be deemed to be a Series B investment. With respect to any portfolio companies in which the Partnership has made a prior investment, any follow-on investments shall be made by Series A, except that the General Partner in its sole discretion may if it determines in its sole and absolute discretion that it would not be appropriate for Series A to acquire some or all of a follow-on investment, allocate all or any portion of such follow-on investment opportunity to Series B.

(iii)    Expenses that are attributable to the operation of a particular Series shall be allocated to such Series. Any General Partnership Expenses incurred after the date of this First Amendment shall be allocated among Series A and Series B on a pro rata basis in proportion to the respective Capital Commitments of the Limited Partners of each such series.

For purposes of the foregoing, "General Partnership Expenses" shall mean any expenses of the Partnership which, in the good faith determination of the General Partner, are not clearly allocable to Series A or Series B.

2.    Application of Partnership Agreement to Series A and Series B.

(a)    In General.  Except as provided otherwise in this First Amendment, the provisions of the Partnership Agreement (as amended by this First Amendment), shall to the extent practicable apply separately to the Series A Limited Partners with respect to their interests in Series A on the one hand, and the Series B Limited Partners with respect to their interests in Series B on the other hand.  For example, and without limiting the foregoing, (i) capital calls shall be made separately with respect to each series, (ii) the determination of Capital Transaction Gain or Loss and Net Income or Loss shall be made separately with respect to each series as though each such series were a separate partnership, (iii) Capital Transaction Gain or Loss (or items thereof) and Net Income or Loss (or items thereof) with respect to a series shall be allocated only to the General Partner and the Limited Partners of such series (except as specifically set forth to the contrary in this First Amendment), (iv) distributions (liquidating and non-liquidating) with respect to each series shall be made to the General Partner and the Limited Partners of such series solely from the assets of such series (except as specifically set forth to the contrary in this First Amendment), (v) the Optionees with respect to the interest of a Limited Partner in a series which has failed to make one of its contributions to such series under Paragraph 3.1 or 3.2 of the Partnership Agreement shall be comprised only of the other Limited Partners of such series, (vi) the determination of the management fee with respect to a series pursuant to Paragraph 5.1 of the Partnership Agreement shall be based solely on the Regulatory Capital with respect to such series, (vii) Paragraphs 4.7 and 4.8 of the Partnership Agreement shall be implemented separately with respect to Series B, (viii) the provisions of Paragraph 10.18 shall be implemented separately with respect to Series A and Series B, and (ix) any matters that affect only a particular series that requires the vote or consent of a specified percentage in interest of the Limited Partners shall require the vote or consent of only such percentage in interest of the Limited Partners of such series.

(b)    Schedule A and New Schedule B.  Schedule A of the Partnership Agreement sets forth the Series A Limited Partners and their Capital Commitments with respect to their interests in Series A.  A new Schedule B in the form attached to this First Amendment is hereby added to the Partnership Agreement, and such Schedule B, as amended form time to time, shall set forth the Series B Limited Partners and their Capital Commitments with respect to their interests in Series B.

(c)    Initial Capital Contribution of Series B Limited Partners.  The Initial Contribution of each Series B Limited Partner being admitted to the Partnership on the first closing of Series B Limited Partnership interests shall be equal to twenty percent (20%) (or such lesser percentage as shall be specified by the General Partner in writing in the initial Series B Drawdown Notice) of such Series B Limited Partner's Capital Commitment.

(d)    Subsequent Capital Contributions of Series B Limited Partners.  The last sentence of Paragraph 3.2 of the Partnership Agreement, as applied to Series B only, is hereby amended to read as follows:

Except with the written consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners shall not be required to contribute capital to the Partnership in an aggregate amount greater than fifty percent (50%) of the Limited Partners' aggregate Capital Commitments to the Partnership during the first 12 months after the establishment of Series B.

(e)    Carried Interest Percentage; GP Participation Percentage.  The amendments set forth in subparagraphs (i) through (vi) of this Paragraph 2(e) are hereby made to the Partnership Agreement as it applies to Series B only:

(i)    The portion of Paragraph 4.3(a)(i) immediately prior to the semi-colon is hereby amended to read as follows:

An amount of the Partnership's Capital Transaction Gain equal to the product of such Capital Transaction Gain and the Carried Interest Percentage shall be allocated to the Partnership Capital Account of the General Partner.

(ii)    Paragraph 4.3(a)(ii) is hereby amended to read as follows:

The remaining Capital Transaction Gain of the Partnership shall be allocated to the Partnership Capital Accounts of all Partners as a group.

(iii)    Paragraph 4.3(b)(i) is hereby amended to read as follows:

An amount of the Partnership's Capital Transaction Loss equal to the product of such Capital Transaction Loss and the Carried Interest Percentage shall be allocated to the Partnership Capital Account of the General Partner.

(iv)    Paragraph 4.3(b)(ii) is hereby amended to read as follows:

The remaining Capital Transaction Loss of the Partnership shall be allocated to the Partnership Capital Accounts of all Partners as a group.

(v)    The portion of Paragraph 6.4(j) immediately following the last parenthetical is hereby amended to read as follows:

will not be less than an amount equal to the product of (i) the aggregate Partnership Capital Account balances of all the Partners and (ii) the GP Participation Percentage.

(vi)    The first sentence of Paragraph 8.3(a)(1)(A) is hereby amended to read as follows:

"First, the Partnership's aggregate Capital Transaction Gain for all accounting periods shall be netted against the Partnership's aggregate

Capital Transaction Loss for all accounting periods and the result shall be multiplied by the GP Participation Percentage."

(vii)   For purposes of the foregoing amendments, the term "Carried Interest Percentage" shall mean twenty percent (20%).

(viii)   For purposes of the foregoing amendments, the term "GP Participation Percentage" shall be equal to the sum of (a) the Carried Interest Percentage and (b) the product of (A) the result obtained by subtracting the Carried Interest Percentage from one hundred percent (100%) and (B) one percent (1%).

(f)   Allocations of Capital Transaction Gain or Loss and Net Income or Loss. It is the intent of the parties that allocations of Capital Transaction Gain or Loss (or items thereof) and Net Income or Loss (or items thereof) with respect to a particular series shall be made only to the Limited Partners of such series, and that each Limited Partner of a series shall receive the same amount of allocations of such items as such Limited Partner would have received if the other series did not exist (the "Target Allocations"). Notwithstanding the foregoing, the parties acknowledge that items of Net Profit or Loss (as such terms are defined in the SBA Annex) may be allocated to the Preferred Limited Partners pursuant to Paragraph 4.3(c) and Article VI of the SBA Annex. To the extent that any items of Net Profit or Loss (as such terms are defined in the SBA Annex) which are allocated to the Preferred Limited Partners contain items of Capital Transaction Gain or Loss or Net Income or Loss, as applicable, of one series (the "Allocation Disadvantaged Series"), and such allocations are made to such Preferred Limited Partners pursuant to Paragraph 4.3(c) and Article VI of the SBA Annex with respect to Leverage (as such term is defined in the SBA Annex) attributable to the other series (the "Allocation Benefitted Series"), any subsequent items of Capital Transaction Gain or Loss or Net Income or Loss, as applicable, of the Allocation Benefitted Series shall be allocated to the Limited Partners of the Allocation Disadvantaged Series in such a manner so as to, as quickly as possible, cause the cumulative allocations received by each Limited Partner of each series from all sources to equal such Limited Partner's Target Allocations. To the extent that the General Partner determines that there are likely to be insufficient amounts of certain items of income, gain, loss and deduction so as to cause the cumulative allocations received by each Limited Partner of each series from all sources to equal such Limited Partner's Target Allocations, then the General Partner may vary the allocations from those described above so as to ensure, to the maximum extent possible, that the Capital Account balance of each Limited Partner of a Series is at the same level as it would have been had such Limited Partner would have received if the other series did not exist.

(g)   Series B Management Fee. Notwithstanding anything in Paragraph 5.1 of the Partnership Agreement to the contrary, (i) the management fee with respect to Series A shall be determined for each Fiscal Quarter in the manner set forth in Paragraph 5.1 taking into account the Series A Regulatory Capital only and (ii) the management fee with respect to Series B for each Fiscal Quarter shall be equal to the management fee determined for such Fiscal Quarter in the manner set forth in Paragraph 5.1 taking into account the Series B Regulatory Capital only and after giving effect to the following amendments to Paragraph 5.1(b) of the Partnership Agreement:

(i)     The portion of Paragraph 5.1(b) of the Partnership Agreement immediately preceding the semi-colon, as it relates to Series B only, is hereby amended to read as follows:

"The management fee for each of the Partnership's Fiscal Quarters shall be an amount equal to the product of (i) 0.625% and (ii) the Regulatory Capital (as defined in the SBA Annex) of the Partnership as of the first day of each such Fiscal Quarter plus, if as of the first day of such Fiscal Quarter the Partnership is a Licensee, two times the Regulatory Capital of the Partnership as of the first day of such Fiscal Quarter"

(ii)     Paragraph 5.1(c) of the Partnership Agreement, as it relates to Series B only, is hereby amended by replacing the date "January 1, 2005" each time it appears with the date "January 1, 2008."

(iii)     Paragraph 5.1(c)(ii) of the Partnership Agreement, as it relates to Series B only, is hereby amended by replacing the date "January 1, 2006" with the date "January 1, 2009."

(iv)     Paragraph 5.1(c)(iii) of the Partnership Agreement, as it relates to Series B only, is hereby amended by replacing the date "January 1, 2007" with the date "January 1, 2010."

(v)     Paragraph 5.1(c)(iv) of the Partnership Agreement, as it relates to Series B only, is hereby amended by replacing the date "January 1, 2008" with the date "January 1, 2011."

(vi)     The portion of Paragraph 5.1(c)(v) of the Partnership Agreement immediately preceding the comma, as it relates to Series B only, is hereby amended to read as follows:

"In the event that the Partnership Term is extended beyond December 31, 2011 pursuant to Paragraph 8.1(e)"

(vii)     Paragraph 5.1(d) of the Partnership Agreement, as it relates to Series B only, is hereby replaced with the following:

"Notwithstanding the foregoing provisions of this Paragraph 5.1, if the Partnership is a Licensee on March 1, 2007, then commencing on such date, the management fee for such Fiscal Quarter and all subsequent Fiscal Quarters that the Partnership is a Licensee shall not exceed 0.625% of the sum of (i) the Series B Regulatory Capital, plus (ii) the amount of outstanding Leverage which is allocable to Series B."

(h)     Inter-Series Loans. It is the intent of the parties that all distributions to the Limited Partners of one series shall be made solely from the assets of such series, and that each Limited Partner of a series shall receive the same amount of distributions as such Limited Partner would have received if the other series did not exist. Notwithstanding the foregoing, the parties

acknowledge that in the event the General Partner makes a distribution to the Limited Partners of one series, or in certain other circumstances, the General Partner may be required to make a distribution to the Preferred Limited Partners pursuant to Article VII of the SBA Annex. To the extent that any such distribution to the Preferred Limited Partners is made out of the assets of one series (the "Distribution Disadvantaged Series") with respect to Leverage attributable to another Series (the "Distribution Benefited Series), the amount of assets of the Distribution Disadvantaged Series that are so utilized shall be referred to herein as the "Distribution Advance Amount," which amount shall be deemed to be a non-recourse advance (payable only out of the assets of the Distribution Benefited Series, if any) from the Distribution Disadvantaged Series to the Distribution Benefited Series. In the event that a Distribution Advance Amount or Distribution Advance Interest Accrual Amount (as defined below) exists at any point in time, subsequent distributions to be made to the General Partner and Limited Partners from the assets of the Distribution Benefited Series shall be made first to Distribution Disadvantaged Series in amounts so as to, as quickly as possible, offset any outstanding Distribution Advance Amounts and Distribution Interest Accrual Amount. Distributions pursuant to the preceding sentence shall be deemed to reduce on a dollar-for-dollar basis first any outstanding Distribution Interest Accrual Amount and then any outstanding Distribution Advance Amount due to the Distribution Disadvantaged Series. In addition, if at any time there exists with respect to both Series A and Series B an outstanding Distribution Interest Accrual Amount and/or an outstanding Distribution Advance Amount, such amounts due to one series shall be immediately offset on a dollar-for-dollar basis against amounts due to the other series in the same manner of priority as set forth in the preceding sentence. As used herein, the "Distribution Interest Accrual Amount" shall be an amount of interest equal to seven percent per annum, compounded as of December 31st of each calendar year, on the daily outstanding Distribution Advance Amount balance. Notwithstanding Paragraph 4.2(b) of the Partnership Agreement, the accrual/payment or receipt of payment of Distribution Interest Accrual Amounts shall be deemed to be an item of interests expense or interest income, as the case may be, of each series that shall be taken into account in computing Net Income or Loss but shall not be taken into account in computing Capital Transaction Gain or Loss. The amount of Distribution Advance Amount and Distribution Interest Accrual Amount shall not be considered as indebtedness for purposes of the limitations contained in Paragraph 7.2(a). Each Limited Partner acknowledges that there may not be sufficient assets to satisfy any outstanding Distribution Interest Accrual Amounts and Distribution Advance Amounts. Any resulting loss from such failure to satisfy such amounts shall be taken into account in determining the Net Income or Net Loss of the Distribution Disadvantaged Series.

(i)     Repayment of Outstanding Leverage. The parties hereby agree that, notwithstanding anything in Article XI of the Partnership Agreement to the contrary, as such Article XI is applied to both Series A and Series B, the General Partner may in its discretion repay any Outstanding Leverage, whether such Outstanding Leverage is associated with Series A or Series B, prior to making any distributions to the Partners pursuant to Paragraph 6.4 of the Partnership Agreement.

(j)     New Paragraph 6.4(k). The following subparagraph (k) is hereby added to Paragraph 6.4 of the Partnership Agreement, as applied to both Series A and Series B:

"In the event that a certain class of Securities of a portfolio company are held by both Series A and Series B, and that the General Partner makes a

distribution of the Securities of such class held by one series to the Partners of such series, the General Partner shall also make a simultaneous distribution of the Securities of such class held by the other series to the Partners of such series."

(k)     Admission of Additional Series B Limited Partners. The first sentence of Paragraph 7.6(b) of the Partnership Agreement, as applied to Series B only, is hereby replaced with the following:

"On or before June 30, 2002, the General Partner may admit additional persons as additional Series B Limited Partners without the consent of any of the then Limited Partners. After June 30, 2002, but on or before December 31, 2002, the General Partner may admit additional persons as additional Series B Limited Partners upon the consent of a Majority in Interest of the Series B Limited Partners. An additional Series B Limited Partner shall only be admitted pursuant to the preceding two sentences of this Paragraph 7.6(b) to the extent that the effect of such admission does not cause the Series B Limited Partners' total Capital Commitments to exceed $40,000,000."

(l)     Combined LP Voting. Notwithstanding the general rule that any matters with respect to a particular series requiring the vote or consent of the Limited Partners shall require the vote or consent of only the Limited Partners of such series, the following items shall require the vote of Two-Thirds in Interest of the Limited Partners (for such purpose, the Limited Partners shall include all Series A Limited Partners and Series B Limited Partners):

(i)     the termination of the Partnership pursuant to Paragraph 2.2(a) of the Partnership Agreement;

(ii)     the admission of an additional general partner pursuant to Paragraph 7.6(a) of the Partnership Agreement;

(iii)     the sale, assignment, pledge, mortgage or other disposition or transfer by the General Partner of its interest in the Partnership or in its capital assets or property (whether such interest relates to Series A or Series B), or the withdrawal by the General Partner from the Partnership, pursuant to Paragraph 7.7(a) of the Partnership Agreement;

(iv)     the extension of the Partnership Term; and

(v)     the election of a successor TMP pursuant to Paragraph 10.17 of the Partnership Agreement.

(m)     Paragraph 7.8(b). The provisions of Paragraph 7.8(b) shall apply separately with respect to Series A on the one hand and Series B on the other hand. Paragraph 7.8(b), as applied to Series A, is hereby amended to clarify that, notwithstanding anything to the contrary in such Paragraph, the members of the General Partner shall not be in violation of the terms of such Paragraph in connection with carrying out the duties and obligations of the General Partner in its capacity as General Partner of Series B.

Paragraph 7.8(b), as applied to Series B, is hereby amended to clarify that, notwithstanding anything to the contrary in such Paragraph, the members of the General Partner shall not be in violation of the terms of such Paragraph in connection with carrying out the duties and obligations of the General Partner in its capacity as General Partner of Series A.

(n)    Advisory Committee.  Series B shall have an Advisory Committee which is separate and distinct from the Series A Advisory Committee.  Accordingly, the provisions of Paragraph 9.8 shall apply separately with respect to Series A on the one hand and Series B on the other hand.

(o)    Indemnification.  It is the intent of the parties to provide, to the maximum extent permitted under the Act and the SBIC Act, that the assets of one series shall not be available to indemnify any party pursuant to Paragraph 10.13 of the Partnership Agreement for any liability associated with the actions of such party on behalf of the other series.  Accordingly, to the maximum extent permitted under the Act and the SBIC Act, the provisions of Paragraph 10.13 shall be applied separately with respect to Series A on the one hand and Series B on the other hand as though each series were a separate partnership.

(p)    Amendments.  With respect to any amendments to the Partnership Agreement (or any waivers of noncompliance with any provision of the Partnership Agreement) which affect only the Series A Limited Partners or only the Series B Limited Partners, Paragraph 10.7 shall be applied so as to require the approval of only Two-Thirds in Interest of the Series A Limited Partners or Two-Thirds in Interest of the Series B Limited Partners, as applicable.  Any amendments to the Partnership Agreement (or any waivers of noncompliance with any provision of the Partnership Agreement) which would affect the Series A Limited Partners and the Series B Limited Partners shall require the approval of Two-Thirds in Interest of the Limited Partners (for such purpose, the Limited Partners shall include all Series A Limited Partners and Series B Limited Partners, voting as a single class).  Notwithstanding anything to the contrary in the Partnership Agreement or in this First Amendment, the Partnership Agreement, the SBA Annex and/or this First Amendment may be amended in the sole discretion of the General Partner to the extent required (i) by the SBA in order for the SBA to approve this First Amendment, (ii) by the SBA in order for the Partnership to continue to be a Licensee or (iii) to comply with the SBIC Act or the SBIC Regulations; provided, however, that no such amendment shall affect the economic rights (including, without limitation, the amount or timing of distributions or allocations) of the General Partner relative to the those of the Limited Partners or the economic rights of any Limited Partner relative to those of any other Limited Partner.

(q)    Original Managing Members of the General Partner.  The definition set forth in Paragraph 11.15, as applied to Series B, is hereby amended to include only Alexander P. Cilento, David Crockett, John Kohler, Lloyd C. Mahaffey and Thaddeus Whalen.

(r)    Exhibit B of Partnership Agreement.  Exhibit B of the Partnership Agreement, as applied to Series A and Series B, is hereby replaced in its entirety by Exhibit B to this First Amendment.

3.    Term of Partnership.

(a)    Paragraph 2.1. The portion of the first sentence of Paragraph 2.1 immediately prior to the semicolon is hereby amended to read as follows:

"The term of the Partnership shall commence upon the filing with the office of Secretary of State of the State of Delaware of the Certificate of Limited Partnership of the Partnership (the "Commencement Date") and shall continue until December 31, 2011, unless sooner terminated as provided in Paragraph 22 or extended as provided in Paragraph 8.1(e) (the "Partnership Term")"

(b)    Paragraph 2.2. Paragraph 2.2 is hereby amended to replace the date "December 31, 2008" with the date "December 31, 2011."

(c)    Paragraph 8.1(e). The first sentence of Paragraph 8.1(e) is hereby amended to read as follows:

"With the written consent of Two-Thirds in Interest of the Limited Partners, the General Partner may extend the Partnership term beyond December 31, 2011 by up to two (2) successive one (1) year periods if, at the end of the year immediately preceding each such one (1) year period, more than ten percent (10%) of the value of the assets of the Partnership (valued pursuant to Paragraph 9.2 hereof) consists of Nonmarketable Securities."

4.    Continued Validity of Partnership Agreement. Except for the amendments set forth in this First Amendment, the Partnership Agreement shall continue in full force and effect as originally constituted.

5.    Restatement of Partnership Agreement. The General Partner and each Limited Partner hereby consent to the restatement of the Partnership Agreement to incorporate the amendments made hereby.

6.    Governing Law. Delaware law shall govern the validity of this First Amendment, the construction of its terms and the interpretation of the rights and duties of the parties.

7.    Counterparts. This First Amendment may be executed in two or more counterparts, each which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C:

By: _____
    Managing Member

SERIES A LIMITED PARTNERS:

_____

Name: _____

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                          SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

Name: Thau Family Trust dated 4/13/88

By: _____

                                          By: _____

    _____            Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Harry R. Wilker Revocable Trust

By: _HARRY WILKER_

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Frankenberg Family Trust

By: _____  Robert J. Frankenberg

Its: _TRUSTEE_____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

Name: Dale G. Seymour & Margo D. Seymour

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  First Trust Corporation FBO
Jerome W. Carlson IRA

By: *Jerome W. Carlson*

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_~Debra L. Schilling~_ (signature)

Name: Schilling Family Trust dated 8-5-99

By: _Debra L. Schilling_

Its: _trustee_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Kevin J. Sullivan

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES-A LIMITED PARTNERS:

_~Bill C. Burger Trustee_

Name:  Burger Family Trust Dated 3/25/98

By: _Bill C. Burger_

Its: _TRUSTEE_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Maurice Werdegar

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____
Name: Thaddeus J. Whalen, Jr.

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Thaddeus J. Whalen III

By: _____

Its: _____

16/2002  21:26    4088720244

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

SERIES A LIMITED PARTNERS:

_____

Name: Ricardo & Ellen Urrutia

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

_____

Name: Crockett Family Living Trust, utd 5-24-91

By: _____

Its: _____TRUSTEE_____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Compudata, Inc.

By: _ROGER KOO_

Its: _PRESIDENT_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Roger S. Koo

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                         SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

By: _____              Name: Santa Clara University

    _____              By: ROBERT D. WARREN

                                         Its: VICE PRESIDENT FOR
                                              ADMINISTRATION AND FINANCE

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_Jeffery M. Nash, TEE_

_Kathleen L. Nash, TEE_

Name:  Jeffery M. Nash & Kathleen L. Nash Trustees of the Jeffery M. Nash and Laura L. Nash Declaration of Trust Dated 3/18/80 As Ammended

By:  _J. M. Nash & K. L. Nash_

Its:  _Trustees_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.


By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  The Love Living Trust Agreement
Dated March 9, 1983

By: _Richard S. Love_____

Its: _Trustee_____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Dean Witter, custodian for Joel Becker.

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_James G Bass_ (signature)

Name:  James G. Bass

By: _James G. Bass_ (signature)

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Alexander P. Cijento

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.


By: _____

_____


SERIES A LIMITED PARTNERS:

_____

Name: Venkatesh Family Living Trust

By: G. VENKATESH

Its: TRUSTEE

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                              SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

*John D. Dunning*

                                              Name: CrossFire Ventures, LLC

By: _____

    _____              By: *John D. Dunning*

                                              Its: *General Manager*

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Small 1988 Living Trust

By: _____

Its:  _Trustee_ _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_Pauline Lo Alker_

Name: Pauline Lo Alker

By: PAULINE LO ALKER

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

Name: SandHill Capital Partners IV, LLC

By: _Tim Johnson_

Its: _General Partner_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Robert L. Corey

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  The Valorie Cook Carpenter Trust
Dated 7/29/97

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Henry I. Feir Living Trust

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

Name: John M. and Linda C. Stedman

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                    SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

                                    Name: Harold V. Feeney

By: _____                 By: _____

    _____                 Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

Name:  Jean A. Kovacs & Brooks Stough,
as Community Property

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Salvador A. Liccardo & Laura S. Liccardo FBO The Liccardo 1983 Trust

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Donald A. Lee & Amanada J. Lee,
Trustees of the *Lee Family Trust* UDT
dated March 16, 2001

By: _Trustees_ _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Allan R. Ferguson

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

*Eugene C. Y. Duh*

Name: Eugene C.Y. Duh

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                    SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

By: _____         Name: John R. Simoneaux
                                    By: _____
    _____         Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: John W. Ward

By: _John W. Ward_

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_Donna L Whitney_

Name: Donna L. Whitney Trust U/A DTD 05/22/96

By _Donna L Whitney_

Its: _Trustee_

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:                          SERIES A LIMITED PARTNERS:

Aspen Venture Management III, L.L.C.

                                          Name: The Fuller Foundation

By: _____             By: SAMUEL L DELCAMP

    _____             Its: EXECUTIVE DIRECTOR

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name:  Peter V. Kuhn

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: The Louis & Jolene Cole 1988
Revocable Trust, Dated 11/7/88

By: _____ Louis C. Cole _____

Its: _____ TRUSTEE _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

_____

Name: Michael A. Volkema

By: _____

Its: _____

IN WITNESS WHEREOF, the undersigned have executed this First Amendment as of the date first set forth above.

GENERAL PARTNER:

Aspen Venture Management III, L.L.C.

By: _____

_____

SERIES A LIMITED PARTNERS:

Name: Fairway Ventures

By: _____

Its: _____

**EXHIBIT B**

**SECURITY AGREEMENT**

In order to secure payment of all obligations of [_____] (the "Borrower") to [_____] (the "Pledgee"), under the promissory note dated [_____], 200\_, in the original principal amount of [$_____.\_\_] (the "Note"), Borrower hereby grants to Pledgee a security interest in that portion of Borrower's limited partnership interest in Aspen Ventures III, L.P., a Delaware limited partnership (the "Partnership"), purchased by Borrower from Pledgee, not including that portion of such purchased interest for which Borrower has made, or has assumed the obligation to make, capital contributions (such security interest, along with the assets described in Section 2 below shall collectively be referred to as the "Collateral").

Borrower shall hold the Collateral in accordance with the following terms and provisions:

1.    Rights and Powers.

    (a)    As long as there exists no event of default under Section 5 of this Agreement, Borrower shall have the following rights:

        (i)    The right to vote with respect to the Collateral;

        (ii)    The right to sell the securities or other assets included in the Collateral, provided the proceeds of such sale shall become part of the Collateral;

        (iii)    The right to direct investment of the proceeds of a sale of the securities or other assets included in the Collateral;

        (iv)    The right at any time to pay in cash to Pledgee all or any portion of indebtedness evidenced by the Note, which payment shall be applied to the payment of the principal of the Note;

        (v)    The right to withdraw any portion of the Collateral and thereby release it from the security interest hereunder, provided, however that no such partial withdrawal may be made if it would reduce the value of the remaining Collateral below one hundred thirty-five percent (135%) of the balance of the Note remaining unpaid after any payment made by Borrower. The value of the Collateral shall be calculated pursuant to the valuation provisions of the Partnership Agreement; and

        (vi)    Notwithstanding Section 1(a)(v) above, the right to withdraw an amount of cash from the Collateral which may be necessary to satisfy any income tax liabilities arising out of ownership of the Collateral and/or the transaction generating the cash.

    (b)    All proxy statements and other stockholder materials pertaining to the Collateral shall be delivered to Borrower at the address indicated below.

2.    Duty to Deliver.  Any new, additional or different securities or cash that are distributed to Borrower with respect to the Collateral including (i) any distribution by the Partnership, (ii) any stock dividend, stock split or reclassification of the capital stock of any corporation whose shares are secured hereunder or (iii) any merger, consolidation or other reorganization affecting the capital structure of any corporation whose shares are secured hereunder shall, upon receipt by Borrower, become part of the Collateral hereunder.

3.    Payment of Taxes and Other Charges.  Borrower shall pay out of the Collateral, prior to the delinquency date, all taxes, liens, assessments and other charges against the Collateral.

4.    Release of Collateral.  Provided that all indebtedness secured hereunder has at the time been paid in full or cancelled, the Collateral shall be immediately released from the security interest hereunder.

5.    Event of Default.

(a)    If the Note is not paid or satisfied on the date for payment set forth in the Note, such event shall constitute an event of default under this Agreement.  Upon the occurrence of such event of default, Borrower shall give the Collateral to Pledgee and Pledgee may, at its election, declare the Note to be immediately due and payable and may exercise any or all of the rights and remedies granted to a secured party under the provisions of the Uniform Commercial Code (as now or hereafter in effect), including (without limitation) the power to dispose of the Collateral by public or private sale or to accept the Collateral in full payment of the Note.

(b)    Any proceeds realized from the disposition of the Collateral pursuant to the foregoing power of sale shall be applied first to the payment of any income tax liabilities generated by such disposition, then applied to any reasonable expenses incurred by Pledgee in connection with the disposition, and finally to the payment of the Note.  Any surplus proceeds shall be paid over to Borrower.  In the event such proceeds prove insufficient to satisfy all obligations of Borrower under the Note, Borrower shall nevertheless have no further obligations under the Note.

6.    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (except their choice-of-law provisions) and shall be binding upon the executors, administrators, heirs and assigns of the parties hereto.

7.    Arbitration.  Any controversy between the parties hereto involving the construction or application of any terms, covenants or conditions of this Agreement or the Note, or any claims arising out of or relating to this Agreement or the Note, or the breach hereof or thereof, will be submitted to and settled by final and binding arbitration in Palo Alto, California, in accordance with the rules of the American Arbitration Association then in effect, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  In the event of any arbitration under this Agreement or the Note, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs incurred therein or in the enforcement or collection of any judgment or award rendered therein.  The "prevailing party" means the party determined by the arbitrator to have most nearly prevailed, even if such

party did not prevail in all matters, not necessarily the one in whose favor a judgment is rendered.

8.    <u>Severability</u>.  If any provision of this Agreement is held to be invalid under applicable law, then such provision shall be ineffective only to the extent of such invalidity, and neither the remainder of such provision nor any other provisions of this Agreement shall be affected hereby.

9.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized representatives of the parties effective as of the date first written above.

[BORROWER]

By:_____
Name:_____
Title:_____

Address:

Agreed to and Accepted by:

[PLEDGEE]

By:_____
Name:_____
Title:_____

Address:

### SCHEDULE OF SERIES B LIMITED PARTNERS

**General Partner**                                    Capital Commitment

Aspen Ventures Management III, L.L.C.          $ _____
1000 Fremont Avenue, Suite 200
Los Altos, CA 94024


**Limited Partners**

                                                      $ _____


**Total Limited Partners**                     $ _____

**Total All Partners**