1  MATTHEW G. BALL (CA BAR 208881)
   DEIRDRE M. DIGRANDE (CA BAR 199766)
2  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   55 Second Street, Suite 1700
3  San Francisco, CA  94105-3493
   Tel:  (415) 882-8200
4  Fax:  (415) 882-8220
   matthew.ball@klgates.com
5  deirdre.digrande@klgates.com

6
   MARTIN D. TECKLER (*pro hac vice*)
7  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   1601 K Street, NW
8  Washington, DC  20006-1600
   Tel:  (202) 778-9000
9  Fax:  (202) 778-9100
   martin.teckler@klgates.com
10
   Attorneys for Defendant and Third Party Plaintiff
11 REDLEAF GROUP, INC.

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN JOSE DIVISION**

15 UNITED STATES SMALL BUSINESS          Case No. C-07-05350 JW (PVT)
   ADMINISTRATION in its capacity as
16 Receiver for Aspen Ventures III,      **DEFENDANT REDLEAF GROUP, INC.'S**
                                         **OPPOSITION TO MOTION OF SBA TO**
17              Plaintiff,               **STRIKE AFFIRMATIVE DEFENSES**

18       v.

19 REDLEAF GROUP, INC.,

20              Defendant and Third-Party
                Plaintiff,               Date:   April 14, 2008
21                                       Time:   9:00 a.m.
         v.                              Ctrm:   8
22                                       Judge:  The Hon. James Ware
   ASPEN VENTURES MANAGEMENT III,
23 LLC, a Delaware Limited Liability Company,
   ALEXANDER P. CILENTO, a California
24 resident, and DAVID CROCKETT, a
   California resident, and DOES 1-10,   Complaint Filed:   October 19, 2007
25                                       Trial Date:        Not Set
                Third-Party Defendants.
26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................................1

II.   ISSUES TO BE DECIDED ...................................................................................................1

III.  FACTS AND REGULATORY BACKGROUND ................................................................2

   A.   Redleaf And The SBA Have Engaged In Detailed Discussions Of Their Respective Positions For Years In Ongoing Settlement Talks. ...............................................................2

   B.   Prior To Redleaf's Investment, The SBA Approved Portfolio Valuation Procedures That Violated SBA Regulations At A Time When Aspen III Was In Serious Financial Trouble. ...3

   C.   Desperate For Additional Capital, And With The SBA's Collusion, Aspen III Persuaded Redleaf To Invest By Agreeing To A Structure Seemingly Designed To Insulate Redleaf From Risk, But That Actually Allowed Aspen III To Further Defraud Redleaf ......................5

   D.   The SBA's Approval Of The Series A/Series B Structure Prevents The SBA From Now Relying On Paragraph 7.1 Of The SBA Annex ...................................................................7

   E.   After Discovering Problems With Aspen III's Management After Investing, Redleaf Eventually Began To Withhold Its Capital Commitment – An Action Which Benefited The SBA Because It Prevented Aspen III From Drawing Further SBA Leverage. .......................8

   F.   The SBA's Description Of The SBIA Regulations Is Inaccurate And Self-Serving; If Anything, The SBIA Regulations Favor Redleaf's Position. ..................................................9

IV.   ARGUMENT .......................................................................................................................10

   A.   The SBA's Motion To Strike Is Untimely And Should Otherwise Be Denied. ..................10

   B.   The SBA Annex Does Not Limit Redleaf's Defenses. .......................................................11

   C.   Redleaf's Defenses Are Not Otherwise Barred. ................................................................13

      1.   The SBA Admits That A Receiver Generally Is Subject To Any Defense Against The Original Party. ..............................................................................................................13

      2.   The SBA Has Failed To Demonstrate Why Redleaf's Legal Affirmative Defenses Should Be Stricken. ......................................................................................................13

         a.   Redleaf's Fraud Defense Is Not Barred. ...............................................................13

         b.   Redleaf's Breach of Contract Defense Is Not Barred. ...........................................16

         c.   Redleaf's Failure Of Conditions Precedent Defense Is Not Barred. ......................17

      3.   Under The Circumstances, This Court Should Allow Redleaf To Assert Equitable Defenses Such As Unclean Hands, Rescission, And Estoppel Against The SBA. ............17

a.    This Court Should Exercise Its Broad Discretion And Allow Redleaf To Assert Its Unclean Hands And Rescission Defenses Against The SBA ........................................ 17

b.    Redleaf May Assert Estoppel Against The SBA ............................................................ 18

V.   CONCLUSION ......................................................................................................................... 19

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>Page</u>

3

**CASES**

4

**Federal**

5

Cox v. Kurt's Marine Diesel of Tampa, Inc.,
785 F.2d 935 (11th Cir. 1986).................................................................................13

6

FDIC v. Niblo,
821 F. Supp. 441 (N.D. Tex. 1993).........................................................................11

7

8

Federal Deposit Ins. Corporation v. O'Melveny & Meyers,
61 F.3d 17 (9th Cir. 1995)...............................................................................passim

9

Resolution Trust Corp. v. Greenwood,
798 F. Supp 1391 (D. Minn. 1992).........................................................................19

10

Pauly v. U.S. Department of Agriculture,
348 F.3d 1143 (9th Cir. 2003)................................................................................19

11

12

Rosales v. Citibank,
133 F. Supp. 2d 1177 (N.D. Cal. 2001)..................................................................10

13

Smith v. Wal-Mart Stores, Inc.,
2006 WL 2711468 (N.D. Cal. 2006).......................................................................10

14

15

U.S. Small Business Administration v. Chimicles,
447 F.3d 202 (3rd Cir. 2006)....................................................................11, 12, 17

16

United States v. Acorn Technology Fund,
429 F.3d 438 (3rd Cir. 2005)...............................................................................3, 14

17

18

United States v. Gamboa-Cardenas,
508 F.3d 491 (9th Cir. 2007)..................................................................................19

19

United States v. Hemmen,
51 F.3d 883 (9th Cir. 1995)....................................................................................19

20

21

Willson v. Cagle,
711 F. Supp. 1521 (N.D. Cal. 1988).......................................................................10

22

**State**

23

Active Crane Rentals v. Envir. Health Research & Testing, Inc.,
992 WL 91143 (Del. Super. 1992)..........................................................................16

24

25

American Nat. Bank v. Stanfill,
205 Cal. App. 3d 1089 (5th Dist. 1988)..................................................................16

26

Erler v. Five Points Motors,
249 Cal. App. 2d 560 (4th Dist. 1967) ...................................................................16

27

28

Lovett v. Carrasco,
   63 Cal. App. 4th 48 (4th Dist. 1998) .................................................................... 12, 17

**STATUTES & RULES**

**Federal**

15 U.S.C. § 687b ..................................................................................................................... 3

Federal Rule of Civil Procedure 12(f) .................................................................................. 10

**Code of Federal Regulations**

13 C.F.R. § 107 ........................................................................................................................ 3

13 C.F.R. § 107.503 ............................................................................................................. 4, 7

13 C.F.R. § 107.1150 ............................................................................................................... 8

13 C.F.R. § 107.1820 ...................................................................................................... 9, 10, 14

**State**

10 Del. Code Ann. § 9536 (West 2007) ............................................................................... 12

**TREATISES**

2 California Affirmative Defenses
   § 44:2 (West 2007) ............................................................................................................ 12

Construction and Effect of Statutory Provisions as to Small Business Investment Companies,
   7 A.L.R. Fed. 224 § 2[a] (West 2007) ................................................................................ 4

## I.    INTRODUCTION

This is a case in which Redleaf Group, Inc. was fraudulently induced to make a multi-million dollar investment – and a promise to invest millions more – in Aspen Ventures III, L.P. ("Aspen III"), what turned out to be a failing Small Business Investment Company ("SBIC").[1] Three managing members of the General Partner of Aspen III, Thaddeus Whalen and Third-Party Defendants Alexander P. Cilento and E. David Crockett, were primarily responsible for the fraud. However, the fraud could not have occurred successfully without the misfeasance of the United States Small Business Administration ("SBA"), which willingly colluded with the managing members of Aspen III's General Partner to persuade Redleaf to invest millions of dollars to prop up the failing SBIC, and commit the millions more that SBA now seeks in order to repay the leverage it advanced which allowed Aspen III to remain in existence, make its terrible investments, and pay management fees to the managing members.

In its untimely Motion to Strike, the SBA seeks to cloak itself in its role as Receiver, and thereby conveniently disassociate itself from the unsavory history of its own role in creating Redleaf's current situation.  In doing so, the SBA oversimplifies and misstates the regulatory scheme under which it operates and ignores a detailed factual history between Redleaf, the SBA, and Aspen III that eviscerates the SBA's ability to successfully advance the positions in its Motion.

Because this case is far more complex and unique than the typical case involving receivers, Redleaf respectfully requests that this Court deny the SBA's Motion to Strike to allow the parties to fully develop the factual record on which Redleaf bases its affirmative defenses.  The SBA's challenges to Redleaf's affirmative defenses – if at all – should be heard only after the development of that factual record.[2]

## II.    ISSUES TO BE DECIDED

(1)    Whether the SBA has failed to meet its burden under Rule 12(f) to demonstrate that Redleaf's legal affirmative defenses of fraudulent inducement, breach of contract, and failure to

---

[1]  Generally, an SBIC is a private venture capital or private equity fund that is licensed by the United States Small Business Administration ("SBA") and "leveraged" with funds provided by the SBA.

[2]   Redleaf hereby withdraws its Fourth Affirmative Defense for lack of standing.

1   perform conditions precedent "cannot succeed under any circumstances" because the SBA has

2   utterly failed to advance any persuasive rationale why this Court should bar these defenses as a

3   matter of law; and

4        (2)      Whether this Court should exercise its discretion to permit Redleaf to assert its

5   equitable defenses of unclean hands, rescission, and estoppel against the SBA, given the fact that the

6   SBA is not merely an innocent receiver, but a willing participant in the unconscionable conduct that

7   led to Redleaf's current situation.

8              **III.    FACTS AND REGULATORY BACKGROUND**

9   **A.    Redleaf And The SBA Have Engaged In Detailed Discussions Of Their Respective
        Positions For Years In Ongoing Settlement Talks.**

10

11       Contrary to the SBA's statement that it is "left to guess what facts and circumstances give

12  rise to its claimed defense" (M'tn at 13:9-10), Redleaf and the SBA have engaged in detailed

13  negotiations regarding the issues underlying the complaint and Redleaf's affirmative defenses since

14  early 2005. SBA and Redleaf have informed these discussions through the exchange of thousands of

15  pages of documents, and Redleaf has presented its official position to the SBA in detail in an

16  unsuccessful effort to spare the parties and this Court the burden of this unnecessary litigation.

17  Redleaf's assertion of unclean hands, fraudulent inducement, estoppel, rescission, material breach of

18  contract, and failure to perform conditions precedent as affirmative defenses is nothing more than

19  the latest expression of Redleaf's position – which SBA well knows and has decided to reject.

20       Accordingly, although Redleaf is more than willing to plead its affirmative defenses in more

21  detail if the Court feels that its Answer does not give the SBA sufficient notice of the basis of its

22  defenses, Redleaf maintains that the SBA understands those bases well enough to rely on the extant

23  pleading. In any event, Redleaf intends the following detailed statement to be a proffer of the facts

24  that Redleaf believes it will be able to prove to support its affirmative defenses.

25  ////

26  ////

27  ////

28

**B.** **Prior To Redleaf's Investment, The SBA Approved Portfolio Valuation Procedures That Violated SBA Regulations At A Time When Aspen III Was In Serious Financial Trouble.**

The SBA's problematic conduct began before Redleaf even decided to make an investment in Aspen III.

As background, the SBA is responsible for licensing and overseeing SBICs once they are licensed to ensure that the SBICs are operating within SBA regulations. 15 U.S.C. § 687b(b)-(c) and 13 C.F.R. § 107 et seq. Once licensed, the SBA's Office of SBIC Operations is given responsibility for conducting the oversight. Each SBIC is assigned an analyst, who is an employee of that Office, as its overseer and point of contact. The analysts are supervised by Area Chiefs. The analyst that the SBA assigned to oversee Aspen III was David Gerogosian, who also oversaw a related SBIC managed by Whalen, Cilento, and Crockett, known as Aspen Ventures West II, L.P. ("Aspen II").[3]

Because of their role as enforcers of SBA regulations, SBA analysts are provided access to much more information about an SBIC than a private investor like Redleaf ever would have. SBA is empowered to conduct detailed on-site inspections of SBICs to ensure that SBICs are financially sound and operating within the SBIC regulations. The results of these inspections are provided to the analyst responsible for the SBIC. Id.; see also United States v. Acorn Technology Fund, 429 F.3d 438, 446 (3rd Cir. 2005) (recognizing the SBA's information advantage over other SBIC investors). Thus, as the SBA points out in its Motion (M'tn at 2:11-13), although SBA earns less on its leverage capital than does a private investor such as Redleaf, SBA's regulatory authority and greater access to information also means it has much more information on which to base its decision to provide leverage to an SBIC than a private investor such as Redleaf has on which to base its investment decisions. Private investors such as Redleaf must make do with representations from the SBIC's management, or whatever it can glean in due diligence.[4] Here, SBA used its greater access to information to benefit itself, to the ultimate detriment of Redleaf.

---

[3] Aspen II is also in receivership; this Court has jurisdiction over that action as well. RJN ¶ 4 & Exh. 4 (Aspen II Receivership Complaint).

[4] The SBA even suggests that its lower returns are the reason why it is able to now strike Redleaf's defenses. M'tn at 2:11-17. The SBA is wrong. As discussed above, the SBA's limited risk is more than ample justification for why it should obtain less return on its capital. Additionally, the SBA's

1    The story began in mid-2001, when the SBA discovered potentially serious violations of the

2    regulations designed to ensure the financial soundness of Aspen III, but chose simply to ignore those

3    violations.[5]  Specifically, in early 2001, SBA examiners conducted an on-site examination of

4    Aspen III for the twelve-month period ending December 31, 2000.  The Examination Report, issued

5    on May 4, 2001, indicated that Aspen had not adequately substantiated or confirmed Aspen III's

6    portfolio valuations – a violation of SBA regulations 13 C.F.R. § 107.503(a), (b), as well as the

7    SBA's valuation Guidelines for SBICs which were incorporated in the Aspen III Limited Partnership

8    Agreement.  These violations were serious.  Proper portfolio valuation procedures are essential for

9    understanding the financial health and stability of any SBIC.  However, after reviewing the

10   Examination Report analysis, Gerogosian excused the violation of SBA regulations, and apparently

11   did so without the review of his Area Chief – an act that itself was a violation of SBA standard

12   operating procedures preventing an analyst from unilaterally resolving an issue raised in an

13   Examination Report.  It further appears that the justification that Gerogosian accepted to excuse the

14   regulatory violations was exceedingly thin.

15   In late 2001, and after the SBA's casual excuse of the Aspen III regulatory violations,

16   Thaddeus Whalen, one of the managing members of Aspen III's general partner, disclosed to analyst

17   Gerogosian that Aspen III was in serious financial trouble, and could not survive without new

18   private capital that could be further leveraged with funds from the SBA.  At the same time, Whalen

19   disclosed to Gerogosian that Aspen II was also in serious financial trouble, and that three of

20   Aspen II's portfolio concerns had been written down by $27 million.[6]  Thus, in late 2001,

21

22   self-serving regulatory analysis ignores the purpose of the Small Business Investment Act in the first
     place:  to provide incentives to ensure an adequate flow of capital to small businesses that were
23   being inadequately served by existing financial institutions.  Construction and Effect of Statutory
     Provisions as to Small Business Investment Companies, 7 A.L.R. Fed. 224 § 2[a] (West 2007).  See
24   also Request for Judicial Notice ¶ 5 & Exh. 5 (SBA Complaint), ¶ 7.  Therefore, the reduced upside
     on leverage funds is more properly considered an a feature designed to further the core purpose of
25   the SBIA – providing additional capital to small businesses – rather than as a justification to prevent
     Redleaf from defending itself.

26   [5] Aspen III was licensed on September 16, 1999, and had been operating since that time.  It had
     drawn down $16,500,000 from its private limited partners and $23,100,000 in leverage from SBA,
27   and had made 12 investments with a reported value of $28,000,000.

28   [6]  In fact, it turns out that the financial condition of Aspen II and Aspen III was even worse than
     Whalen reported.  Based on Redleaf's review of documents provided by the SBA, it appears that

Gerogosian was in the position of having overseen two SBICs managed by Whalen, Cilento and Crockett which had drawn millions and millions of dollars of private capital and SBA leverage – that now appeared to be at significant risk – and had also unilaterally excused a significant deviation from SBA's valuation regulations by Aspen III without involving his Area Chief, as he was required to do.

The only thing that could prevent the absolute collapse of Aspen III and the resulting loss of millions and millions of dollars of SBA leverage was additional private capital from another source that could itself leverage additional SBA funds.  Essentially, Gerogosian and Aspen III faced the same question – whether to double down on a losing bet in the hopes of digging themselves out of a financial hole.

**C.    Desperate For Additional Capital, And With The SBA's Collusion, Aspen III Persuaded Redleaf To Invest By Agreeing To A Structure Seemingly Designed To Insulate Redleaf From Risk, But That Actually Allowed Aspen III To Further Defraud Redleaf.**

Less than a month after Whalen revealed to the SBA the depth of Aspen II and III's financial troubles, Redleaf appeared as a potential new investor that could salvage Aspen III.  After Whalen and third-party defendants Cilento and Crockett approached Redleaf about an investment, Redleaf began to conduct due diligence in late 2001, and its Board of Directors authorized an investment in February of 2002.

Whalen, Cilento, and Crockett persuaded Redleaf to invest by agreeing to an investment structure that they represented would limit Redleaf's risk on pre-existing investments.  Specifically, Redleaf was concerned about previous illiquid investments that Aspen III had made, together with the liability for associated SBA leverage that was outstanding, and wished to avoid a situation in which Redleaf's multi-million dollar commitment could be used to repay SBA leverage that Aspen III used to make previous investments.  As it turns out, Aspen was right to be concerned.  Before Redleaf agreed to invest in Aspen III, Aspen III had drawn more than $23 million in SBA leverage.  Request for Judicial Notice ("RJN") ¶ 1 & Exh. 1 (Receivership Complaint), ¶ 16.

Aspen II was capitally impaired and facing liquidation, and that Aspen III was slipping into capital impairment.

1    Accordingly, to assuage Redleaf's concerns about prior investments, Redleaf and Aspen III

2  agreed to divide the Aspen III investments into Series A and Series B investments.  RJN ¶ 5 &

3  Exh. 5.C (SBA Complaint Exh. C, First Amendment to Amended and Restated Partnership

4  Agreement) ¶¶ 1-2.  Series A investments, generally, would consist of investments made before

5  Redleaf agreed to invest in Aspen III.  Id. at ¶ 1(c)(i)-(ii).  Series B investments would consist of

6  investments made after Redleaf agreed to invest.  Id. at ¶ 1(c)(ii).  Among other terms, Aspen III and

7  Redleaf agreed that its commitment would not be used to support or repay SBA leverage drawn in

8  connection with Series A investments.  Id. at ¶ 1(a).[7]

9    Pursuant to this agreement, Redleaf was admitted to the Aspen Ventures III L.P. Amended

10  and Restated Limited Partnership Agreement of August 20, 1999 (the "1999 Partnership

11  Agreement").  RJN ¶ 5 & Exh. 5.B (SBA Complaint, Exh. B).  The parties memorialized the Series

12  A/Series B structure in the Aspen Ventures III L.P. 2002 Amendment to Amended and Restated

13  Partnership Agreement (the "2002 Amendment"), entered into as of April 1, 2002.  Id. at Exh. 5.C.

14  The parties accomplished Redleaf's admission itself by the Series B Admission and Amendment

15  Agreement ("Admission Agreement"), also as of April 1, 2002.  Id. at Exh. 5.D.  SBA approved the

16  structure in April of 2002.

17    Without an agreement such as the 2002 Amendment to insulate Redleaf from claims relating

18  to leverage supporting Series A investments – and without the SBA's approval of the 2002

19  Amendment – Redleaf would never have agreed to become a limited partner of Aspen III.

20    Given Aspen III's precarious state, the $23 million in SBA leverage that it had already

21  drawn, its desperate need for capital to avoid a total collapse, and the SBA's knowledge of all of

22  these facts, it should come as no surprise that this Series A/Series B structure was approved after

23  review by none other than SBA analyst Gerogosian.  Moreover, compounding the SBA's previous

24  errors, this Series A/Series B structure was itself inconsistent with SBA regulations and procedures,

25  in that the structure excluded Redleaf's management representatives from anything having to do

26  with Series A investments, and even prevented them from learning anything about the Series A

27  _____

28  [7] Such a two-tiered structure for an SBIC is unprecedented.  Indeed, SBA may never have approved
such a structure prior to this one, or since.

1  investments.[8]  This kept Redleaf wholly in the dark about the true state of the disastrous Series A

2  investments, allowing Aspen III to make capital calls on Redleaf – to support further SBA leverage –

3  without resistance from Redleaf.  After SBA approval of the Series A/Series B structure, Redleaf

4  met capital calls from Aspen III totaling $3 million, and obtained further SBA leverage of

5  $5 million.

6  **D.    The SBA's Approval Of The Series A/Series B Structure Prevents The SBA From Now Relying On Paragraph 7.1 Of The SBA Annex.**

7

8         The SBA as receiver now refuses to recognize this SBA-approved Series A/Series B

9  structure as any kind of a defense, and is demanding that Redleaf meet the balance of its capital

10  contribution by paying the remaining $10.6 million of the original $15 million capital contribution.

11  On information and belief, the SBA will use this $10.6 million to repay the leverage funds extended

12  to Aspen III.

13         One of the points the SBA relies heavily upon to support its position is Paragraph 7.1 of the

14  SBA Annex.  M'tn at 7:11 – 9:3.  What the SBA fails to make clear, however, is that the SBA

15  Annex is incorporated into the 1999 Partnership Agreement.  RJN ¶ 5 & Exh. 5.B (SBA Complaint

16  Exh. B) ¶¶ 1.2, 2.5.  The Series A/Series B structure that SBA approved is set forth in the 2002

17  Amendment executed as of April 1 2002.  Id. at Exh. 5.C.  Thus, while the Annex does provide that

18  "the obligation to make [capital] contributions shall not be subject to any conditions set forth in the

19  Agreement" (SBA Annex ¶ 7.1), the 2002 Amendment to the Limited Partnership Agreement which

20  SBA approved specifically provides:

21         the debts, liabilities, and obligations incurred, contracted for or
       otherwise existing with respect to a particular series will be
22         enforceable against the assets of such series only . . . and none of the
       debts, liabilities, obligations and expenses incurred, contracted for or
23         otherwise existing with respect to any series shall be enforceable
       against the assets of such other series . . . .
24
25         [and]

26

27  _____

[8]  Specifically, SBA's procedures require all the managers of an SBIC to value an SBIC's
28  investments.  See 13 C.F.R. § 107.503(c) and ¶ 3.2 of the 1999 Partnership Agreement (RJN 5 and Exh. 5.B.

1
2

> The allocation of Leverage . . . shall be as follows:  Any Outstanding
> Leverage as of the time immediately prior to the execution of this 2002
> Amendment shall be Leverage associated with Series A . . . .

3  Id. at Exh. 5.C ¶¶ 1(a), 1(c)(i).  Accordingly, in its negotiations with the SBA, Redleaf has taken the

4  position – and takes the position here – that, to the extent the SBA Annex would have ever given the

5  SBA an absolute right to Redleaf's unfunded commitment – a position that Redleaf disputes – the

6  SBA's approval of the Series A/Series B structure in the 2002 Amendment prevents them from

7  asserting that position now.

8  **E.    After Discovering Problems With Aspen III's Management After Investing, Redleaf
        Eventually Began To Withhold Its Capital Commitment  – An Action Which Benefited**

9  **The SBA Because It Prevented Aspen III From Drawing Further SBA Leverage.**

10    Redleaf satisfied a total of $4.4 million in capital calls from April 2002, through January of

11  2004, and Aspen III drew $8.8 million in SBA leverage based on those capital calls.  However,

12  thereafter, Redleaf satisfied no further capital calls.

13    The SBA would have this Court believe that it "already disbursed to [Aspen III] its promised

14  funds based in part upon the promise by Redleaf to pay its binding unfunded commitment in full"

15  and that it therefore makes sense to deny Redleaf a defense because "all of SBA's dollars have

16  already been put at risk."  M'tn at 2:20-22, 3:9-10.  In other words, the SBA claims that Redleaf

17  should not be permitted to defend itself in this multi-million dollar action because the SBA already

18  disbursed $30 million leverage to Aspen III based on Redleaf's $15 million promise.  This is false.

19  First, SBA Regulations only permit an SBIC to draw SBA leverage when a capital commitment is

20  actually paid in to the SBIC.  13 C.F.R. § 107.1150.  Furthermore, given the Series A/Series B

21  structure which SBA agreed to, Aspen III could only leverage drawn Series B funds for Series B

22  investments and management expenses.  Here SBA seeks to draw Series B funds to repay leverage

23  obtained with drawn Series A Capital.  It is contractually prohibited from doing so.  In addition, the

24  SBA certainly could not have committed all $30 million leverage based on Redleaf's promise,

25  because under the 2002 Amendment, Series B funds could only be drawn to fund Series B

26  investments and there were only a limited number of Series B investments that Aspen III made.  It is

27  disingenuous for the SBA to assert otherwise here.

28

1    If anything, Redleaf's reluctance to fund its full commitment has helped SBA to mitigate the

2    SBA's eventual losses. Had Redleaf paid to Aspen III the full capital commitment, there is little

3    doubt that Aspen III would have drawn the entire $30 million in leverage, with analyst Gerogosian's

4    full support. It therefore strikes Redleaf as ironic that the SBA has pursued Redleaf with such

5    single-mindedness, given that Redleaf's reluctance to fund its commitment ultimately saved the

6    SBA millions of dollars.

7    **F.    The SBA's Description Of The SBIA Regulations Is Inaccurate And Self-Serving; If
       Anything, The SBIA Regulations Favor Redleaf's Position.**

8

9    The SBA asserts that a prime goal of the SBIA Regulations at issue here is to protect the

10   SBA's profitability, and stack the deck in its favor when an SBIC goes belly-up and there are

11   unfunded commitments to be had. For example, the SBA describes the regulatory scheme as a

12   "draconian" system that leaves "Redleaf essentially barred from avoiding its obligation to pay . . . ."

13   M'tn at 7:6-8. The SBA further claims that "[o]nce SBA invoked its right to place [Aspen III] in

14   restricted operations pursuant to 13 C.F.R. 107.1820, Redleaf's obligation to pay its unfunded

15   commitment became absolute." The SBA's view of the regulations is narrow, self-serving, and

16   simply wrong. If anything, the regulations favor Redleaf's position.

17   In March of 2005, the SBA put Aspen III into restricted operations. RJN ¶ 1 & Exh. 1

18   (Receivership Complaint), ¶ 20. When the SBA puts an SBIC into "restricted operations" it does so

19   because the SBIC has committed one or more of several regulatory violations referred to in

20   13 C.F.R. § 107.1820(e). SBA is then entitled to exercise one or more remedies found in 13 C.F.R.

21   § 107.1820(f).

22   One of the remedies found in 13 C.F.R. § 107.1820 allows the SBA to require the SBIC "to

23   require all [the] commitments from investors to be funded at the earliest time(s) permitted in

24   accordance with [the SBIC's] Articles." 13 C.F.R. § 107.1820(f)(3). In fact, this is the only remedy

25   in § 107.1820 that even hints at the SBA's ability to call unfunded capital commitments. Section

26   107.1820 says nothing about stripping private limited partners of any defenses they might have. It

27   says nothing about "prevent[ing] private limited partners from evading their obligations." M'tn at

28

2:9-11.  It certainly says nothing about "protect[ing the] SBA, especially on the downside when an

SBIC is not profitable."  <u>Id.</u> at 2:16-17.

What § 107.1820(f)(3) <u>does</u> say is that the SBA may only require the commitments to be

funded <u>in accordance with the SBIC's articles.</u>  Here, pursuant to the 2002 Amendment, which SBA

expressly approved, Aspen III amended its Articles of Limited Partnership on file with the Delaware

Secretary of State to recognize the Series A/Series B structure – including the limitation on the right

to call the capital of Redleaf in connection with debts relating to Series A investments.  Thus,

pursuant to the plain language of § 107.1820(f)(3), the SBA is no longer entitled to an unconditional

capital call.  The SBA has utterly failed to recognize this fundamental fact in negotiations with

Redleaf, in the apparent belief – on display in this motion – that it can vaguely cite to the SBIC

regulations and then do whatever it wants regardless of its previous actions.  Redleaf respectfully

submits that this Court should find otherwise and deny the SBA's Motion.

## IV.    <u>ARGUMENT</u>

**A.    <u>The SBA's Motion To Strike Is Untimely And Should Otherwise Be Denied.</u>**

The SBA's Motion to Strike is untimely, as it was required to be filed 20 days after Redleaf

filed its answer.  Fed. R. Civ. P. 12(f).  Redleaf filed its answer on December 17, 2007.  For this

reason alone the SBA's Motion should be denied.

Moreover, "Rule 12(f) motions are generally disfavored because they are often used as

delaying tactics and because of the limited importance of pleadings in federal practice."  <u>Rosales v.

Citibank</u>, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001).  Motions to strike defenses in particular, are

not granted "'unless it is clear that the matter sought to be stricken could have no possible bearing on

the subject matter of the litigation,'" or without "'a showing of prejudice to the moving party . . . .'"

<u>Smith v. Wal-Mart Stores, Inc.</u>, 2006 WL 2711468 at *2 (N.D. Cal. 2006) (citations omitted);

<u>Willson v. Cagle</u>, 711 F. Supp. 1521, 1534 (N.D. Cal. 1988).  As the SBA admits, its Motion to

Strike should be granted only if, as a matter of law, Redleaf's affirmative defenses "cannot succeed

under any circumstances."  M'tn at 6:13-17.  Even in the context of a receiver moving to strike

affirmative defenses, courts have recognized that granting such a motion to strike is a "drastic

1  remedy," and that the motion must be denied if there is "any question of fact or law." <u>FDIC v.</u>

2  <u>Niblo</u>, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (refusing to strike defense of unclean hands asserted

3  against receiver). The SBA's Motion cannot possibly surmount these high standards, especially

4  because, as demonstrated below, the SBA's arguments simply have no merit.

5  **B.**    **The SBA Annex Does Not Limit Redleaf's Defenses.**

6        The SBA argues that the SBIC regulatory scheme restricts Redleaf's available defenses. The

7  SBA is wrong. As set forth in Section III.F, the SBA points to nothing in the regulations that stands

8  for this proposition. The only specific assertion the SBA makes is that Paragraph 7.1 of the SBA

9  Annex demands this result. M'tn at 6:18 – 9:3. However, the language of the Annex is unavailing.

10        The SBA relies on two phrases of Annex ¶ 7.1 to support its argument. The first provides

11  that if the SBIC is subject to restricted operations, and the SBA requires the funding of capital

12  commitments, "the obligation to make such contributions shall not be subject to any conditions set

13  forth in the Agreement . . . ." This language does not assist the SBA at all, because, as is clear from

14  the discussion above, Redleaf's affirmative defenses have nothing to do with conditions found in the

15  1999 Partnership Agreement, into which the Annex was originally incorporated. Rather, the basis of

16  Redleaf's affirmative defenses, generally, is (1) the extra-contractual fraudulent conduct of

17  Aspen III's management, and the SBA's clear collusion therein; and (2) the SBA-approved 2002

18  Amendment which amended the terms of 1999 Partnership Agreement and Annex and now prevents

19  the SBA from relying on the preexisting (1999) paragraph 7.1 of the SBA Annex. As a result of the

20  2002 Amendment, Aspen III would only have been able to call Series B capital for the purposes

21  specified in the 1999 Partnership Agreement. Now SBA as receiver is only entitled to do the same.

22  It cannot call Series B capital to repay leverage obtained with Series A capital used to fund Series A

23  investments.

24        Accordingly, contrary to the SBA's assertion (M'tn at 8:13-9:3), the Third Circuit's opinion

25  in <u>U.S. Small Business Administration v. Chimicles</u>, 447 F.3d 202 (3rd Cir. 2006), has no application

26  here. As the SBA admits, in <u>Chimicles</u>, the limited partners defending against the SBA's claim for

27  unfunded commitments sought to rely on an arbitration provision that the Third Circuit held was a

28

1  condition of the partnership agreement.  There was no suggestion of extra-contractual fraudulent

2  conduct in the <u>Chimicles</u> case, nor was there any suggestion that the SBA or the SBIC took any

3  action to prevent the SBA from relying on the Annex in that case.

4        The other phrase the SBA relies upon in Paragraph 7.1 of the Annex is that no limited partner

5  "shall have any right to delay, reduce or offset any capital contribution obligation to the Partnership

6  called under this Section 7.1 by <u>reason of any</u> **counterclaim** <u>or right to</u> **offset** . . . ."  M'tn at 8:2-5

7  (quoting Paragraph 7.1, emphasis added).  This language does not help the SBA either.  Redleaf has

8  brought no counterclaim against SBA.  Nor has Redleaf asserted the affirmative defense of setoff, or

9  offset, which is recognized as a distinct affirmative defense under both California and Delaware law.

10 <u>See</u> 2 <u>California Affirmative Defenses</u> § 44:2 (West 2007); 10 Del. Code Ann. § 9536 (West 2007)

11 ("In every action…the defendant, if he or she has against the plaintiff any account, demand, or cause

12 of action, cognizable before a justice of the peace, shall bring it forward and plead it as a setoff…").

13 If the SBA's assertion is that Redleaf agreed to waive affirmative defenses (other than offset) by this

14 language the SBA's assertion must fail.  A waiver of a right to assert affirmative defenses must be

15 express, rather than implied (<u>e.g.</u>, <u>Lovett v. Carrasco</u>, 63 Cal. App. 4th 48, 53 (4th Dist. 1998) (waiver

16 of rights must be express, rather than implied)), and here Redleaf – at most – waived the right to

17 bring certain counterclaims and the specific affirmative defense of offset.  There is no justification

18 for finding a further waiver.

19        The SBA has directed this Court to no cases where the SBA Annex justified striking

20 affirmative defenses other than a defense of offset, and Redleaf has found none.  Similarly, the SBA

21 has directed this Court to no cases where the SBA limited its right to rely on the SBA Annex by

22 approving inconsistent amendments to the original partnership agreement that incorporated the

23 Annex.  Redleaf has similarly found none.  In the absence of (1) clear regulatory authority justifying

24 the SBA's position that the regulatory scheme strips Redleaf of its affirmative defenses; (2) clear

25 language in the SBA Annex directed to the types of affirmative defenses that Redleaf asserts here;

26 and (3) a compelling reason why the SBA Annex as it existed in 1999 should even apply, given the

27 2002 Amendment, the Motion to Strike should be denied.

28

**C.    Redleaf's Defenses Are Not Otherwise Barred.**

    1.    The SBA Admits That A Receiver Generally Is Subject To Any Defense Against The Original Party.

As the SBA admits, "in general, a receiver occupies no better position than that which was occupied by the person or party for whom he acts . . . and any defense good against the original party is good against the receiver." Federal Deposit Ins. Corporation v. O'Melveny & Meyers, 61 F.3d 17, 19 (9th Cir. 1995) (internal quotations omitted).  The SBA spends the vast majority of its brief arguing that exceptions should be made to this general rule.  The SBA's arguments fail for the reasons discussed in detail below.

    2.    The SBA Has Failed To Demonstrate Why Redleaf's Legal Affirmative Defenses Should Be Stricken.

The SBA has utterly failed to advance any convincing rationale why Redleaf's legal affirmative defenses, fraud, breach of contract, and failure of conditions precedent should not be subject to the general rule of receivership found in O'Melveny.  As a result, the SBA's Motion to Strike should be denied as to those defenses.

    a.    Redleaf's Fraud Defense Is Not Barred.

The SBA asserts that Redleaf's fraudulent inducement defense is barred, relying on a variety of arguments, all of which fail.[9]

First, the SBA asserts that this defense fails because Redleaf did not plead it with specificity.  M'tn at 13:4-5.  As discussed above, the SBA is well aware of the basis of its defenses due to the lengthy negotiations between Redleaf and the SBA, and the repeated and detailed explanations of Redleaf's positions during those negotiations, and in writing.  That said, should the Court deem it necessary, Redleaf will describe the defenses with more particularity in an amended answer.

The SBA next asserts that Redleaf's "claim" may be barred by the Federal Tort Claims Act, or may be derivative.  M'tn at 13:6-8.  Again, Redleaf has brought no claims against the SBA.  Redleaf has merely brought a defense by which to avoid liability.  See Cox v. Kurt's Marine Diesel

---

[9]  Redleaf's rescission defense is based on the same fraud discussed in this brief, but Redleaf analyzes it under equitable defenses, infra.

of Tampa, Inc., 785 F.2d 935, 936 (11th Cir. 1986) (Federal Tort Claims Act did not bar defense of misrepresentation because the defendant raised it only to avoid liability, rather than make a claim). Moreover, Redleaf has no idea how an affirmative defense could possibly be derivative, and even if it could, the very case that the SBA relies upon held that fraud in the inducement claims are generally individual, rather than derivative.  Acorn Technology Fund, 429 F.3d at 447.

The SBA further argues that Redleaf somehow agreed to waive any fraud defense to payment of its full capital commitment, should the SBA decide to put Aspen III in restricted operations.  M'tn at 13:11 – 14:10.  This argument makes no sense even upon repeated readings.  In any event, it fails because it relies on the SBA Annex.  The argument further relies on 13 C.F.R. § 107.1820(b)(5), which is curious given that the regulation appears to support Redleaf's theory of the case.  Under Section 107.1820(b)(5), the SBA may put an SBIC into restricted operations if an SBIC "commit[s] a fraudulent act which causes serious detriment to SBA's position as a guarantor or investor."  Here, one of Redleaf's theories is that Aspen III's fraudulent inducement of Redleaf improved the SBA's position as a guarantor or investor, in that Redleaf's investment offered the SBA the chance of keeping Aspen III afloat, or, at worst, a potential source of capital that SBA could use to repay some of its outstanding leverage.  In fact, Redleaf believes that this is precisely why analyst Gerogosian approved the Series A/Series B structure, even though the structure itself was inconsistent with SBA regulations.

The SBA next argues that wrongs of the previous management may not be imputed to the receiver, relying on O'Melveny & Meyers, 61 F.3d at 19.  M'tn at 5:7.  The SBA is again wrong.  The holding of the O'Melveny & Meyers case is clearly limited to equitable, rather than legal defenses.  61 F.3d at 19 ("we nevertheless conclude that the [receiver] is not barred by certain equitable defenses O'Melveny could have raised against [the party in receivership]") (emphasis added).  It has no application to legal defenses such as fraudulent inducement.

However, even if it did, the Court could allow Redleaf to assert a defense of fraud, and there would be every reason to do so.  The Ninth Circuit in O'Melveny & Meyers specifically recognized that in certain appropriate circumstances, defenses based on inequitable conduct can apply against a

1    receiver.  Id. at 19 ("defenses based on a party's unclean hands do not generally apply against that

2    party's receiver"; "it does not necessarily follow that equitable defenses can never be asserted

3    against . . . a receiver.") (emphasis added).  The facts of this case cry out for the exercise of this

4    Court's discretion in Redleaf's favor.  Even though formal discovery has not yet begun, the facts

5    now available raise strong inferences that the SBA colluded with Aspen III's management to defraud

6    Redleaf, and thus should be subject to a fraud defense based on its own conduct, as well as the

7    imputed conduct of Aspen III's management.

8         Specifically, the picture that emerges from Redleaf's investigation is that of an SBA analyst

9    who was too close to Aspen III – so much so that he excused serious regulatory violations that went

10   directly to Aspen III's stability, and without involving his supervisor as he was required to do.  Then,

11   when he learned of the financial disaster that Aspen III had become, and facing the loss of at least

12   $23 million in SBA funds, he approved an investment structure that was inconsistent with any other,

13   and allowed Aspen III's management to continue to conceal Aspen III's desperate financial situation

14   from Redleaf.  This allowed Aspen III to call millions of dollars in capital to support millions more

15   in SBA leverage.  In other words, it appears that the SBA helped to defraud Redleaf in a desperate

16   attempt to keep Redleaf afloat and avoid consequences for its earlier misfeasance.

17        Accordingly, unlike in O'Melveny & Meyers, the SBA is no "innocent entity that steps into

18   the party's shoes pursuant to court order or operation of law", as the receiver apparently was in that

19   case; it is instead a "party to the original inequitable conduct . . . ."  Id. at 19.  Moreover, the SBA

20   here is unlike the receiver in O'Melveny & Meyers, who was not "in a position to take action prior

21   to [the receivership]. . . ."  Rather, the SBA could have chosen to avoid this situation and take its

22   losses, but instead chose to try to keep Aspen III afloat with the funds of an unsuspecting new

23   investor.  Accordingly, contrary to the SBA's statements in its Motion, Redleaf is not claiming "that

24   SBA's regulatory framework only applies to [it] when an SBIC is a winner . . . but not when an

25   SBIC is unsuccessful . . . ."  M'tn at 3:10-12.  Redleaf is seeking relief from this Court because it

26   was defrauded with the help of SBA.

27

28

1    Under these circumstances, the balance of equities favors Redleaf.  Although it is true that

2 preventing the SBA from collecting the $10.6 million from Redleaf will have a miniscule effect on

3 the taxpayer now, stripping Redleaf of its equitable and other defenses could have an even worse

4 impact on the taxpayer over time.  If this Court accepts the SBA's position, there would be no

5 incentive for the SBA in future cases not to do exactly what it did here, with the concomitant injury

6 to the public fisc.  Moreover, in cases where, unlike here, Redleaf prevented the SBIC from drawing

7 further leverage, in future cases the taxpayer might not be so fortunate.

8                    b.        Redleaf's Breach of Contract Defense Is Not Barred.

9                    As with its other defenses, Redleaf's affirmative defense of "breach of contract" is

10 good against the SBA as receiver if it is good against the original parties.  O'Melveny & Meyers, 61

11 F.3d at 19.  The SBA attempts to escape this conclusion by arguing that Redleaf's breach of contract

12 defense is a "counterclaim" or "offset" that is barred by paragraph 7.1 of the SBA Annex.  M'tn at

13 14:11-21.  The SBA is wrong again.

14    To be clear, Redleaf's position is that the SBA's decision to call the balance of its capital

15 commitment, without regard to the Series A/Series B structure of the 2002 Amendment and the

16 Admission Agreement, is a breach of both of those agreements.  As discussed above in detail, the

17 2002 Amendment which SBA agreed to trumps the 1999 Partnership Agreement, and the SBA

18 Annex.

19    Thus, Redleaf's first response to this argument is that the SBA Annex does not apply here at

20 all, and provides no assistance to the SBA.  However, even if it did apply, Redleaf's affirmative

21 defense for material breach of contract is neither a "counterclaim" nor an "offset", but an affirmative

22 defense by which Redleaf avoids liability on the SBA's claim.  Both Delaware and California permit

23 defendants to assert a breach of contract as an affirmative defense, and do not require defendants to

24 plead such allegations as counterclaims, or as an offset.  See American Nat. Bank v. Stanfill, 205

25 Cal. App. 3d 1089, 1093 (5th Dist. 1988); Erler v. Five Points Motors, 249 Cal. App. 2d 560, 561 (4th

26 Dist. 1967); Active Crane Rentals v. Envir. Health Research & Testing, Inc., 1992 WL 91143 at 1

27 (Del. Super. 1992).  Accordingly, the Motion to Strike this defense should be denied.

28

c.    Redleaf's Failure Of Conditions Precedent Defense Is Not Barred.

The SBA as Receiver is subject to the defense of failure of conditions precedent.  See

O'Melveny & Meyers, 61 F.3d at 19.  Here, under the 2002 Amendment, the SBA's right to call

Redleaf's entire capital commitment is conditioned upon a demonstration that that the capital call is

to be made only to repay debts (including SBA leverage) relating to Series B investments.  RJN

¶ 5 & Exh. 5.B (SBA Complaint) Exh. B ¶ 1(b).

The SBA argues that no such conditions exist in the 1999 Partnership Agreement.  M'tn at

15:1-19.  Regardless of whether this is true, it is irrelevant.  The 2002 Amendment, by definition and

express effect, amended the 1999 Partnership Agreement to impose limits on exactly when and for

what Aspen III's management, and by extension, the SBA, could call Redleaf's capital commitment.

The SBA also again attempts to rely on the SBA Annex and the Chimicles case.  This

reliance fails for the reasons discussed above.

3.    Under The Circumstances, This Court Should Allow Redleaf To Assert Equitable
Defenses Such As Unclean Hands, Rescission, And Estoppel Against The SBA.

a.    This Court Should Exercise Its Broad Discretion And Allow Redleaf To
Assert Its Unclean Hands And Rescission Defenses Against The SBA.

The SBA argues that Redleaf's unclean hands (and rescission) defenses should be barred,

because it is nothing more than an innocent party who is stepping into Aspen III's shoes as receiver,

and that courts do not allow parties to assert equitable defenses in these circumstances.  M'tn at 9:4 –

12:12.  The SBA is again wrong.  As the SBA admits, this Court has discretion to allow Redleaf to

assert its unclean hands and rescission defenses, and should do so.

Of course it makes no sense to assert, as the SBA does, that Redleaf's unclean hands and

rescission defenses are barred as a matter of law.  In fact, the SBA admits that under Delaware law,

courts have "extraordinarily broad discretion" to allow a party to assert equitable defenses to the

point where courts are "not bound by formula or restrained by any limitation that tends to trammel

the free and just exercise of discretion."  M'tn at 11:5-10 (quoting Nakahara v. NS 1991 American

Trust, 718 A.2d 518, 522-23 (Del. Ch. 1998)).  California courts enjoy similarly broad discretion to

grant an unclean hands defense.  Lovett v. Carrasco, 63 Cal. App. 4th 48, 55 (4th Dist. 1998)

1   ("Whether the unclean hands doctrine applies in a particular case is within the trial court's sound

2   discretion.").

3          As demonstrated above in the section dealing with fraud, the O'Melveny & Meyers case

4   actually supports Redleaf's position.  The balance of the SBA's cases dealing with receivers all

5   involve situations where an adverse party attempts to impute to a blameless receiver bad acts that

6   occurred before the receiver took control.  Accordingly, the SBA has not convincingly demonstrated

7   that it is entitled to an order striking Redleaf's affirmative defenses.

8          Acknowledging the weakness of its substantive argument, SBA halfheartedly asserts that

9   "SBA as federal agency is not a party to this action, nor has Redleaf asserted any claims against

10  SBA with respect to these matters."  The SBA provides no basis or authority as to why Redleaf may

11  not assert affirmative defenses against the SBA in its capacity as receiver, based on the SBA's

12  previous misconduct.  In fact, in casting itself as the innocent receiver in this case, rather than

13  acknowledging its true role, the SBA is asking this Court to "elevate form over substance" –

14  something the Ninth Circuit in O'Melveny & Meyers expressly refused to do.  Id. at 20.[10]

15              b.    Redleaf May Assert Estoppel Against The SBA.

16         The SBA next asserts that Redleaf's estoppel defense is barred.  Again the SBA relies on

17  O'Melveny v. Meyers.  M'tn at 12:14-19.  The SBA's reliance is misplaced for the same reasons as

18  discussed above.

19         The SBA further argues that the SBIC act and its regulations expressly prevent Redleaf from

20  attempting to assert waiver or estoppel, quoting 13 C.F.R. § 107.1910, which provides in relevant

21  part:  "SBA's failure to exercise or delay in exercising any right or remedy under the Act or the

22  regulations in this part does not constitute a waiver of such right or remedy."  This regulation is

23  inapposite, because Redleaf does not claim that the SBA waived a right or remedy by failing to

24  exercise it, or delaying to exercise it.  Rather, Redleaf's claim is that the SBA engaged in affirmative

25  misconduct, in that, among other things, it approved the Amended Aspen III Agreement with the

26  Series A/Series B structure, while at the same time knowing of Aspen III's financial distress, that the

27

28  [10]  For some reason, the SBA notes that Redleaf has asserted no claims against it, but if it did, those
      claims "may" be barred by the Federal Tort Claims Act.  M'tn at 12:3-7.

Printed on Recycled Paper

1  Series A/Series B structure was inconsistent with SBA practice, and that approval of Aspen's

2  method for establishing portfolio valuations also failed to comply with SBA regulations and

3  procedures.  This affirmative misconduct should estop the SBA from seeking to enforce its

4  commitment now.

5        Under the circumstances, Redleaf's position is that these facts will support a claim for

6  estoppel against the SBA, meeting the following elements:  (1) the party to be estopped knows the

7  facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party

8  invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be

9  ignorant of the true facts, and (4) he or she must detrimentally rely on the former's conduct."  United

10  States v. Gamboa-Cardenas, 508 F.3d 491, 502 (9th Cir. 2007) (quoting United States v. Hemmen,

11  51 F.3d 883, 892 (9th Cir. 1995)).  Redleaf believes the SBA's conduct further satisfies the additional

12  elements needed to support a claim of estoppel against the government:  (1) "the government has

13  engaged in affirmative misconduct going beyond mere negligence" and (2) "the government's act

14  will cause a serious injustice and the imposition of estoppel will not unduly harm the public

15  interest.'"  Gamboa-Cardenas, 508 F.3d at 502 (quoting Pauly v. U.S. Dep't of Agric., 348 F.3d

16  1143, 1149 (9th Cir. 2003)).

17        Assuming that these elements are met, courts have recognized that it is possible to assert a

18  defense of estoppel against an agency that engaged in misconduct, and then brings a claim as a

19  receiver against a party arising out of that misconduct.  See Resolution Trust Corp. v. Greenwood,

20  798 F. Supp. 1391, 1398 (D.Minn. 1992).  As with the other defenses, the SBA has pointed to

21  nothing that suggests this Court should strip Redleaf of this defense at this point in the action.

22            **V.    CONCLUSION**

23        In general, Redleaf can assert the same affirmative defenses against the SBA that it could

24  against Aspen III.  The SBA has utterly failed to demonstrate why Redleaf should be barred from

25  asserting its legal defenses of fraud, breach of contract, and failure of conditions precedent against

26  the SBA's claims.  Reduced to its essence, the SBA's arguments rely almost exclusively on

27  Paragraph 7.1 of the SBA Annex.  However, this reliance is faulty, because the SBA-Approved 2002

28

1  Amendment prevents the SBA from relying on the SBA Annex, and because the SBA Annex only

2  ever limited Redleaf's right to assert counterclaims and the affirmative defense of offset – not other

3  affirmative defenses.

4      Moreover, although some courts have refused to apply equitable defenses such as unclean

5  hands and estoppel against a party's receiver, this Court should exercise its discretion to allow these

6  defenses here.  The SBA unconscionably contributed to Redleaf's current situation by colluding with

7  Aspen III, and is now compounding its misconduct by seeking to force Redleaf to pay it an

8  additional $10.6 million.  In short, Redleaf respectfully submits that this is a situation in which this

9  Court should exercise its discretion to allow Redleaf to assert all available affirmative defenses,

10 whether equitable or not.  In any event, the SBA has certainly not met its burden under Rule 12(f) to

11 demonstrate that Redleaf's affirmative defenses "cannot succeed under any circumstances."  M'tn at

12 6:14-15.  Redleaf therefore respectfully requests that the Motion to Strike be denied.

13                                       Respectfully submitted,

   Dated:  March 21, 2007
14                                       KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP

15

16                        By:  Matthew G. Ball /s/
                              Matthew G. Ball, Esq. (CA Bar 208881)
17                            55 Second Street, Suite 1700
                              San Francisco, CA  94105
18                            Telephone:  (415) 882-8200
19                            Facsimile:  (415) 882-8220
                              (matthew.ball@klgates.com)
20
                              Martin D. Teckler (*pro hac vice*)
21                            martin.teckler@klgates.com
                              Kirkpatrick & Lockhart Preston Gates Ellis LLP
22                            1601 K Street, NW Washington, DC, 20006-1600
                              Telephone: (202) 778-9000
23                            Facsimile: (202) 778- 9100
24                            (martin.teckler@klgates.com)
25                            Attorneys for Defendant/Third-Party Plaintiff
                              Redleaf Group, Inc.
26

27

28