# EXHIBIT 6

1  Matthew G. Ball (SBN 208881)
2  matthew.ball@klgates.com
   KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
3  55 Second Street, Suite 1700
   San Francisco, CA 94105
4  Telephone: (415) 882-8200
   Facsimile: (415) 882-8220
5

6  Martin D. Teckler (*pro hac vice* application pending)
   martin.teckler@klgates.com
7  KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
   1601 K Street, NW
8  Washington, DC, 20006-1600
   Telephone: (202) 778-9000
9  Facsimile: (202) 778- 9100

10  Attorneys for Defendant
    Redleaf Group, Inc.
11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                          SAN JOSE DIVISION

15  UNITED STATES SMALL BUSINESS          Case No. C-07-05350 JW PVT
    ADMINISTRATION in its capacity as
16  Receiver for Aspen Ventures III,

17                        Plaintiffs,      DEFENDANT REDLEAF GROUP,
                                           INC.'S THIRD-PARTY COMPLAINT
18       v.
                                           JURY TRIAL DEMANDED
19  REDLEAF GROUP, INC.,

20       Defendant and Third-Party Plaintiff,
                                           Complaint Filed:    October 19, 2007
21       v.                                Trial Date:         Not Set

22  ASPEN VENTURES MANAGEMENT III,
    LLC, a Delaware Limited Liability Company,
23  ALEXANDER P. CILENTO, a California
    resident, and DAVID CROCKETT, a
24  California resident, and DOES 1-10,

25                   Third-Party Defendants.

26

27

28

                                    1
─────────────────────────────────────────────
         DEFENDANT REDLEAF GROUP, INC.'S THIRD-PARTY COMPLAINT
                  CASE NO. C 07-05350 JW PVT

SF-144579 v1

1   NOW COMES Defendant/Third-Party Plaintiff Redleaf Group, Inc. ("Redleaf") and for its

2   Third-Party Complaint against Aspen Ventures Management III, LLC ("AVM"), Alexander P.

3   Cilento ("Cilento") and E. David Crockett ("Crockett") (collectively, "Third-Party Defendants"),

4   states as follows:

## INTRODUCTION

6   1.    This is a case in which Third-Party Defendant AVM, the general partner of the Small

7   Business Investment Company Aspen Ventures III ("Aspen"), Thaddeus J. Whalen, one of the

8   general partner's managing members who is now deceased, and Third-Party Defendants Cilento and

9   Crockett, the general partner's surviving managing members, fraudulently induced Redleaf to enter

10  into two agreements and invest millions of dollars into Aspen, an enterprise Third-Party Defendants

11  knew was failing.  AVM, Cilento, and Crockett breached the agreements in numerous ways,

12  continued to conceal and misrepresent material facts, and breached their fiduciary duties to Redleaf.

13  For example, and as discussed below in more detail:

14      a.    critical evidence regarding the state of affairs of Aspen was intentionally

15  withheld from Redleaf;

16      b.    the true Aspen portfolio valuations were manipulated intentionally and by

17  misuse of United States Small Business Administration's ("SBA") own regulatory reporting

18  procedures;

19      c.    critical information regarding an SBA examination report finding fault with

20  Aspen management valuation procedures was withheld from Redleaf;

21      d.    in response to direct questions regarding the health of the Aspen portfolio,

22  Aspen managers repeatedly misrepresented the facts;

23      e.    Aspen made no effort to raise additional capital from its existing investors

24  despite direct representations to Redleaf that it would do so;

25      f.    Aspen faced regulatory capital impairment at the time it solicited Redleaf's

26  investment and could not survive without Redleaf's capital; and

27

28

2

1          g.    Aspen created a legal structure in violation of SBA regulatory procedure,

2   depriving Redleaf of an opportunity to participate in the management or even obtain critical

3   information of Aspen's affairs.

4          2.    In addition to the millions of dollars that Redleaf invested in Aspen – now

5   irretrievably lost – the ultimate result of Third-Party Defendants' conduct is that Redleaf is

6   defending a multimillion dollar claim that Aspen's Receiver has brought against it.  Quite simply,

7   but for Third-Party Defendants' breaches of contract and torts, Redleaf would never be in this

8   situation.  Redleaf therefore brings this case against the Third-Party Defendants to recover the

9   damages it has already suffered, and so that in the unlikely case Aspen's Receiver succeeds in its

10  multi-million dollar claim against Redleaf, the parties truly responsible for Redleaf's situation can

11  make Redleaf whole.

12          3.    Subject-Matter Jurisdiction:  Subject matter jurisdiction is based on 28 U.S.C. §

13  1367(a).  This Court has the power to exercise supplemental subject matter jurisdiction here because

14  Redleaf's claims against AVM, Cilento and Crockett share a common nucleus of operative fact with

15  SBA's claims against Redleaf such that these claims are part of the same case or controversy.

16  Redleaf's Complaint does not raise novel or complex issues of State law and does not substantially

17  predominate over SBA's claims.  This Court has not dismissed all claims over which it has original

18  jurisdiction and there are no other compelling reasons for declining jurisdiction.

19          4.    Personal Jurisdiction:  This Court has personal jurisdiction over AVM because AVM

20  has its principal place of business within the state of California.  This Court has personal jurisdiction

21  over Cilento and Crockett because they are California residents.

22          5.    Venue:  Venue is proper in this District and Court pursuant to 28 U.S.C. § 1391(a)

23  and (c) because a substantial part of the events giving rise to this action occurred in this District and

24  because AVM, Cilento and Crockett are subject to personal jurisdiction in this District.

25          6.    Intradistrict Assignment:  Assignment to the San Jose division is appropriate because

26  this third-party action forms part of the same case or controversy as an action already pending in this

27  division.

28

**PARTIES**

7.     AVM is the General Partner of Aspen, and is a Delaware limited liability company with a principal place of business at 1000 Fremont Avenue, Suite 200, Los Altos, CA 94024.

8.     Cilento is a resident of California with an address at 1198 Jefferson Way, Laguna Beach, CA 92651. Crockett is a resident of California with an address at 10898 Mora Drive, Los Altos Hills, CA 98024. Cilento and Crockett, along with Whalen were, at all relevant times, the managing members of AVM.

9.     Redleaf is a Delaware corporation with its principal place of business located at 100 First Avenue, Suite 920, Pittsburgh, Pennsylvania.

10.     Redleaf is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Third-Party Defendants DOES 1 through 10, inclusive, and therefore sues said Third-Party Defendants, and each of them, by such fictitious names. Redleaf will seek leave to amend this Third-Party Complaint to allege the true names, identities, and capacities of such Third-Party Defendants when the same have been ascertained. Redleaf is informed and believes and thereon alleges that each of the Third-Party Defendants designated herein as "DOE" is responsible in some manner for the events and happenings herein referred to, or as hereinafter alleged.

11.     Redleaf alleges on information and belief that at all times herein DOES 1 through 10 were and are the agent, servant, representative and/or alter ego of Third-Party Defendants and each of the other Third-Party Defendants and/or otherwise was acting in concert with them, and in doing the things alleged herein, was acting within the scope of their authority as such agent, servant, representative and/or alter ego, with the permission and consent of the remaining Third-Party Defendants.

**FACTS**

**A.    Background**

12.    Aspen is a licensed Small Business Investment Company ("SBIC"). Generally, an SBIC is a private venture capital or private equity fund that is licensed by SBA and "leveraged" with funds provided by the SBA. Aspen was licensed by SBA on September 16, 1999.

13.    The "leverage" that SBA provides is a primary advantage to becoming an SBIC. After undergoing a rigorous qualification process and meeting certain minimum capital requirements, an SBIC such as Aspen could be licensed by SBA and receive "participating securities leverage" from SBA at up to a 2:1 ratio. This means that for every dollar of private capital invested in Aspen that it could draw on to invest, Aspen could receive a commitment from SBA to draw an additional two dollars in "leverage" capital from SBA.

14.    The 2:1 "leverage" enables SBICs like Aspen and their investors to magnify their profits if a particular investment turns out to be successful. Rather than simply gaining the profit that would be theirs on a one-dollar investment, investors in an SBIC gain a profit on three dollars of investment and share a portion of the profits with SBA pursuant to a formula set by regulation.

15.    SBA's leverage, however, is not without risks. Investors also share losses with SBA. An SBIC's investors can also be liable to repay SBA leverage to the extent of their capital commitments if an SBIC fails, as Aspen did here. Generally speaking, in the case of a liquidation of an SBIC, SBA has a liquidation preference in relation to the other investors. This means that, in case of a liquidation of an SBIC, the SBIC must repay SBA's leverage in full before any other investors can receive any funds. Also, in case funds realized through the liquidation of an SBIC's investments and other assets are insufficient to make SBA fully whole, SBA can demand that investors remit funds to the SBIC to the extent of their unfunded capital commitments. In other words, if an investor has committed to invest ten dollars in an SBIC, but has only actually invested 5 dollars at the time of the SBIC's liquidation, SBA may be able to demand that the investor remit the remaining five dollars to repay SBA's leverage. This is the situation Redleaf now faces.

**B.    Redleaf's Decision To Invest In Aspen**

16.    Redleaf is a Delaware corporation that at all relevant times had offices in Saratoga, California, and Pittsburgh, Pennsylvania.

17.    In mid-2001, Whalen, Cilento, and Crockett first presented Redleaf's Board-of Directors with a proposal on behalf of AVM. The proposal contemplated that Redleaf would make a $15 million commitment to Aspen (the "Commitment") and that Redleaf would become a limited partner in Aspen.

18.    Although Redleaf was interested in the opportunity to invest in Aspen, and thereby gain the benefit of Aspen's SBA leverage, Redleaf was also cognizant of the risks of SBA leverage, especially given the fact that Aspen had made a number of illiquid portfolio investments that were difficult to value between September 1999 and the time Whalen, Cilento, and Crockett approached Redleaf. Indeed, a primary focus of Redleaf's due diligence related to the risk that these prior investments presented.

19.    To allay Redleaf's concerns about the prior investments (the "Series A Investments"), AVM, through Whalen, Cilento, and Crockett between late November 2001, and January 2002, made certain representations and took certain actions that ultimately induced Redleaf to make the $15 million Commitment to, and become a limited partner in, Aspen.

20.    Whalen, Cilento, and Crockett first allayed any concern regarding the Series A Investments by representing that: the value of the Series A Investments was sufficient to repay all of SBA leverage which had been drawn by Aspen to that point; the Series A Investments would realize a profit; those limited partners who had previously invested in Aspen would receive a complete return of their original capital; and other investors would make additional investments in Aspen after Redleaf made its investment.

21.    These representations were false. At that time and thereafter, the valuations of the Series A investments for which Whalen, Cilento, and Crockett were responsible were grossly overstated and the value of the Series A Investments was insufficient to repay SBA the $33 million in leverage which SBA had committed to Aspen and the more than $23 million in leverage which

6

1  Aspen had drawn before Redleaf's decision to invest in Aspen. In fact, Aspen faced regulatory

2  capital impairment under SBA regulations at the time it solicited Redleaf's Commitment because of

3  the depreciation of its existing investments that the overstated valuations concealed, and could not

4  survive without an investment from Redleaf which would provide it with an enhanced balance sheet

5  and the potential for $30 million more in SBA leverage. Moreover, despite Third-Party Defendants'

6  representations that other investors would make additional investments in Aspen, Third-Party

7  Defendants never even solicited new investors, and no new investors committed to invest in Aspen

8  after Redleaf made its Commitment. Had Redleaf known the true facts, Redleaf would never have

9  agreed to invest in Aspen.

10      22.    Before Redleaf made its Commitment, AVM, Whalen, Cilento, and Crockett also

11  concealed certain important facts. For example, AVM, Whalen, Cilento and Crockett concealed the

12  fact that SBA had issued an examination report in 2001 finding significant regulatory fault with

13  AVM's valuation procedures. Further, Whalen, Cilento, and Crockett failed to disclose that Whalen,

14  Cilento, and Crockett had managed another SBIC into regulatory capital impairment, Aspen

15  Ventures West II, L.P. ("Aspen II"). Again, had Redleaf known these facts at the time, it never would

16  have agreed to make the investment in Aspen.

17      23.    Another way that Whalen, Cilento, and Crockett persuaded Redleaf to invest in

18  Aspen was to represent to Redleaf that Aspen would be divided into two series of investments (the

19  Series A Investments and "Series B Investments"). Series A Investments would be those that existed

20  at the time of the admission of Redleaf into Aspen, and Series B Investments would be those made

21  after Redleaf's admission to Aspen. Whalen, Cilento, and Crockett also represented that the

22  agreements governing the operations of AVM and Aspen would be amended to reflect the separate

23  nature of the two series of investments, and that would further insulate Redleaf from any ill effect of

24  the Series A investments.

25      24.    The division of Aspen into Series A and Series B Investments was important to

26  Redleaf because Redleaf believed the division would insulate Redleaf from risk associated with the

27

28

1  Series A Investments, which had been funded with Aspen's private capital and leverage obtained

2  from SBA before Redleaf's admission to Aspen.

3       25.    Redleaf believed the division would insulate Redleaf from risk because this is what

4  Whalen, Cilento, and Crockett represented to Redleaf. Specifically, Whalen, Cilento, and Crockett,

5  who had far more knowledge and experience in this area than did the Redleaf principals, represented

6  that: the Series B Investments were to be funded exclusively with private capital obtained from the

7  Redleaf Commitment and SBA leverage backed by the capital that the Redleaf would commit to

8  Aspen; the affairs of the two Series would be kept separate; capital calls on Redleaf would

9  exclusively be used to fund Series B Investments and follow-on Series A Investments made after

10  Redleaf's admission to Aspen; and Redleaf's Commitment would be called only to obtain SBA

11  leverage used to fund those investments. In essence, Whalen, Cilento, and Crockett promised that

12  Redleaf would not be forced to contribute its capital to support the existing Series A Investments, or

13  to make SBA whole should the Series A investments fail.

14       26.    Redleaf conducted its final due diligence between January and February 2002. In

15  doing so, Redleaf accepted the representations of Third-Party Defendants. SBA thereafter approved

16  Redleaf's admission to Aspen on the terms and conditions presented to it by AVM, Whalen, Cilento,

17  and Crockett notwithstanding the AVM valuation deficiencies it had previously discovered, and

18  notwithstanding the failure of the proposed structure of Aspen and AVM to comply with its own

19  regulatory standards as pointed out below.

20       27.    Effective as of April 1, 2002, Aspen, by action of AVM and its limited partners,

21  admitted Redleaf as a limited partner. In order to accomplish this, the Amended and Restated

22  Limited Partnership Agreement of Aspen dated August 20, 1999 (the "LP Agreement"), was further

23  amended on April 1, 2002 to reflect the admission of Redleaf as a limited partner. The amendment

24  to the LP Agreement, which Aspen's counsel drafted, made clear that the Series A and Series B

25  Investments were in all ways to be treated separately and that, for all purposes, the two Series were

26  to be treated as separate funds. Specifically, the Amended and Restated Limited Partnership

27  Agreement made clear that:

28

DEFENDANT REDLEAF GROUP, INC.'S THIRD-PARTY COMPLAINT
CASE NO. C 07-05350 JW PVT

1        a.     the interests of the parties to the amended LP Agreement would be construed

2 as separate for purposes of partnership law, except as specifically provided by the amendment or as

3 required the Small Business Investment Act of 1958 and the regulations promulgated thereunder;

4        b.     the debts and liabilities of the two separate series of investments would be

5 treated separately;

6        c.     the records of the two separate series of investments would be treated

7 separately;

8        d.     SBA leverage that Aspen obtained before and after the amendment would be

9 separately allocated to the Series A and Series B Investments, with all outstanding leverage

10 attributable exclusively to Series A Investments and all leverage drawn thereafter attributable to

11 Series A follow-on Investments, or Series B Investments as determined by AVM;

12        e.     all investments of Aspen outstanding at the date of the amendment would be

13 considered Series A Investments and all thereafter (except for follow-on investments in Series A

14 investments) were to be considered Series B Investments; and

15        f.     capital calls would be made separately with regard to each Series.

16    28.    Further, the Second Amended and Restated Limited Liability Company Agreement of

17 AVM, dated August 20, 1999, (the "GP Agreement"), was also amended effective April 1, 2002, to

18 reflect the intentions of Aspen and Redleaf as to how AVM would manage Aspen after the

19 admission of Redleaf as a limited partner. Aspen's counsel also drafted this amendment. The

20 amendments to the GP Agreement:

21        a.     admitted John Kohler and Lloyd Mahaffey (the "Series B" or "Redleaf

22 Managing Members") as Managing Members of AVM, in addition to Cilento, Crockett and Whalen

23 (the "Series A" or "Aspen Managing Members") who up to that point had been the sole Managing

24 Members of AVM;

25        b.     provided for certain mechanisms that were intended to, and did, separate the

26 managing members of AVM into two separate and distinct classes:  (i) the existing Aspen Managing

27

28

1  Members, or Series A Managing Members, and (ii) the Series B Managing Members, consisting of

2  the Redleaf Managing Members, plus the existing Aspen Managing Members; and

3          c.    required the approval of a majority of Series B Managing Members for

4  decisions concerning the valuation, purchase, sale, or other acquisition or disposition of Series B

5  Investments by Aspen.

6      29.    Although Third-Party Defendants presented these changes to the Amended and

7  Restated Limited Partnership Agreement and the GP Agreement as beneficial to Redleaf (because of

8  the separation between the Series A and Series B investments), there were many features of the

9  changes to the agreements that were actually detrimental to Redleaf's interests.

10      30.    For example, because Whalen, Cilento, and Crockett were all three managing

11  members of the Series A and Series B investments, Whalen, Cilento, and Crockett had complete de

12  facto control of the valuation, purchase, sale, or other acquisition or disposition of both the Series A

13  and Series B Investments at all relevant times.

14      31.    Similarly, the separation between the Redleaf managing members and the Series A

15  investments meant that the Redleaf managing members had no way to participate in decision-making

16  and valuations with regard to the Series A Investments, or the requests for and utilization of SBA

17  leverage that supported those investments. In fact, at all relevant times after Redleaf's agreement to

18  invest in Aspen, AVM conducted separate Series A and Series B partnership meetings, and Messrs.

19  Kohler and Mahaffey were excluded from all Series A partnership meetings. This exclusion of the

20  Redleaf managers from critical decisions was in fact a violation of SBA standard regulatory

21  procedure which required all managers of an SBIC to value all of its investments. This is significant

22  because in order to value an SBIC's investments, the SBIC's managers need to have accurate

23  information on the value of the investments.

24      32.    Thereafter, as of April 1, 2002, Redleaf was admitted to Aspen as a limited partner.

25  Between April 2002, and December 2003, Redleaf met capital calls totaling almost $3 million and

26  Aspen obtained SBA leverage totaling $5 million. Redleaf further paid a $300,000 upfront

27

28

1  commitment fee, calculated on the total amount of SBA leverage – $30 million – that Aspen could

2  draw based on Redleaf's $15 million Commitment.

3      33.    However, Third-Party Defendants were continuing to conceal crucial information

4  from Redleaf, and misrepresent critical facts. Further, the Third-Party Defendants were breaching

5  their fiduciary duties to Redleaf via the concealment and misrepresentation, and the self-dealing

6  which the concealment allowed.

7      34.    For example, between April 2002, and January 2004, the Third-Party Defendants

8  failed to provide Redleaf the quarterly financial reports regarding the value of the Series A

9  Investments, as well as the entire operating budget of AVM. Third-Party Defendants further

10  specifically denied Redleaf certain material information regarding the Series A Investment operating

11  budget, and instead provided Redleaf with inaccurate representations regarding the value of the

12  Series A Investments.

13      35.    The failure to provide information concerning the Series A Investments allowed the

14  Third-Party Defendants to conceal acts of blatant self-dealing. Specifically, certain of Aspen's

15  Series A Investments were co-investments with Aspen Ventures West II, L.P. ("Aspen II"), another

16  fund that Whalen, Crockett, and Cilento managed. Aspen II was, and continued to be, capitally

17  impaired. Thus, Aspen's co-investments in Aspen II's portfolio investments appear to be nothing

18  less than an attempt to shore up Aspen II's rapidly depreciating portfolio at Aspen's – and ultimately

19  Redleaf's – expense.

20      36.    Redleaf discovered irregularities and problems at Aspen in 2002-2003. For example,

21  the very first Series B Investment that AVM authorized was in an Aspen II portfolio concern.

22  Further, despite representations to the contrary, AVM made no efforts to solicit any further

23  investment in Aspen. Moreover, Redleaf discovered that Aspen II was capitally impaired. Redleaf

24  was so concerned that it brought the irregularities and problems to AVM's attention, and

25  subsequently to the SBA. As a result, Aspen and Redleaf jointly proposed in March of 2003 that

26  Redleaf would contribute assets to Aspen in exchange for a release from its capital Commitment,

27  and SBA approved the proposal. However, the Redleaf Board of Directors decided in late 2003 not

28

11

1    to contribute assets valued at $24 million to Aspen in order to satisfy the remaining Commitment. In

2    hindsight, it is clear that the contribution of the assets would have enabled Aspen to draw

3    approximately $22 million in additional SBA leverage, thereby compounding SBA's losses.

4        37.    In January of 2004, Whalen, Cilento, and Crockett authorized a capital call on

5    Redleaf. They represented to Redleaf that the called capital and SBA leverage it would enable

6    would be sufficient to meet all outstanding obligations relative to both Series A Investments and

7    Series B Investments for the remaining term of Aspen. In this regard, they represented that the

8    leverage was to be used to meet Aspen obligations with respect to both Series A follow-on

9    Investments and Series B Investments, and for Aspen operating expenses. Whalen, Cilento and

10    Crockett at this time again stated that the value of the Series A portfolio would be sufficient to repay

11    all of SBA leverage drawn to that point and provide a return of capital. Based on these

12    representations, Redleaf agreed to honor $1.5 million of the Commitment, enabling Aspen to draw

13    $3 million in SBA leverage.

14        38.    However, Redleaf would never have agreed to satisfy any of the capital calls had it

15    known the true state of the value of the Series A Investments, or the investments in Aspen II's

16    failing portfolio.

17        39.    Shortly thereafter, the true status of the value of the Series A Investments and the

18    disastrous nature of the Aspen/Redleaf relationship became clear to Redleaf. Redleaf discovered

19    that Aspen had used Redleaf's capital and the leverage Redleaf's capital supported for purposes

20    other than Series B Investments and Series B management expenses.

21        40.    Redleaf also discovered that Whalen, Cilento and Crockett, who were solely

22    responsible for valuing the Series A Investments, had provided Redleaf and SBA with valuations of

23    those investments which were grossly misstated prior to the time of the Commitment and prior to the

24    January 2004 capital call, and had continued to do so thereafter.

25        41.    The difference between the value of the Series A portfolio as represented, and the

26    actual value of the portfolio was massive. Aspen's March 31, 2004 report to investors had indicated

27    that the value of the portfolio was $29.2 million. However, for reasons unknown to Redleaf, and

28

DEFENDANT REDLEAF GROUP, INC.'S THIRD-PARTY COMPLAINT
CASE NO. C 07-05350 JW PVT

1  solely within Whalen, Cilento and Crockett's knowledge, by June 30, 2004 the valuation of the same

2  investments had dropped to $12.9 million. This precipitous 56-percent decline in value triggered an

3  incurable regulatory capital impairment of Aspen which caused SBA to place Aspen in liquidation

4  status.

5      42.    Finally, after SBA placed Aspen in liquidation status, it became clear that SBA would

6  not recognize the protection that Third-Party Defendants represented the Series A/Series B structure

7  would provide Redleaf. Even though the great majority of the outstanding SBA leverage was drawn

8  prior to Redleaf's admission to Aspen, and relates to Series A Investments, SBA has insisted that

9  Redleaf remit the balance of its $15 million Commitment – which totals more than $10 million – to

10 the Receiver as reimbursement for the outstanding leverage. On information and belief, the Third-

11 Party Defendants knew that SBA would take that position, but represented otherwise in order to

12 convince Redleaf to invest the money to shore up the failing portfolios of Aspen and Aspen II.

13                          **FIRST CAUSE OF ACTION**

14                (Breach of Contract – against AVM, Cilento and Crockett)

15     43.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

16 allegations in Paragraphs 1 through 42 above.

17     44.    The amended LP Agreement and GP Agreement constitute contracts between AVM,

18 Cilento and Crockett, and Redleaf. Under these Agreements Redleaf agreed to make the

19 Commitment to Aspen and AVM, and Cilento and Crockett agreed to conduct the affairs of Aspen in

20 a prescribed manner.

21     45.    Redleaf did all of the things it was required to do under the Agreements, or was

22 excused from doing so, but AVM, Cilento and Crockett did not conduct the affairs of Aspen in

23 accordance with the terms of the LP Agreement and the GP Agreement. Among other things, they

24 did not deploy capital drawn from Redleaf's Commitment and SBA leverage backed by that capital

25 in accord with the Agreements; they did not value Aspen's portfolio investments in accord with the

26 Agreements or SBA regulations; they did not provide information regarding Aspen's investments

27 and operations to Redleaf in accord with the Agreements; they did not obtain leverage from SBA in

28

---

                                    13

1   accord with the Agreements; and they misrepresented the value of the Aspen portfolio to Redleaf

2   and to SBA in order to obtain leverage.

3       46.    Redleaf has been damaged by Third-Party Defendants' breaches of contract, in that

4   Redleaf lost millions of dollars of invested capital, and is even now expending sums defending a

5   case against SBA. Moreover, in the unlikely event that SBA is able to prove that Redleaf is

6   obligated to fulfill its Commitment to Aspen, Redleaf will have been damaged by AVM's, Cilento's

7   and Crockett's breach of contract in an amount to be proven at trial including, but not limited to any

8   money judgment awarded to SBA, any pre-judgment and post-judgment interest and reasonable

9   attorneys' fees and costs awarded to SBA, Redleaf's attorneys' fees, costs and prejudgment interest.

10      47.    Wherefore, Redleaf has been damaged according to proof.

11                          **SECOND CAUSE OF ACTION**

12      (Breach of the Covenant of Good Faith and Fair Dealing – against AVM, Cilento, and Crockett)

13      48.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

14   allegations in Paragraphs 1 through 47 above.

15      49.    The Amended LP Agreement and GP Agreement both include an implied covenant of

16   good faith and fair dealing.

17      50.    AVM, Cilento, and Crockett breached the covenant of good faith and fair dealing in

18   the contracts by virtue of the acts and omissions alleged herein.

19      51.    As a consequence of Third-Party Defendants' breaches, AVM, Cilento, and Crockett

20   have suffered damages in an amount according to proof.

21      52.    Wherefore, FT Partners prays for judgment as set forth below.

22                          **THIRD CAUSE OF ACTION**

23                      (Fraud – against AVM, Cilento and Crockett)

24      53.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

25   allegations in Paragraphs 1 through 52 above.

26      54.    In order to induce Redleaf's Commitment to Aspen, AVM, and its managing

27   members, Whalen, Cilento and Crockett, misrepresented and concealed, among other things, the

28

1    value of Aspen's portfolio of investments, their track record with the capitally impaired Aspen II, the

2    finding that AVM's valuation procedures were not in compliance with SBA regulations, the manner

3    in which Aspen would be managed after Redleaf's Commitment was made, the manner in which

4    investments would be made by Aspen after Redleaf's Commitment was made, the amount of

5    authority that Redleaf would have over the affairs of investments of Aspen after Redleaf's

6    Commitment was made, and the manner in which AVM would use Redleaf's Commitment to obtain

7    leverage from SBA.

8        55.    AVM's Cilento's and Crockett's representations were false.

9        56.    AVM, Cilento and Crockett knew these representations to be false and intended that

10    Redleaf rely on these representations.

11        57.    Redleaf reasonably relied on AVM's Cilento's and Crockett's representations.

12        58.    Redleaf has been damaged by Third-Party Defendants' misrepresentations, in that

13    Redleaf lost millions of dollars of invested capital, and is even now expending sums defending a

14    case against SBA.  Moreover, in the unlikely event that SBA is able to prove that Redleaf is

15    obligated to fulfill its Commitment to Aspen, Redleaf will be harmed by AVM's, Cilento's, and

16    Crockett's representations in an amount to be proven at trial including, but not limited to, any money

17    judgment, pre-judgment and post-judgment interest, reasonable attorney's fees and costs awarded to

18    SBA, Redleaf's attorneys' fees and costs, and prejudgment interest.

19        59.    Wherefore, Redleaf has been damaged according to proof.

20                    **FOURTH CAUSE OF ACTION**

21                (Negligent Misrepresentation – against AVM, Cilento, and Crockett)

22        60.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

23    allegations in Paragraphs 1 through 59 above.

24        61.    In order to induce Redleaf's Commitment to Aspen, AVM, through its managing

25    members, Whalen, Cilento and Crockett misrepresented the value of Aspen's portfolio of

26    investments, the manner in which Aspen would be managed after Redleaf's Commitment was made,

27    the manner in which investments would be made by Aspen after Redleaf's Commitment was made,

28

1    the amount of authority that Redleaf would have over the affairs of investments of Aspen after

2    Redleaf's Commitment was made, and the manner in which AVM would use Redleaf's Commitment

3    to obtain leverage from SBA.

4        62.    AVM, Cilento, and Crockett had no reasonable grounds for believing that these

5    representations were true.

6        63.    AVM, Cilento and Crockett intended that Redleaf rely on these representations.

7        64.    Redleaf reasonably relied on AVM's Cilento's and Crockett's representations.

8        65.    Redleaf has been damaged by Third-Party Defendants' misrepresentations, in that

9    Redleaf lost millions of dollars of invested capital, and is even now expending sums defending a

10   case against SBA. Moreover, in the unlikely event that SBA is able to prove that Redleaf is

11   obligated to fulfill its Commitment to Aspen, Redleaf will be harmed by AVM's Cilento's and

12   Crockett's representations in an amount to be proven at trial including, but not limited to, any money

13   judgment, pre-judgment and post-judgment interest, reasonable attorney's fees and costs awarded to

14   SBA, Redleaf's attorneys' fees and costs, and prejudgment interest.

15       66.    Wherefore, Redleaf has been damaged according to proof.

16                            **FIFTH CAUSE OF ACTION**

17                (Equitable Indemnity – against AVM, Cilento and Crockett)

18       67.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

19   allegations in Paragraphs 1 through 66 above.

20       68.    On or about October 19, 2007, Plaintiff SBA filed the underlying suit against Redleaf

21   seeking a money judgment, pre-judgment and post judgment interest, and reasonable attorneys' fees

22   and costs. Redleaf denies and continues to deny any conduct or omission giving rise to any liability

23   whatsoever with respect to the underlying suit.

24       69.    In the event SBA should recover any sums from Redleaf in the suit, the liability of

25   Redleaf will be secondary, passive, and vicarious in nature, or legally imposed, and based solely

26   upon its status or relationship to AVM, Cilento and Crockett, and not as a result of any acts, conduct

27   or omission of Redleaf which caused or contributed to the cause of liability or damages alleged by

28

1  SBA, and all of said recovery was proximately caused or contributed to by the acts, omissions, and

2  tortious conduct of AVM, Cilento and Crockett.

3      70.    Any liability of Redleaf in the underlying suit would be proximately caused by the

4  acts or omissions of AVM, Cilento and Crockett.

5      71.    Redleaf has suffered, and will continue to suffer, actual damages in an amount as yet

6  determined as a direct and proximate result of the wrongfully and legally culpable conduct of AVM,

7  Cilento and Crockett, as herein alleged.  Such damages include, but are not limited to any money

8  judgment, pre-judgment and post-judgment interest and reasonable attorneys' fees and costs SBA is

9  awarded in the underlying suit and Redleaf's legal fees and costs incurred and to be incurred, in

10  defending the underlying suit.

11      72.    Redleaf is entitled to be fully and completely indemnified and held harmless by

12  AVM, Cilento and Crockett for its losses herein alleged.

13      73.    Wherefore, Redleaf has been damaged according to proof.

14                    **SIXTH CAUSE OF ACTION**

15              (Declaratory Relief – against AVM, Cilento and Crockett)

16      74.    Redleaf realleges and incorporates by reference, as if fully set forth herein, the

17  allegations in Paragraphs 1 through 73 above.

18      75.    On or about October 19, 2007, Plaintiff SBA filed the underlying suit against Redleaf

19  seeking a money judgment interest and reasonable attorney's fees and costs.

20      76.    If SBA sustained losses as alleged in its complaint, these losses were caused entirely

21  by AVM, Cilento and Crockett.

22      77.    An actual controversy has arisen and now exists between Redleaf and AVM, Cilento

23  and Crockett in that Redleaf contends, that as between Redleaf and AVM, Cilento and Crockett

24  responsibility, if any, for the losses claimed by SBA in the underlying suit rests entirely on AVM,

25  Cilento and Crockett, and that as a result, AVM, Cilento and Crockett are obligated to fully

26  indemnify Redleaf for any sums that Redleaf may be compelled to pay as the result of any losses,

27  judgment, or other awards recovered by SBA against Redleaf.

28

1    78.    Wherefore, Redleaf has been damaged according to proof.

2                              **SEVENTH CAUSE OF ACTION**

3           (Breach of Fiduciary Obligations – against AVM, Cilento and Crockett)

4    79.    Redleaf realleges and incorporates by reference if is fully set forth herein, the

5    allegations in Paragraphs 1 through 78 above.

6    80.    AVM, Cilento and Crockett had fiduciary obligations to manage Aspen in a manner

7    consistent with applicable law, the duties of care and loyalty, and the GP and LP Agreements.

8    81.    AVM, Cilento and Crockett breached their fiduciary obligations.

9    82.    Redleaf has been damaged by Third-Party Defendants' breaches of fiduciary duty, in

10   that Redleaf lost millions of dollars of invested capital, and is even now expending sums defending a

11   case against SBA.  Moreover, in the unlikely event that SBA is able to prove that Redleaf is

12   obligated to fulfill its Commitment to Aspen, Redleaf will be harmed by AVM's Cilento's and

13   Crockett's representations in an amount to be proven at trial including, but not limited to, any money

14   judgment, pre-judgment and post-judgment interest, reasonable attorney's fees and costs awarded to

15   SBA, Redleaf's attorneys' fees and costs, and prejudgment interest.

16   83.    Wherefore, Redleaf has been damaged according to proof.

17                              **EIGHTH CAUSE OF ACTION**

18           (Conspiracy to Commit Fraud – Against Cilento & Crockett)

19   84.    Redleaf realleges and incorporates by reference if is fully set forth herein, the

20   allegations in Paragraphs 1 through 82 above.

21   85.    Cilento and Crockett entered into a conspiracy with Whalen to commit fraud, as

22   detailed above.  Both Cilento and Crockett were aware that each other, and Whalen, planned the

23   fraud.  Additionally, both Cilento and Crockett agreed among themselves, and with Whalen, that the

24   fraud as detailed above be committed.

25   86.    Redleaf has been damaged by Third-Party Defendants' misrepresentations, in that

26   Redleaf lost millions of dollars of invested capital, and is even now expending sums defending a

27   case against SBA.  Moreover, in the unlikely event that SBA is able to prove that Redleaf is

28

1  obligated to fulfill its Commitment to Aspen, Redleaf will be harmed by AVM's Cilento's and

2  Crockett's representations in an amount to be proven at trial including, but not limited to, any money

3  judgment, pre-judgment and post-judgment interest, reasonable attorney's fees and costs awarded to

4  SBA, Redleaf's attorneys' fees and costs, and prejudgment interest.

5       87.    Wherefore, Redleaf has been damaged according to proof.

6                              **PRAYER FOR RELIEF**

7       WHEREFORE, Defendant/Third-Party Plaintiff Redleaf, Inc. prays for the following relief

8  against Aspen Venture Management III, LLC, Alexander P. Cilento and E. David Crockett.

9       A.     Damages according to proof.

10      B.     In the unlikely event that SBA is able to prove that Redleaf is obligated to fulfill its

11  Commitment to Aspen and is awarded a money judgment, pre-judgment or post-judgment interest,

12  and/or reasonable attorneys' fees and costs, Redleaf is entitled to recover such sums from AVM,

13  Cilento and Crockett, inclusive of interest.

14      C.     In the unlikely event that SBA is able to prove that Redleaf is obligated to fulfill its

15  Commitment to Aspen and is awarded a money judgment, pre-judgment and post-judgment interest,

16  and/or reasonable attorneys' fees and costs, Redleaf is entitled to indemnity for such sums, including

17  its own reasonable attorneys fees and costs, from AVM, Cilento and Crockett;

18      D.     A declaration that AVM, Cilento and Crockett are obliged to fully indemnify Redleaf

19  for any sums that Redleaf may be compelled to pay as a result of any money judgment or other

20  awards recovered by SBA from Redleaf.

21      E.     Redleaf's attorneys' fees and costs in this action;

22      F.     Prejudgment interest; and

1    G.    Such other relief, including equitable relief, as this Court deems Redleaf is entitled.

2

3    Dated:  December 17, 2007                        KIRKPATRICK & LOCKHART PRESTON
                                                      GATES ELLIS LLP
4

5                                           By:    Matthew G. Ball /s/
                                                   Matthew G. Ball, Esq. (CA Bar 208881)
6                                                  55 Second Street, Suite 1700
                                                   San Francisco, CA  94105
7                                                  Telephone:  (415) 882-8200
                                                   Facsimile:  (415) 882-8220
8                                                  (matthew.ball@klgates.com)

9                                                  Martin D. Teckler (pro hac vice application
10                                                 pending)
                                                   martin.teckler@klgates.com
11                                                 Kirkpatrick & Lockhart Preston Gates Ellis
                                                   LLP
12                                                 1601 K Street, NW Washington, DC, 20006-
                                                   1600
13                                                 Telephone: (202) 778-9000
                                                   Facsimile: (202) 778- 9100
14

15                                                 Attorneys for Defendant/Third-Party Plaintiff
                                                   Redleaf Group, Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT REDLEAF GROUP, INC.'S THIRD-PARTY COMPLAINT
CASE NO. C 07-05350 JW PVT

1

## JURY DEMAND

2      Pursuant to Federal Rule of Civil Procedure 38(b), and Northern District Local Rule 3-6,

3  Third-Party Plaintiff Redleaf Group, Inc. hereby demands a trial by jury.

4

5  Dated:  December 17, 2007                          KIRKPATRICK & LOCKHART PRESTON
                                                     GATES ELLIS LLP
6

7                                          By:   /s/ Matthew G. Ball
                                                 Matthew G. Ball, Esq. (CA Bar 208881)
8                                                55 Second Street, Suite 1700
                                                 San Francisco, CA  94105
9                                                Telephone:  (415) 882-8200
                                                 Facsimile:  (415) 882-8220
10                                               (matthew.ball@klgates.com)

11
                                                 Martin D. Teckler (pro hac vice application
12                                               pending)
                                                 martin.teckler@klgates.com
13                                •              Kirkpatrick & Lockhart Preston Gates Ellis
                                                 LLP
14                                               1601 K Street, NW Washington, DC, 20006-
                                                 1600
15                                               Telephone: (202) 778-9000
                                                 Facsimile: (202) 778- 9100
16

17

18                                               Attorneys for Defendant/Third-Party Plaintiff
                                                 Redleaf Group, Inc.
19

20

21

22

23

24

25

26

27

28
                                            21