1  Gregory C. Nuti (Bar No. 151754)
   SCHNADER HARRISON SEGAL & LEWIS LLP
2  One Montgomery Street, Suite 2200
   San Francisco, CA 94104-5501
3  Telephone: 415-364-6700
   Facsimile: 415-364-6785
4  E-mail: gnuti@schnader.com

5  Beverley Hazlewood Lewis
   Trial Attorney, Office of General Counsel
6  U.S. Small Business Administration
   409 3rd Street, S.W., Suite 7200
7  Washington, D.C. 20416
   Telephone (202) 619-1605
8  Facsimile (202) 481-0468

9  Attorneys for Plaintiff,
   United States Small Business Administration in its
10 capacity as Receiver for Aspen Ventures III, L.P.

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

                           SAN JOSE DIVISION
14

15  UNITED STATES SMALL BUSINESS          Case No.: C07-05350 JW/PVT
    ADMINISTRATION IN ITS CAPACITY AS
16  RECEIVER FOR ASPEN VENTURES III, L.P.,  **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT OF**
                                            **MOTION FOR SUMMARY**
                       Plaintiff,           **JUDGMENT, OR IN THE**
17                                          **ALTERNATIVE SUMMARY**
         vs.                                **ADJUDICATION, ON THE**
18                                          **RECEIVER'S CLAIM FOR BREACH**
    REDLEAF GROUP, INC.,                    **OF CONTRACT**
19
                       Defendants.          Date:      June 23, 2008
20                                          Time:      9:00 a.m.
    REDLEAF GROUP, INC.,                    Location:  280 South First Street,
21                                                     Courtroom 8, 4th Floor
                       Third-Party Plaintiff,          San Jose, CA 95113
22                                          Judge:     Hon. James Ware

23       vs.

24  ASPEN VENTURES MANAGEMENT III,
    LLC, a Delaware Limited Liability Company,
25  ALEXANDER P. CILENTO, a California
    resident, and DAVID CROCKETT, a California
26  resident, and DOES 1-10,

27                     Third-Party Defendants.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1

# TABLE OF CONTENTS

2

Page

3    I.    INTRODUCTION ................................................................................................1

II.   FACTS .............................................................................................................2

        A.    Redleaf Joins Aspen Ventures ...........................................................2

        B.    Aspen Ventures Is Placed in Receivership ........................................5

III.  ARGUMENT ...................................................................................................6

        A.    Standards for Granting Summary Judgment .....................................6

        B.    The Receiver Is Entitled to Summary Judgment Against Redleaf on its
              Claim for Breach of Contract .............................................................7

        C.    The Affirmative Defenses are Legally Insufficient ...........................8

                1.    The Statutory Framework of the Act and Regulations Make Redleaf's
                      Capital Contribution Obligation Absolute....................................8

                2.    The First Amendment and Admission Agreement Did Not and
                      Cannot Alter the Statutory Scheme or the Enforceability of the
                      SBA Annex..................................................................................10

                3.    The First Amendment Does Not Excuse Redleaf's Obligation to Pay
                      its Full Capital Commitment .......................................................12

                4.    Redleaf's First, Eighth, Ninth, Tenth and Eleventh Affirmative
                      Defenses Fail as a Matter of Law ...............................................14

        D.    Redleaf Cannot Assert Equitable Claims Attributable to the SBA as Regulator
              In Defense of Claims Asserted by the Receiver On Behalf of the
              Receivership Estate.............................................................................16

                1.    Redleaf's Fifth and Seventh Affirmative Defenses of Fraud
                      and Recsission Fail as a Matter of Law.......................................16

                2.    Redleaf's Third Affirmative Defense Of Unclean Hands Is Barred
                      as a Matter of Law ......................................................................19

                3.    Redleaf's Sixth Affirmative Defense Of Estoppel Is Barred as
                      Matter of Law ..............................................................................23

                4.    Redleaf's Second Affirmative Defense of Latches is Barred As a
                      Matter of Law ..............................................................................23

                5.    Redleaf's Twelfth Affirmative Defense Failure to Mitigate Damages Is
                      Barred as a Matter of Law ...........................................................24

IV.   CONCLUSION ...............................................................................................24

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

## TABLE OF AUTHORITIES

### FEDERAL CASES

Pages

*A. Farber and Partners, Inc. v. Maynard Hal Garber*, 417 F. Supp 2d 1143 (C.D. Cal. 2006) ...................................................................................................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)...........7

*Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995) .........................................7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ......................7

*Federal Deposit Ins. Co. v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995) ............20, 21, 22, 23

*Harmelin v. Man Fin., Inc.*, 2007 U.S. Dist. LEXIS 73851 (E.D. Pa. 2007*)* ...............................21

*Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103 (3d Cir. 1985), *cert. denied*, 475 U.S. 1013, 106 S. Ct. 1190, 89 L. Ed. 2d 305 (1986)..........................................7

*Official Committee of Unsecured Creditors v. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) .......................................................................................................................21

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) ...................................................................21

*U.S. Small Business Administration v. Chimicles*, 447 F.3d 207 (2006)...............19, 14, 15, 19, 23

*United States of America v. Acorn Technologies Fund, L.P.*, 2006 U.S. Dist. LEXIS 3507 (E.D. Pa. 2006) .........................................................................................................21

*United States Small Business Administration v. Propper*, 2004 U.S. LEXIS 23363 (2004) ........17

*United States v. Acorn Technology Fund*, 429 F.3rd 438 (3rd Cir. 2005) .......................16, 17, 18

*Walton v. Nalco Chemical Company*, 272 F.3d 13 (1st Cir. 2001)..............................................15

*Waslow v. Grant Thorton LLP (In re Jack Greenberg)*, 240 B.R. 486 (E.D. Pa. 1999) ..............21

### STATE CASES

*Affiliated Enterprises v. Waller, Del. Super.*, 5 A.2d 257 (1939) ..................................................15

*American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1 (Del. Ch., 1992).................24

*American University v. Todd, Del. Super.*, 1 A.2d 595 (1938) ....................................................16

*Camerer v. Cal. Sav. & Commercial Bank of San Diego*, 4 Cal. 2d 159, 48 P.2d 39 (1935) .......................................................................................................................21

*Edward M. Crough, Inc. v. Department of General Services of District of Columbia, D.C.App.*, 572 A.2d 457 (1990).................................................................................24

1  *Gordon v. Rolfe*, 1986 Del. Ch. LEXIS 372 (1986) ........................................................15

2  *Hudak v. Procek*, 806 A.2d 140 (Del. 2002.) ...............................................................24

3  *Interim Health Care, Inc. v. Spherion Corporation*, 884 A.2d 513 (Del. 2005)............8

4  *Kousi v. Sugahara*, 1009 Del. Ch. LEXIS 194 (1991) ...................................................20

5  *Nakahara v. NS 1991 American Trust*, 718 A.2d 518 (1998) .................................22, 23

6  *Smithkline v. Merck & Co., Inc.*, 766 A.2d 442 (2000)..................................................22

7  *Wolfe v. Crosby, 377 A.2d 22 (1997)* ...........................................................................16

8                          **FEDERAL STATUTES**

9  13 C.F.R. § 107.1820...........................................................................................................9

10  13 C.F.R. §107.1820(b)(5) ...............................................................................................19

11  13 C.F.R. § 107.1910........................................................................................................23

12  13 CFR § 107.20..................................................................................................................8

13  13 CFR 107.30......................................................................................................................8

14  13 C.F.R. § 107.500..........................................................................................................19

15  15 U.S.C. § 681 ....................................................................................................................9

16  28 U.S.C. § 1346, 2671 et. seq ........................................................................................22

17  28 U.S.C. § 2679 ..............................................................................................................18

18  Fed. R. Civ. P. 56(c) ...........................................................................................................7

19  13 C.F.R. § 107.820f(3).......................................................................................................8

20                          **STATE STATUTES**

21  *6 Del Code § 3201(a)(d)*.........................................................................................7, fn 3

22

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1    **I.    INTRODUCTION**

2    Plaintiff, the United States Small Business Administration in its capacity as

3    Receiver for Aspen Ventures III, L.P. ("Receiver") seeks pursuant to Federal Rule of Civil

4    Procedure 56 summary judgment, or in the alternative summary adjudication, on its claim for

5    breach of contract against Redleaf Group, Inc. ("Readleaf").

6    Redleaf agreed to make a $15 million capital contribution to, and become limited

7    partner of, Aspen Ventures III, L.P ("Aspen Ventures").  Redleaf has only contributed $4.4

8    million, leaving $10.6 million due and owing.  These facts are not in dispute.

9    Redleaf asserts two theories in defense of the Receiver's claim.  Redleaf first

10    argues that it is not obligated to pay the remaining $10.6 million because under the terms of the

11    applicable agreements, it is not obligated to contribute capital to satisfy debts incurred by the

12    partnership prior to its admission as a partner.  Redleaf's second argument is that if in fact it is

13    obligated for the remaining $10.6 million, alleged wrongs of SBA, *as regulator*, should be

14    imputed to the Receiver, thus absolving Redleaf of its liability.  Both of these arguments fail.

15    As discussed more fully below, Redleaf overlooks the fact that the partnership

16    agreement (through its express incorporation of applicable federal statutes, regulations and the

17    SBA Annex PS) provides that in the event Aspen is placed into receivership, the receiver is

18    empowered to compel payment of a partner's unsatisfied obligation to make capital contributions

19    to the partnership, and that such obligation to contribute "shall not be subject to any conditions

20    set forth in the Agreement" other than conditions relating to the amount and dates the

21    contributions are due.  Thus, assuming *arguendo* that Redleaf's agreement with Aspen

22    conditions its capital commitment upon utilizing those funds only to pay post-admission debts,

23    that is a "condition set forth in the Agreement" which is overridden when Aspen was placed into

24    receivership.  Moreover, Redleaf committed $15 million to Aspen Ventures with full knowledge

25    that its capital commitment was unconditionally binding and liable for any and all debts existing

26    prior to its admission to the partnership.  The applicable agreements and negotiations leading to

27    them unambiguously bear this out.  Redleaf's attempt to argue otherwise is a desperate attempt to

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1  get out of a deal that, with 20/20 hindsight, it now regrets.  Redleaf's allegations of fraud and

2  wrong doing are without both legal significance and factual basis.

3                                      II.    **FACTS**

4      A.    **Redleaf Joins Aspen Ventures.**

5              Aspen Ventures III, L.P. ("Aspen Ventures") was formed for the purpose

6  operating as a venture capital fund licensed as a SBIC under the Small Business Investment Act

7  of 1958 (the "Act") as implemented by 13 CFR Part 107 (the "Regulations").  Aspen Ventures is

8  a limited partnership formed under the laws of Delaware pursuant to that certain Amended and

9  Restated Limited Partnership Agreement dated and effective as of August 20, 1999 ("Partnership

10  Agreement").  Declaration of Dick Moser In Support of Motion for Summary Judgment, ¶ 6,

11  **Exhibit A-B** (hereinafter, "Moser Decl.").

12              In late 2001, Aspen Ventures was pursuing limited partners that could inject

13  additional capital into the partnership.  From the outset, Aspen Ventures contemplated a two

14  tiered arrangement whereby Series A investments would consist of investments made before

15  Redleaf was admitted to the partnership and Series B investments would consist of investments

16  made after Redleaf was admitted to the partnership.  However, at all times, Aspen Ventures *and*

17  *Redleaf* knew and understood that the Series A/Series B structure would not shield Redleaf from

18  making its full capital commitment.

19              On November 15, 2001, Aspen Ventures sent a fax to the SBA proposing a

20  structure for a new equity infusion for Aspen Ventures ("Term Sheet").  The Term Sheet

21  generally outlined the Series A/Series B construction, but made clear that Series B may be

22  required to fund Series A liabilities:

23              Pool 2 will be accounted for separately from the existing Aspen fund.
            SBIC regulations will apply to both the existing Aspen Fund and Pool 2 on a
24          combined basis.  An interfund liability will be created in the event one fund is
            required by SBIC regulations to make distributions to the SBA on behalf of the
25          other fund.  Such interfund liability will carry 7% annual rate of interest.

26
27  Moser Decl., ¶ 7, **Exhibit C**.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

Redleaf explicitly acknowledged this aspect of the investment in an analysis provided to its Board of Directors of the key terms of its admission to Aspen Ventures (hereinafter, "Board Analysis"):

> **Legal Structure:**  Under Delaware law, a limited partnership may be divided into two or more series, each of which may have distinct sets of assets, liabilities and interest holders.  A limited partnership agreement may provide that one series will not be liable for any liabilities of another series.  *However, the laws and regulations applicable to the Old Fund and the New Fund as SBICs provide for cross-liability between these series under certain circumstances.*
>
> ***
>
> **Cross-Collateralization of the New Fund and the Old Fund**:  Although the New Fund and the Old Fund are generally treated under Delaware law as if they were separate entities, under certain circumstances *the New Fund may be required to make payments to the SBA that relate to leverage allocated to the Old Fund* (and the Old Fund may have similar obligations with respect to leverage allocated to the New Fund).  When this happens, the payment from New Fund (or the Old Fund, as the case may be) assets will be treated as a non-recourse loan to the other fund.

Moser Decl., ¶ 9, **Exhibit E** (emphasis added).

On February 13, 2002, the SBA provided preliminary approval of the amendments to Aspen Ventures' partnership agreement via a letter that was transmitted to both Aspen Ventures and Redleaf.  The letter explicitly states: "Regardless of the internal accounting treatment provided for within the aforementioned amendments for each series, Operations will continue to view the Series A and B limited partners as one fund for purposes of leverage eligibility, management fee structure, distributions and other regulatory matters."  Moser Decl., ¶ 8, **Exhibits D**.

Redleaf conducted a Board Meeting on February 13, 2002 to discuss, among other things, its proposed investment in Aspen.  The meeting minutes reflect that the "Board heard an overview of the transaction and legal structure.  The capital call procedure, allocation of SBA leverage and *cross collateralization* of the new fund and the old fund were described."  Moser Decl., ¶ 9, **Exhibit F** (emphasis added).  Thereafter, Redleaf's Board approved the transaction.  *Id*.

On March 4, 2002, Thad Whalen asked Mike Tomana of Redleaf to comment on a draft cover letter intended to be sent to the existing limited partners of Aspen Ventures.  The

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1  letter was to obtain approval of the Series A/Series B structure and admission of Redleaf to the

2  partnership.  That letter states, under the heading "Risks":

3
> Notwithstanding the division of Aspen III into to two distinct series of interests, the SBA will treat the partnership, including Aspen III-A and Aspen III-B, as a single entity. *This means that the SBA will have the right to satisfy liabilities associated with leverage against either series regardless of the fact that the general partner and the limited partners view such liabilities as belonging to a particular series.*  In short, the SBA will have the right to seek Aspen III-A assets to satisfy Aspen III-B leverage liabilities, thereby potentially reducing Aspen III-A returns or delaying the distributions of such returns to the Series A limited partners (and vice versa).

8  Moser Decl., ¶ 10, **Exhibit G** (emphasis added).

9         The existing limited partners of Aspen Ventures approved the Series A/Series B

10 amendments and the admission of Redleaf as a new limited partner pursuant to the terms of the

11 First Amendment to Amended and Restated Limited Partnership Agreement ("First

12 Amendment").  Moser Decl., ¶ 11, **Exhibit H**.  The First Amendment provided *inter alia* that

13
> [T]he debts, liabilities, and obligations incurred, contracted for or otherwise existing with respect to a particular series will be enforceable against the assets of such series only. . . and none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to any series shall be enforceable against the assets of such other series.

16
> The allocation of Leverage . . . shall be as follows: Any Outstanding Leverage as of the time immediately prior to the execution of this Amendment shall be Leverage associated with Series A…

18 *See* First Amendment, ¶¶ 1(a) and (1)(c)(i)).

19         However, the First Amendment goes on to explicitly acknowledge that assets

20 attributable to one series may be applied to pay SBA loans (referred to as the "Leverage")

21 attributable to the other series:

22
> It is the intent of the parties that all distributions to the Limited Partners of one series shall be made solely from the assets of such series….[n]otwithstanding the foregoing, *the parties acknowledge* that in the event the General Partner makes a distribution to the Limited Partners of one series, or in certain other circumstances, the General Partner may be required to make a distribution to the Preferred Limited Partners [SBA] pursuant to Article VII of the SBA Annex.  *To the extent that any such distribution to the Preferred Limited Partners is made out of the assets of one series…with respect to Leverage attributable to another series…the amount of assets…that are so utilized…shall be deemed to be a non-recourse advance [from one series to the other series.]*

28 *See* First Amendment, ¶ 2(h) (emphasis added).

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   On April 1, 2002, Redleaf was admitted to Aspen Ventures as "Series B" limited

2   partner pursuant to the terms of the Series B Admission and Amendment Agreement

3   ("Admission Agreement").  Moser Decl.  ¶ 12, **Exhibit I**.

4   The parties' conduct after Redleaf was admitted confirm their understanding that

5   Redleaf could be compelled to make its capital contribution in order to satisfy Leverage obtained

6   prior to its admission as a partner as evidenced by a financial statement prepared by Aspen

7   Ventures' independent accountants and correspondence between Aspen Ventures and Redleaf

8   over the issue. Moser Decl., ¶¶ 13-14, **Exhibits J, K**.

9   **B.    Aspen Ventures Is Placed in Receivership.**

10   This Court appointed the Receiver pursuant to the terms of the Stipulation for

11   Consent Order of Receivership dated October 4, 2006 ("Consent Order).  Request for Judicial

12   Notice, ¶ 1, **Exhibit A** ("RJN").

13   On October 19, 2007, the Receiver filed the instant Complaint asserting a single

14   claim against Redleaf for breach of contract for failing to make its capital contribution in the

15   amount of $10.6 million to Aspen Ventures.  RJN, ¶ 3, **Exhibit C**.

16   On December 17, 2007, Redleaf filed its Answer of Defendant Redleaf Group,

17   Inc. ("Answer").  RJN, ¶ 4, **Exhibit D**.  The Answer did not deny the existence of Redleaf's

18   contractual obligations, but asserted twelve (12) affirmative defenses ("Affirmative Defenses[1]").

19   Also on December 17, 2007, Redleaf filed Defendant Redleaf Group, Inc.'s Third Party

20   Complaint (Jury Trial Demanded) ("Third Party Complaint") against Aspen Ventures

21   Management, LLC (Aspen Ventures' managing general partner), and its principals Alexander

22   Cilento and David Crockett (collectively, "Third Party Defendants").  RJN, .¶ 5, **Exhibit E.**

23   On March 10, 2008, the Receiver filed a Motion to Strike certain affirmative

24   defenses asserted by Redleaf.  RJN, ¶ 6, **Exhibit F**.  In its opposition to the Motion to Strike,

25   Redleaf revealed its defensive theories ("Opposition").  RJN, ¶ 7, **Exhibit G**.

26

27   [1] Redleaf has withdrawn its Fourth Affirmative Defense of lack of standing.  Opposition, p.1, fn. 2.

28

1    The essence of Redleaf's defenses is that its capital commitment can only be

2   called upon to repay obligations associated with investments made after Redleaf was admitted as

3   a Series B limited partner:

4          Accordingly, to assuage Redleaf s concerns about prior investments,
       Redleaf and Aspen III agreed to divide the Aspen III investments into Series A
5      and Series B investments.  Series A investments, generally, would consist of
       investments made before Redleaf agreed to invest in Aspen III.  Series B
6      investments would consist of investments made after Redleaf agreed to invest.
       Among other terms, Aspen III and Redleaf agreed that its commitment would not
7      be used to support or repay SBA leverage drawn in connection with Series A
       investments.
8
9          Pursuant to this agreement, Redleaf was admitted to the Aspen Ventures
       III, L.P.  The parties memorialized the Series A/Series B structure in the [First
10     Amendment].  The parties accomplished Redleaf's admission itself by the
       [Admission Agreement].  SBA approved the structure in April of 2002.
11
           Without an agreement such as the [First Amendment] to insulate Redleaf
12     from claims relating to leverage supporting Series A investments - and without
       the SBA's approval of the [First Amendment] - Redleaf would never have agreed
13     to become a limited partner of Aspen III.

    Opposition, p.6:1-19 (citations omitted).

14
15         Redleaf's argument above is nothing more than a desperate attempt to rewrite

16  history.  The indisputable evidence of the negotiations leading to Redleaf's commitment – in

17  particular, the Board Analysis, Board Minutes, and 2002 letter to existing partners concerning

18  Redleaf's admission (which Redleaf reviewed and approved) –  proves that Redleaf knew and

19  understood that its capital commitment was not insulated from claims relating to Leverage

20  supporting Series A investments.

21         Perhaps knowing the applicable agreements do not support its position, Redleaf

22  also makes completely unsubstantiated allegations that it was mislead in agreeing to its capital

23  commitment.  As set forth above, this is simply not the case.  However, even if true, fraud does

    not provide a defense for Redleaf's obligation.

24
25                              III.    ARGUMENT

    A.      Standards for Granting Summary Judgment

26
27         Rule 56(c) provides for summary judgment when the moving party demonstrates

28  that there is no genuine issue of material fact and the evidence establishes the moving party's

Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501
Telephone: 415-364-6700

1    entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *Celotex Corp. v. Catrett,* 477

2    U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the moving party has satisfied its

3    initial burden, the party opposing the motion must establish that a genuine issue as to a material

4    fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.

5    1985), *cert. denied,* 475 U.S. 1013, 106 S. Ct. 1190, 89 L. Ed. 2d 305 (1986).  In considering a

6    motion for summary judgment, all evidence submitted must be viewed in a light most favorable

7    to the party opposing the motion.  *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 330 (3d

8    Cir. 1995).

9         The party opposing the motion for summary judgment cannot rest on mere

10    allegations and must instead present actual evidence that creates a genuine issue as to a material

11    fact for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d

12    202 (1986).  However, a mere "scintilla" of evidence in favor of the non-movant is insufficient to

13    withstand a summary judgment motion.  *Id*. at 252.

14            **B.**     **The Receiver Is Entitled to Summary Judgment Against Redleaf on its Claim**

15                       **for Breach of Contract.**

16         In order to prevail on a claim for breach of contract under Delaware law[2], the

17    Receiver must prove (1) a contractual obligation; (2) a breach of that obligation and (3) resulting

18    damages.  *Interim Health Care, Inc. v. Spherion Corporation*, 884 A.2d 513, 548 (Del. 2005).

19         There is no dispute that Redleaf entered into a contract with Aspen Ventures that

20    requires Redleaf contribute $15 million in capital to Aspen Ventures.  Answer, ¶12.  Redleaf

21    further admits that it has not paid the full $15 million as agreed.  Answer, ¶ 19.  Further, there

22    can be no dispute that the Receiver has damages of $11,163,095.22 as of May 19, 2008 as a

23    result of Redleaf failure to pay as agreed[3].  Moser Decl., ¶18.  Therefore, Redleaf is liable for

24    breach of contract in the amount of at least $11,163,095.22 unless it can prevail on its

---

25    [2] Delaware law applies under the Partnership Agreement.  Partnership Agreement, ¶ 10.4.

26    [3] Delaware law provides for prejudgment interest at the rate of 5% over the Federal Reserve

27          Discount Rate from the time of injury through judgment.  6 Del. C. § 2301(a), (d).  The
      Federal Reserve Discount Rate was 6.25 % as of May 29, 2007.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1    Affirmative Defenses.  As will be shown below, Redleaf's Affirmative Defenses do no provide

2    an escape for its liability.

3    **C.    The Affirmative Defenses are Legally Insufficient.**

4                1.    The Statutory Framework of the Act and Regulations Make Redleaf's
                       Capital Contribution Obligation Absolute.

5

6                Congress and SBA specifically established a federal legal framework to prevent

7    private limited partners from evading their payment obligations to SBA's licensees under the Act

8    when the SBIC becomes insolvent.  As relevant here, the regulations prescribe specific terms that

9    all SBIC partnership agreements must contain.  15 U.S.C. § 681; 13 CFR §§ 107.20, 107.30**.**  In

10   conformity with that requirement, Aspen Ventures' Partnership Agreement is subject to all

11   existing and future provisions of the Act and its Regulations.  Partnership Agreement, ¶¶ 1.2 and

12   2.5; 13 CFR 107.30.  Limited partners, such as Redleaf, by executing the partnership agreements

13   acknowledge and agree to abide by these federal regulations and terms mandated by the federal

14   regulations in order to participate in a SBIC.

15               Under 13 C.F.R. § 107.1820f(3) upon the occurrence of certain events triggering

16   so-called "Restricted Operations Conditions" or "Removal Conditions", including inadequacy of

17   capital and the failure to repay sums due to the SBA, limited partners can be compelled to satisfy

18   any unperformed capital contributions.  13 C.F.R. §107.1820f(3).  This regulation is

19   implemented in Paragraph 7.1 of the SBA Annex PS ("SBA Annex"), incorporated into the

20   Partnership Agreement pursuant to paragraph 2.5.  Paragraph 7.1 of the SBA Annex provides:

21               (b) Notwithstanding any provision in the Agreement to the contrary
     (except as expressly provided in this Section 7.1(b)), in the event that the

22   Partnership is subject to restricted operations (as such term is used in the SBIC
     Act) and prior to the liquidation of the Partnership the *SBA requires the General*

23   *Partner and the Private Limited Partners to contribute any amount of their
     respective Commitments not previously contributed to the Partnership, the*

24   *obligation to make such contributions shall not be subject to any conditions set
     forth in the Agreement other than limitations on the amount of capital which a*

25   *Partner is obligated to contribute (i) within any specified time period or (ii) prior
     to any specified date.*

26               (c) …No Private Limited Partner or General Partner shall have any right to
     delay, reduce or offset any capital contribution obligation to the Partnership called

27   under this Section 7.1 by reason of any counterclaim or right to offset by such
     Partner or the Partnership against SBA or any Preferred Limited Partner.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   Partnership Agreement, ¶ 2.5, SBA Annex PS, ¶ 7.1[4] (emphasis added.).

2           Hence, once the SBA placed Aspen Ventures in restricted operations and

3   thereafter receivership pursuant to 13 C.F.R. § 107.1820, Redleaf's obligation to pay its

4   unfunded commitment became absolute.  The SBA Annex is unequivocal.  Redleaf is required to

5   contribute any amount of its commitments not previously contributed and the obligation "shall

6   not be subject to any conditions set forth in the Agreement" other than limitations on the amount

7   of capital and the time period for payment.  Further, Redleaf has no right to "delay, reduce or

8   offset any capital contribution obligation…by reason of any counterclaim or right to offset."

9           The Third Circuit in *U.S. Small Business Administration v. Chimicles*, 447 F.3d

10  207 (2006) ("*Chimicles*") held this provision prevented limited partners from using an arbitration

11  provision contained in the partnership agreement to delay their payment obligations.  In

12  *Chimicles*, SBA as receiver of a failed SBIC sought to enforce payment of unfunded capital

13  commitments from several limited partners.  *Chimicles,* 447 F.3d at 209-210.  The limited

14  partners sought to stay the proceedings pending mandatory arbitration.  *Id.*  The Third Circuit

15  found that even if the claims for the unfunded commitments were subject to arbitration, it was no

16  longer enforceable after the receiver had been appointed:

17          Now that the SBA has been appointed as receiver and is attempting to
            marshal Acorn's assets, appellants' obligations to make contributions are no longer
18          'subject to any conditions set forth in the Agreement,' which we hold includes the
            arbitration provision set forth in section 13.10.  Thus, even if imported into the
19          subscription agreements, the arbitration provision of the partnership agreements
            would not apply to these disputes over unpaid investor commitments.
20

21  *Chimicles*, 447 F.3d at 211.  The provision relied upon by the court in *Chimicles* is the same as

22  set forth in the Aspen Ventures' Partnership Agreement[5].  The other documents admitting

23  Redleaf to Aspen Ventures is consistent with this legal and regulatory framework.

24  [4] Moser Decl. ¶ 6, **Exhibit B.**

25  [5] The full text of the provision relied upon by the court in *Chimicles* is as follows:

26          Notwithstanding any provision in the Agreement to the contrary (except as expressly
            provided in this Section 5.1.2), in the event that the Partnership is subject to restricted
27          operations (as such term is used in the SBIC Act)2 and prior to the liquidation of the
            Partnership the SBA requires the General Partner and the Private Limited Partners to
28                                                                          *…Continued*

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

2.    The First Amendment and Admission Agreement Did Not and Cannot Alter the Statutory Scheme or the Enforceability of the SBA Annex.

Redleaf argues that it agreed with Aspen Ventures and the SBA that it would not be liable for leverage incurred prior to its admission to the partnership.  This argument is not supported by either the facts or the law.

As shown above, at every stage of the negotiations, Aspen Ventures and Redleaf acknowledged that if the circumstances set out in the Act and Regulations arose, Redleaf's capital would be liable for, or cross collateralize, all outstanding Leverage, regardless of when it was incurred.  Moser Decl., ¶¶ 7-10, **Exhibits C - G.**  The terms of the Partnership Agreement, First Amendment and Admission Agreement (collectively, the "Partnership Documents") are all consistent on the cross collateralization issue.

The Partnership Agreement at paragraph 2.5 provides:

At any time the Partnership is a Licensee, the provisions of this Agreement shall be subject to the SBIC Act and the SBIC Regulations to the extent applicable.  At any time that the Partnership has outstanding Preferred Limited Partnership Interests, the provisions of the SBA Annex PS attached as Annex A to this Agreement (the "SBA Annex") shall be incorporated in this Agreement with the same force and effect as if fully set forth herein…

Moser Decl., ¶ 6, **Exhibit A.**

The SBA Annex provides:

Conflict with the SBIC Act.  The provisions of this Annex and the Agreement shall be interpreted to the fullest extent possible in a manner consistent with the SBIC Act. In the event of any conflict between any provision of the Agreement or this Annex and the provisions of the SBIC Act (including, without limitation, any conflict with respect to the rights of the SBA or the respective Partners hereunder), *the provisions of the SBIC Act shall control.*

*Continued from previous page*
contribute any amount of their respective Commitments not previously contributed to the Partnership, *the obligation to make such contributions shall not be subject to any conditions set forth in the Agreement* other than limitations on the amount of capital which a Partner is obligated to contribute (a) within any specified time period or (b) prior to any specified date.

*Chimicles,* 447 F.3d at 211 (emphasis added).

1
2
3

> <u>Conflict With Other Provisions of the Agreement.</u>  The provisions of the Agreement shall be interpreted to the fullest extent possible in a manner consistent with the provisions of this Annex.  In the event of any conflict between any provision of this Annex and any other provision of the Agreement, *the provisions of this Annex shall control.*

4   SBA Annex, ¶¶ 1.2 and 1.3 (emphasis added).  Thus, the provisions of the Act and Regulations

5   control over the SBA Annex.  In turn, the provisions of the SBA Annex control over the

6   provisions of the Partnership Agreement, First Amendment and Admission Agreement.  Aspen

7   Ventures and Redleaf were cognizant of this hierarchy.

8            No term of the Partnership Documents purports to alter the terms of the Act,

9   Regulations or SBA Annex, all of which compel payment of any outstanding capital

10  contributions if the SBIC is placed in either Restricted Operations Conditions or Removal

11  Conditions.  As set forth above, the Partnership Agreement at paragraph 2.5 explicitly states that

12  it is subject to the Act and the Regulations.  Paragraph 1(a) of the First Amendment qualifies the

13  division of partnership interests into Series A and Series B to the "extent permitted under the

14  Act".  First Amendment, ¶1(a) ("Except to the extent specifically provided in this First

15  Amendment *or required under the SBIC Act, to the maximum extent permitted under the Act,* the

16  interests in the Partnership ...shall constitute separate series of partnership

17  interests…")(emphasis added)).  The First Amendment also recognizes that the Partnership

18  Agreement, except as modified, remains in full force and effect as originally constituted, which

19  includes the SBA Annex.  First Amendment, ¶ 4.  The First Amendment also acknowledges the

20  continued enforceability the SBA Annex by its numerous references to it, including a specific

21  reference to Article VII.  First Amendment ¶ 1(c) (referring to the SBA Annex for the definition

22  of "Leverage"); ¶2(f) (referring to the SBA Annex for the definitions of "Net Profit", "Loss" and

23  "Leverage"); ¶2(h) (addressing inter series loans in the event "the General Partner is required to

24  make a distribution to the Preferred Limited Partner [SBA] pursuant to Article VII of the SBA

25  Annex.") and ¶2(p)(addressing ability of the General Partner to unilaterally amend the

26  Partnership Documents).

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1    The Admission Agreement incorporates the Partnership Agreement and First

2    Amendment.  Thus, Redleaf agreed to be bound by all the terms and conditions of those

3    agreements.

4    It is therefore clear from the plain language of the Partnership Documents that the

5    Act, Regulations and SBA Annex remain in full force and effect, including, but not limited to,

6    the provisions set forth in Article VII of the SBA Annex making Redleaf's capital contribution

7    absolute.

8            3.    <u>The First Amendment Does Not Excuse Redleaf's Obligation to Pay its</u>

9    <u>Full Capital Commitment.</u>

10    Redleaf concluded that the Receiver cannot enforce Redleaf's Capital

11    Commitment based upon the following provisions in the First Amendment:

12        [T]he debts, liabilities, and obligations incurred, contracted for or
      otherwise existing with respect to a particular series will be enforceable against

13    the assets of such series only. . . and none of the debts, liabilities, obligations and
      expenses incurred, contracted for or otherwise existing with respect to any series

14    shall be enforceable against the assets of such other series.

15        The allocation of Leverage . . . shall be as follows: Any Outstanding
      Leverage as of the time immediately prior to the execution of this Amendment

16    shall be Leverage associated with Series A…

17    Opposition, pp.7:21-8:3 (quoting First Amendment, ¶¶ 1(a) and (1)(c)(i)).  Redleaf interprets this

18    to mean that Aspen Ventures could not make a capital call on Redleaf to be used to pay Leverage

19    and debts attributable to Series A.  Redleaf glosses over the fact that the above quoted language

20    does not support its conclusion and is directly at odds with the evidence of the parties'

21    negotiations regarding this issue.

22    The provisions upon which Redleaf relies only address how Aspen Ventures was

23    to allocate its assets and liabilities as between Series A and Series B.  It does not address when

24    and how Redleaf is required to make its capital commitment.  These issues are set forth in

25    paragraph 2(c) and (d) of the First Amendment which only limited Redleaf's obligation to the

26    extent it was capped at $15 million and it did not have to contribute more than $7.5 million

27    within the first year.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   The entire Series A/Series B scheme contemplated by the First Amendment was

2   only enforceable to *the extent permitted under the Act.*  Redleaf conveniently ignores this

3   important qualification.  The agreement between the Series A and Series B limited partners as to

4   the internal distribution of assets and liabilities is a private agreement; it does not and cannot

5   alter the application of the Act and Regulations.  Aspen Ventures is only one SBIC and the entire

6   fund and its capital commitments are subject to the Act and Regulations.  Aspen Ventures,

7   Redleaf and the SBA discussed, and made perfectly clear, this aspect of the Series A/Series B

8   architecture.  *See* Moser Decl., ¶¶ 7-10, **Exhibits** C-G.  Redleaf points to no provision under the

9   Act or the Regulations permitting the Series A and Series B limited partners to be treated as

10  separate SBICs; there are none.  The SBA as regulator explicitly pointed this out to Aspen and

11  Redleaf when it approved Redleaf as a new limited partner.  The Partnership Documents are

12  consistent with the concept.

13  The First Amendment explicitly acknowledges that the SBA Annex may require

14  the General Partner to apply assets attributable to one series to pay Leverage attributable to the

15  other series:

16  It is the intent of the parties that all distributions to the Limited Partners of
    one series shall be made solely from the assets of such series….[n]otwithstanding

17  the foregoing, *the parties acknowledge* that in the event the General Partner
    makes a distribution to the Limited Partners of one series, or in certain other

18  circumstances, the General Partner may be required to make a distribution to the
    Preferred Limited Partners [SBA] pursuant to Article VII of the SBA Annex.  *To*

19  *the extent that any such distribution to the Preferred Limited Partners is made out*
    *of the assets of one series…with respect to Leverage attributable to another*

20  *series…the amount of assets…that are so utilized…shall be deemed to be a non-*
    *recourse advance [from one series to the other series.]*

21

22  First Amendment, ¶ 2(h) (emphasis added).  This provision reveals two important points.  It

23  specifically acknowledges that the terms of the SBA Annex are not only in full force and effect,

24  they control.  And, Redleaf knew and agreed that the Act, Regulations and SBA Annex may

25  require Aspen Ventures to ignore the Series A/Series B distinction and use Series B capital to

26  pay Series A Leverage.  And, in fact, Aspen reminded Redleaf of this fact when asked about it in

27  October 2005.  *See* Moser Decl., ¶ 14, Ex. K.

28

1    Further, if there were to be a restriction on the application of Series B capital to

2  repay only Series B Leverage, one would expect it to be found in paragraph 2(i) of the First

3  Amendment addressing the "Repayment of Outstanding Leverage[6]".  Of course, there is no such

4  restriction because it would be contrary to the Act and Regulations.

5    Finally, even if the First Amendment created a condition precedent to Redleaf's

6  obligation to make its capital commitment (which it did not), such condition became

7  unenforceable under the SBA Annex as merely a "condition set forth in the Agreement".

8  *Chimicles*, 447 F.3d at 211; Partnership Agreement, ¶ 2.5, SBA Annex PS, ¶ 7.1.

9    4.    <u>Redleaf's First, Eighth, Ninth, Tenth and Eleventh Affirmative Defenses
10       Fail as a Matter of Law.</u>

11    Redleaf's First Affirmative Defense asserts failure to state facts sufficient to state

12  a cause of action.  As set forth above, there is no dispute that Redleaf (1) entered into the

13  Partnership Documents; (2) failed to pay $10.6 million of its $15 million capital commitment

14  and (3) the receivership estate has been damaged by Redleaf's failure to pay.  The Receiver has

15  not only stated the elements for breach of contract, it has proved them.

16    Redleaf's Eighth Affirmative Defense asserts that the complaint is barred due to

17  AVM breaching the Partnership Documents.  In other words, Redleaf claims it has counter

18  claims or offsets against AVM that relieves it of its obligation to pay its capital commitment.

19  This is precisely the type of argument that the Act and Regulations prevent and are addressed in

20  the paragraph 7.1 of the SBA Annex.  Further, there is no provision in the Partnership

21  Documents absolving Redleaf of its obligations upon a breach by AVM.  And even if there were

22  such a provision, it would not be enforceable under terms of the SBA Annex.  *Chimicles*, 447

23  F.3d at 211.  Redleaf's Eighth Affirmative Defense is both factually and legally deficient.

24

---

25  [6] Paragraph 2(i) of the First Amendment provides:

26    The parties hereby agree that…the General Partner may in its discretion repay any
      Outstanding Leverage, whether such Outstanding Leverage is associated with Series A or
27    Series B, prior to making any distributions to the Partners…

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   Redleaf's Ninth Affirmative Defense asserts failure of consideration.

2   Consideration generally consists of a benefit to a promisor, or detriment to a promisee.  *Wolfe v.*

3   *Crosby, 377 A.2d 22 (1997).*  Further, "[e]ven if (*arguendo*) the consideration were inadequate,

4   that is no defense, because courts generally do not inquire into the adequacy of consideration."

5   *Gordon v. Rolfe,* 1986 Del. Ch. Lexis 372, *7 (1986) (*citing Affiliated Enterprises v. Walle*r, *Del.*

6   *Super.,* 5 A.2d 257 (1939); *American University v. Todd, Del. Super.,* 1 A.2d 595 (1938)).

7   The Partnership Documents admitted Redleaf as a limited partner allowing it the

8   opportunity to participate in potential profits in exchange for its capital commitment.  The fact

9   that the investment was not profitable does not negate the consideration.  To find otherwise

10  would prevent the enforcement of any failed investment.

11  Redleaf's Tenth Affirmative Defense asserts it has fully performed all its

12  obligations under the contract.  As set forth above, under the Act, Regulations, SBA Annex, and

13  Partnership Documents, Redleaf is obligated for its entire capital commitment.  Redleaf admits it

14  has not paid its capital commitment in full.

15  Redleaf's Eleventh Affirmative Defense asserts that the complaint is barred

16  because AVM failed to perform conditions precedent.  This affirmative defense suffers the same

17  fatal flaws as the Eighth Affirmative Defense.  There are no conditions precedent to Redleaf's

18  obligation to make its capital commitment and even if there were, they are no longer enforceable.

19  SBA Annex, ¶ 7.1, *Chimicles*, 447 F.3d at 211.

20  The Partnership Agreement and First Amendment do not create any conditions

21  precedent applicable here.  The First Amendment provides that Redleaf's obligation was only

22  limited to the extent it was capped at $15 million and it did not have to contribute more than $7.5

23  million within the first year.  First Amendment, ¶ 2.  As of April 1, 2003, Redleaf was obligated

24  to pay its entire committed amount upon request by Aspen Ventures, and now, by the Receiver.

25  *See* Partnership Agreement, ¶ 3.2.

26  Further, Redleaf must plead with specificity and particularity the conditions

27  precedent to its obligation to pay its capital commitment.  Federal Rule Civil Procedure 9(c);

28  *Walton v. Nalco Chemical Company*, 272 F.3d 13, n.15 (1st Cir. 2001); *citing* 5 Wright & Miller

1   § 1304 ("A party who intends to controvert the claimant's general allegation of performance [of a

2   condition precedent] thus is given the burden of identifying those conditions he believes are

3   unfulfilled and wishes to put into issue…).  Redleaf has failed to identify conditions in the

4   agreements that have been left unfulfilled because there are none.

D.   **Redleaf Cannot Assert Equitable Claims Attributable to the SBA as**
5        **Regulator In Defense of Claims Asserted by the Receiver On Behalf of the**
6        **Receivership Estate.**

7        1.   Redleaf's Fifth and Seventh Affirmative Defenses of Fraud and Recission
8             Fail as a Matter of Law.

9        Redleaf argues that the "the basis of Redleaf's affirmative defenses, generally, is

10   …the extra-contractual fraudulent conduct of Aspen III's management and the SBA's clear

11   collusion therein…."  Opposition, p. 11:15-17.  Redleaf's Fifth and Seventh Affirmative defense

12   allege fraud in the inducement and a right to rescind the applicable agreements.  Allegations of

13   fraud against Aspen Ventures' management or the SBA as regulator, *even if true,* do not give rise

14   to a legally viable defense.

15       The SBA *as Receiver* is a different entity from SBA *as Regulator*.  Redleaf

16   ignores this critical distinction.  Redleaf purposely blurs this distinction because the law is clear

17   that Redleaf may not assert claims against the SBA in an attempt to avoid its obligation to pay its

18   capital commitment.

19       In *United States v. Acorn Technology Fund*, 429 F.3rd 438 (3rd Cir. 2005)

20   ("*Acorn*"), a case factually similar, the receiver sued two limited partners, the Barracks, for

21   unfunded capital commitments.  The Barracks responded by filing a motion seeking to have the

22   stay of litigation lifted for the purpose of asserting counterclaims against the SBA, the SBIC

23   limited partnership, and its general partner for, among other things, fraud.  Like Redleaf, the

24   Barracks claimed that they had been fraudulently induced into their capital commitment, the

25   SBIC had been mismanaged and that the SBA was complicit in the wrongful acts.  *Id.* at 445

26   ("The Barracks would like to assert two classes of claims against the SBA: first, against the SBA

27   as a preferred limited partner of Acorn for breach of fiduciary duties allegedly owed to the

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   Barracks as co-limited partners; and second, against the SBA for breach of 'its statutory and

2   regulatory duties as regulator of Acorn, an SBIC.'").  The Third Circuit found these claims

3   without merit as a matter of law.  *Id.*

4            The Third Circuit cited the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671

5   *et. seq.*, as the exclusive method for suing an administrative agency in tort for monetary

6   damages.  28 U.S.C. § 2679.  The Barracks' claims were barred by the so-called discretionary

7   function exception, which bars:

8            Any claim based upon an act or omission of an employee of the
         Government, exercising due care, in the execution of a statute or regulation,
9        whether or not such statute or regulation be valid, or based upon the exercise or
         performance or the failure to exercise or perform a discretionary function or duty
10       on the part of a federal agency or an employee of the Government, whether or not
         the discretion involved be abused.
11
     *Acorn,* 429 F.3d at 445 *(citing  28 U.S.C. § 2680(a)).*
12
13           The court thereafter concluded:

14           The Barracks' claims against the SBA for breaching "statutory and
         regulatory duties" obviously fall within the discretionary function exception and
15       cannot be maintained. The Barracks argue that their other claims against the SBA
         were not based on the SBA's actions as regulator, but on the SBA's actions as a
16       preferred limited partner of and investor in Acorn.  The SBA supposedly learned
         that the Torkelsens were looting and otherwise mismanaging Acorn, but failed to
17       tell the other investors, thereby depriving them of this superior information and
         the opportunity to stop investing.  The SBA also, according to the Barracks, erred
18       by not imposing sanctions after these misdeeds were discovered.  These actions
         allegedly breached a fiduciary duty owed by the SBA to co-limited partners.
19       Therefore, the Barracks claim, the suit is not barred by the discretionary function
         exception. Unfortunately, the Barracks have shown no support for this distinction,
20       nor can we find any.

21   *Id.,* at 445-446; *see also United States Small Business Administration v. Propper,* 2004 U.S.

22   Lexis 23363 (2004) (dismissing claims of fraud in the inducement as both derivative and as

23   barred by the Federal Tort Claims Act)[7].

24           Redleaf's claims in this case are the same as asserted by the Barracks in *Acorn.*

25   Redleaf argues that "the SBA discovered potentially serious violations of the regulations

26   designed to ensure the financial soundness of Aspen III, but chose simply to ignore those

27   ────────────────
     [7] This case also stemmed from the Acorn Technologies receivership.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1   violations." Opposition, p. 4:1-3. Ostensibly, Redleaf would lead the Court to believe that this

2   alleged regulatory transgression absolves Redleaf from its contractual obligations owed to Aspen

3   Ventures. Exactly where the authority lies for this conclusion, Redleaf fails disclose.

4   Regardless, as set forth in *Acorn*, these claims are barred.

5          Redleaf fares no better when it complains that Aspen Ventures persuaded Redleaf

6   to invest by agreeing to a structure seemingly designed to insulate Redleaf from risk but that

7   actually allowed Aspen Ventures to further defraud Redleaf. *See* Opposition, III.C., pp.5-7. In

8   other words, Redleaf claims the entire Series A/Series B structure was a fraudulent, illegal

9   scheme. As shown above, this argument is completely without any factual merit. Moser Decl.,

10  ¶¶ 7-10, **Exhibits C-G.** However, assuming, *arguendo,* the Series A/Series B structure was

11  fraudulent, it still does not provide a defense. This same argument was rejected by the Third

12  Circuit in *Acorn*:

13          The Barracks next seek permission to sue Acorn and Acorn Partners for
            mismanagement, alleging that if Acorn had not been mismanaged by Torkelsen,
14          and if Torkelsen had not told them that Acorn was being managed in accordance
            with federal and state laws, they would not have invested or continued to invest.
15          The District Court concluded that these claims could only be brought in a
            derivative suit by the SBA as receiver for Acorn, and therefore the receivership
16          stay should not be lifted to allow their assertion by the Barracks individually. We
            agree.
17
            The Barracks' claim, despite creative characterization, reduces to an
18          allegation that they would not have invested, or have lost money on capital
            already invested, if the company had been properly managed or had disclosed the
19          mismanagement. In this, the Barracks suffered the same wrong as all other
            investors in Acorn-management misled them as to how the company was being
20          run, and its compliance with various laws, and as an indirect result their
            investments lost value.
21

22  *Acorn*, 429 F.3d at 447.

23          Redleaf's allegations against the SBA, as regulator, fail as matter of law. Redleaf

24  attempts to get around this by not asserting affirmative *claims*, but only affirmative *defenses*.

25  Opposition, p.13:25-26, p.16:23-27. There is no authority supporting what Redleaf is attempting

26  here: resurrection of legally deficient claims against SBA *as regulator* for the purpose of

27  asserting them as affirmative defenses against the SBA *as Receiver*.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1    Fraud is also unavailable to Redleaf as a defense under the SBA Annex.  Fraud is

2  a regulatory violation for which SBA may impose restricted operations remedies, triggering an

3  absolute obligation to pay.  13 C.F.R. §107.1820(b)(5).  An SBIC is subject to the condition that

4  it not commit fraud and this condition is incorporated in the Partnership Agreement at paragraph

5  2.5: "[A]t any time that the Partnership is a Licensee, the provisions of this Agreement shall be

6  subject to the SBIC Act and the SBIC Regulations to the extent applicable."  Pursuant to the

7  SBA Annex, once an SBIC has been placed in restricted operations, the obligation of private

8  limited partners to fulfill their capital commitments shall not be subject to any conditions in the

9  Partnership Agreement other than those relating to amount and time of payment.  As recognized

10  by the Third Circuit, an SBIC must conduct its activities in accordance with federal law-the Act

11  and Regulations.  *Chimicles*, 447 F.3d at 208 (*citing* 13 C.F.R. § 107.500). In signing the

12  Partnership Agreement and related documents, Redleaf agreed its "obligation to make such

13  contribution [capital commitment] shall not be subject to any conditions [failure to comply with

14  the Regulations] set forth in the agreement."  SBA Annex, ¶ 7.1(a).

15    Redleaf waived its defenses and offsets when it entered into the Partnership

16  Agreement, First Amendment and Admission Agreement.  *Chimicles*, 447 F.3d at 211.

17  Redleaf's obligation to the Receiver for its capital commitment is absolute and unconditional[8].

18  The Receiver and its estate cannot provide redress for Redleaf's claims.  If Redleaf cannot

19  establish fraud against the Receiver, it may not rescind its contracts.  Redleaf's Fifth and Seventh

20  Affirmative Defenses are legally deficient.

21    2.    Redleaf's Third Affirmative Defense Of Unclean Hands Is Barred as a Matter of Law.

---

[8] There is another noteworthy aspect of the several cases stemming from the failed Acorn Technologies SBIC.  In Acorn, there was no question that Torkelson, Acorn's principal, defrauded the limited partners.  Yet, of the three published decisions addressing unfunded capital commitments (*Propper, Chimicles* and *Acorn)*, not a single limited partner was successful in avoiding its obligation to make a capital commitment due to fraud.  The circumstances of this case do not warrant deviation from this precedent.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1    Redleaf asserts that the Receiver's claims are barred by the equitable doctrine of

2  unclean hands.  The defense of unclean hands, or *in pari delicto*, "derives from the equitable

3  maxim that 'one who comes into equity must do so with clean hands.'"  *Kousi v. Sugahara*, 1009

4  Del. Ch. Lexis 194, *5 (1991).  "'The purpose of the clean hands maxim is to protect the public

5  and the court against misuse by one who, because of his conduct, has forfeited his right to have

6  the court consider his claims, regardless of their merit.  As such it is not a matter of defense to be

7  applied on behalf of a litigant; rather it is a rule of public policy.'"  *Id., quoting  Skoglund v.*

8  *Ormand Industries, Inc.*, 372 A.2d 204, 213 (1976).  Although the Receiver has not found

9  Delaware authority directly on point, several jurisdictions hold that equitable defenses, including

10  unclean hands, are not applicable to a receiver.

11    Under California law, "defenses based on a party's unclean hands or inequitable

12  conduct do not generally apply against that party's receiver."  *A. Farber and Partners, Inc. v.*

13  *Maynard Hal Garber,* 417 F. Supp 2d 1143, 1147 (C.D. Cal. 2006); *citing Federal Deposit Ins.*

14  *Co. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir. 1995) ("*O'Melveney*") and *Camerer v. Cal.*

15  *Sav. & Commercial Bank of San Diego,* 4 Cal. 2d 159, 170-71, 48 P.2d 39 (1935).  The Ninth

16  Circuit in *O'Melveny* discussed the issue as follows:

17    [W]e nevertheless conclude that the FDIC [a receiver] is not barred by
certain equitable defenses O'Melveny could have raised against ADSB. We
18    recognize that, in general, "[a] receiver occupies no better position than that
which was occupied by the person or party for whom he acts . . . and any defense
19    good against the original party is good against the receiver."  However, this rule is
subject to exceptions; defenses based on a party's unclean hands or inequitable
20    conduct do not generally apply against that party's receiver.  While a party may
itself be denied a right or defense on account of its misdeeds, there is little reason
21    to impose the same punishment on a trustee, receiver or similar innocent entity
that steps into the party's shoes pursuant to court order or operation of law.
22    Moreover, when a party is denied a defense under such circumstances, the
opposing party enjoys a windfall. This is justifiable as against the wrongdoer
23    himself, not against the wrongdoer's innocent creditors.

        ***
24
    Also significant is the fact that the receiver becomes the bank's successor
25    as part of an intricate regulatory scheme designed to protect the interests of third
parties who also were not privy to the bank's inequitable conduct.  That scheme
26    would be frustrated by imputing the bank's inequitable conduct to the receiver,
thereby diminishing the value of the asset pool held by the receiver and limiting
27    the receiver's discretion in disposing of the assets.

28

PHDATA 3092314_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance - something courts sitting in equity traditionally will not do....

*O'Melveny*, 61 F.3d at 19 (citations omitted).  The Seventh Circuit, applying Illinois law, is of the same view as the Ninth Circuit.  In *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), the court declined to impute to a receiver the principal's wrongdoing where the receiver sought to maximize the value of the corporation for the benefit of investors and creditors.  *Id.* at 754; *see also United States of America v. Acorn Technologies Fund, L.P.,* 2006 U.S. Dist. Lexis 3507 *14-*15 (E.D. Pa. 2006) (holding a defendant cannot impute misconduct on a receiver under New Jersey law); *Official Committee of Unsecured Creditors v. Lafferty & Co., 267 F.3d 340, 354-355 (3d Cir. 2001)* (upholding *in pari delicto* doctrine as applied to creditors committee suing under 11 U.S.C. § 541 but noting different result often reached in receivership context); *Waslow v. Grant Thorton LLP (In re Jack Greenberg),* 240 B.R. 486, 517-518 (E.D. Pa. 1999) (holding bankruptcy trustee not subject to imputation defenses applying Pennsylvania law); *Harmelin v. Man Fin., Inc.,* 2007 U.S. Dist. LEXIS 73851 (E.D. Pa. 2007*)* (refusing to bar recovery by receiver based upon prior fraud of agent of fund now in receivership).

These cases are consistent with the notion held by Delaware courts that they enjoy broad discretion in applying equitable doctrines:

While it is true that cases turning on matters related to unclean hands are infrequent as a matter of course, that infrequency has little to do with the lack of judicial power to invoke the doctrine.  In fact, the decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine.  The most oft-cited statement of the applicable standard is the United States Supreme Court's opinion in *Keystone Driller Co. v. General Excavator Co.*, where Justice Butler stated "[in consideration of unclean hands, courts] are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Presumably, courts in Delaware are governed by the same wide latitude.

*Nakahara v. NS 1991 American Trust*, 718 A.2d 518, 522-523 (1998); *see also Smithkline v. Merck & Co., Inc.*, 766 A.2d 442 (2000).

1    Delaware courts will not invoke equitable defenses in contravention of public

2  policy.

3    The greatest limitation on the doctrine is the widely accepted exception
     that since it is ultimately based on public policy, countervailing public policy
4    which points in the direction of reaching the case on the merits can preclude its
     operation.  In other words, a stronger public policy may be at work giving the
5    unclean litigant fortuitous reprieve from the doctrine's otherwise potentially
     preclusive effect.  As one astute commentator put it "the doctrine should not be
6    invoked when the only party losing is the public."

7  *Nakahara,* 718 A.2d at 523.

8    The instant case is one where Redleaf should not be allowed to invoke its

9  equitable defenses.  The Receiver is an innocent entity that stepped into Aspen Ventures' shoes

10  pursuant to court order and an elaborate statutory scheme aimed at protecting public funds.  *See*

11  *O'Melveny,* 61 F.3d at 19.  The Receiver's obligation to collect unfunded capital commitments

12  serves the two-fold purpose of maximizing the value of the Aspen Ventures for the benefit of

13  investors and creditors and upholding the public policy at the foundation of the Act and its

14  Regulations.  This purpose would be frustrated by imputing the alleged inequitable conduct to

15  the Receiver.  The public is the only party to lose if Redleaf is allowed to invoke an unclean

16  hands defense against the Receiver.  This is not the proper purpose of an equitable defense.

17  *Nakahara,* 718 A.2d at 523.

18    Further, to the extent that Redleaf may be alleging that SBA, in its capacity as

19  federal agency, has unclean hands, the defense must likewise fail.  SBA as federal agency is not

20  a party to this action, nor has Redleaf asserted any claims against SBA with respect to these

21  matters.  Indeed, as set forth above, such claims by Redleaf are barred by the Federal Tort

22  Claims Act. 28 U.S.C. § 1346, 2671 et. seq.

23    Finally, the undisputed evidence proves that Redleaf knew exactly what it was

24  agreeing to; there simply was no inequitable conduct on behalf of the SBA, Aspen Ventures or

25  the Receiver.

26    Redleaf, in agreeing to the terms of the Partnership Documents, waived its right to

27  delay, reduce or offset its obligation by reason of any counterclaim or right to offset.  SBA

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1  Annex, ¶ 7.1, *Chimicles,* 447 F.3d at 211.  Redleaf's redress for any alleged wrong committed

2  lies with those that allegedly committed the acts, in this case, AVM and its principals[9].

3              3.  <u>Redleaf's Sixth Affirmative Defense Of Estoppel Is Barred as Matter of Law.</u>

4  

5        Redleaf asserts that the Receivers claims are barred by the equitable doctrine of

6  estoppel. For the same reasons set forth immediately above, estoppel cannot be asserted against a

7  receiver.  *O'Melveny*, 61 F.3d at 19 ("[W]e conclude that the equities between a party asserting

8  an equitable defense and a bank are at such variance with the equities between the party and a

9  receiver of the bank that equitable defenses good against the bank should not be available against

10  the receiver.").

11        Further, the Act and Regulations expressly prevent Redleaf from attempting to

12  assert waiver or estoppel based upon a failure by SBA, as a federal agency, to act.  13 C.F.R. §

13  107.1910 ("SBA's failure to exercise or delay in exercising any right or remedy under the Act or

14  the regulations in this part does not constitute a waiver of such right or remedy.").

15              4.  <u>Redleaf's Second Affirmative Defense of Latches is Barred As a Matter of Law.</u>

16  

17        Under Delaware law, the doctrine of latches acts as a bar to an action in equity if

18  the defendant carries the burden of persuasion that two conditions have been satisfied: (1) the

19  plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly

20  prejudices the defendant.  *Hudak v. Procek*, 806 A.2d 140, 154 (Del. 2002.).  The burden to

21  prove the elements of latches — both delay and prejudice to defendants — rests upon the

22  defendant.  *Id.*

23        There has been no delay in the enforcement of Redleaf's capital commitment or

24  prejudice to Redleaf.  Redleaf admits that it has been negotiating the payment of its capital

25  commitment since early 2005.  Opposition, p. 2:12-14.  Redleaf can prove no set of facts to show

26  

27  [9]    In fact, Redleaf has done just that in filing the Third Party Complaint.

28

that Aspen Ventures, and now the Receiver, slept on its rights causing Redleaf to change its position to its detriment.

5.    <u>Redleaf's Twelfth Affirmative Defense Failure to Mitigate Damages Is Barred as a Matter of Law.</u>

Under Delaware law, "while there is a general duty to mitigate damages if it is feasible to do so, a plaintiff need not take unreasonably speculative steps to meet that duty." *American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch., 1992) (citing *Edward M. Crough, Inc. v. Department of General Services of District of Columbia, D.C.App.*, 572 A.2d 457 (1990)).  In this case, the Receiver is not seeking any damages beyond that which Redleaf agreed to pay under the Admission Agreement.  There is nothing the Receiver could have done to reduce Redleaf's obligation to pay its capital commitment.

## IV.   <u>CONCLUSION</u>

Wherefore, the Receiver prays for an order:

1.    Granting summary judgment for breach of contract in favor of the Receiver and against Redleaf in the amount of $11,163,095.22, plus $3,267.12 per day after May 20, 2008 until entry of the Judgment;

2.    For such further relief the Court deems just and proper.

Dated: May 19, 2008          SCHNADER HARRISON SEGAL & LEWIS LLP


By:  /s/ Gregory C. Nuti
       Gregory C. Nuti
       Attorneys for Plaintiff, the United States
       Small Business Administration in its
       capacity as Receiver for Aspen Ventures III,
       L.P.

Dated: May 19, 2008

U.S. Small Business Administration


By:   /s/ Beverley Hazlewood Lewis
       Beverley Hazlewood Lewis
       Office of General Counsel
       Attorneys for Plaintiff,
       United States Small Business
       Administration in its capacity as Receiver
       for Aspen Ventures III, L.P.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700