MATTHEW G. BALL (CA BAR 208881)
DEIRDRE M. DIGRANDE (CA BAR 199766)
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Tel: (415) 882-8200
Fax: (415) 882-8220
matthew.ball@klgates.com
deirdre.digrande@klgates.com

MARTIN D. TECKLER (*pro hac vice*)
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9000
Fax: (202) 778-9100
martin.teckler@klgates.com

Attorneys for Defendant
REDLEAF GROUP, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES SMALL BUSINESS ADMINISTRATION in its capacity as Receiver for Aspen Ventures III,<br><br>Plaintiffs,<br><br>v.<br><br>REDLEAF GROUP, INC.,<br><br>Defendant and Third-Party Plaintiff,<br><br>v.<br><br>ASPEN VENTURES MANAGEMENT III, LLC, a Delaware Limited Liability Company, ALEXANDER P. CILENTO, a California resident, and DAVID CROCKETT, a California resident, and DOES 1-10,<br><br>Third-Party Defendants. | Case No. C-07-05350 JW (PVT)<br><br>**DECLARATION OF MICHAEL J. TOMANA IN SUPPORT OF REDLEAF GROUP, INC.'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION, ON THE RECEIVER'S CLAIM FOR BREACH OF CONTRACT**<br><br>Date: June 23, 2008<br>Time: 9:00 a.m.<br>Judge: Hon. James Ware |

1.      I, Michael J. Tomana, am President and Chief Executive Officer of Redleaf Group, Inc. I make this Declaration in support of Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract. I have personal knowledge of the facts stated herein except where stated and, if called as a witness, I could testify competently thereto.

2.      Redleaf Group, Inc. ("Redleaf") is a Delaware corporation that was formed on January 5, 2000. Redleaf is a private technology operating company that provides services and capital for pre-seed and seed-stage technology companies.

3.      I became Vice President, General Counsel and Secretary of Redleaf in April 2000 and served in that capacity until January 2005, when I assumed the responsibilities of President and Chief Executive Officer. During this time period, I had primary responsibility for the legal affairs of the corporation and the dissemination of information to Redleaf's Board of Directors. I attended all meetings of the Board of Directors and served on the management committee of the corporation. Since 2004, I have served as a Director of Redleaf Group, Inc.

4.      In mid-2001, Thaddeus Whalen of Aspen Ventures Management III, LLC, the general partner of the Small Business Investment Company ("SBIC") Aspen Ventures III, L.P. ("Aspen III"), initiated discussions with John Kohler, then Co-CEO of Redleaf. The discussions centered on whether Redleaf would enter into a "joint venture" with Aspen III by forming a new "Series B" fund.

5.      On November 27 and 28, 2001, I attended meetings in Pittsburgh, Pennsylvania, where Thad Whalen, one of the Managing Members of Aspen III's general partner, made a presentation to Redleaf officers, certain directors and key management personnel. In those meetings Mr. Whalen outlined the strategy and structure of the new Aspen/Redleaf joint venture. He stated that the limited partnership agreement of Aspen would be amended to divide Aspen into two distinct portfolios—one consisting of currently existing assets and liabilities (the "Old Fund" or "Series A") and the other consisting of new assets and liabilities (the "New Fund" or "Series B").

6.  In response to questions from Redleaf personnel, Mr. Whalen described the current condition of Aspen III, which would become the Series A fund under his proposed structure. He stated that Aspen III had remaining capital available from its current investors as well as remaining leverage. He further stated that he was confident that the Aspen III portfolio would provide value sufficient to repay all outstanding leverage and investment capital as well as provide a profit to his original investors. Mr. Whalen also stated that predecessor funds Aspen I and II were successful and profitable to date and that he intended to raise additional capital from current Aspen III Series A investors.

7.  In late 2001, Redleaf's Board of Directors met on two occasions to discuss the proposed Aspen III investment. I was present at both meetings. At those meetings, Redleaf's Board discussed the history of the discussions regarding the Aspen III investment. Specifically, the Board discussed that in mid-2001, Aspen III's management had approached John Kohler, then Co-CEO of Redleaf, about Redleaf's potentially making an investment in Aspen III. The Board further discussed that Aspen III had drawn $23 million in United States Small Business Administration leverage to make investments, and that the SBA had committed an additional $10 million in leverage. Redleaf's Board discussed Redleaf's concerns about making a substantial investment in Aspen III, given that Aspen III had drawn so much leverage. Specifically, Redleaf was concerned about the possibility that any capital committed by Redleaf could be used to repay leverage drawn to support already existing investments. Redleaf wanted to avoid this possibility.

8.  Redleaf further discussed that, to assuage Redleaf's concerns, Aspen III's management, specifically Thad Whalen, proposed a new structure for the investment, which would divide Aspen III into two series of investments – Series A and Series B. Redleaf understood and intended that one of the purposes of this structure was to insulate Redleaf from having its planned $15 million capital commitment used to repay existing leverage should Aspen III fail. Similarly, Mr. Whalen represented to the Redleaf Officers and Directors, including me, that the intent of the structure was to insulate Series A investments from liabilities associated with the new Series B fund. Mr. Whalen also represented to Redleaf Officers and Directors, including me, that this would indeed

be the effect of the Series A/Series B structure and that Series A investments were sufficient to repay Series A outstanding leverage and capital. The 2002 Amendment and all ancillary documents were prepared by Aspen's principal counsel, Gunderson, Dettmer, et al. (Steven Franklin, Esq.)

9. On February 13, 2002, Redleaf's Board of Directors approved the terms of the Aspen III investment.

10. On April 1, 2002, Redleaf entered into the First Amendment to the Amended and Restated Limited Partnership Agreement (the "2002 Amendment.") A true and correct copy of this agreement is attached as Exhibit H to the Declaration of Richard Moser in support of the SBA's Motion for Summary Judgment.

11. Critical to Redleaf's decision to invest in Aspen III were: Aspen III's management's representations concerning the Series A/SeriesB structure and its insulating effect on Redleaf's proposed capital commitment; and the representations of Aspen Ventures Management concerning Aspen III's financial condition, as discussed above. Had Redleaf known the true financial condition of Aspen III at the time, or that its capital commitment could be used to repay leverage associated with existing investments, Redleaf would not have entered into the 2002 Amendment, or the agreements associated with the 2002 Amendment.

12. Redleaf did understand that the 2002 Amendment could require the use of Series B assets to pay liabilities associated with leverage attributable to Series A investments, but understood that could occur only if and when Aspen III was required to make a distribution to the SBA, but did not have sufficient Series A capital to make the distribution to the SBA. In such a case, Series B could be used to pay the liability, and Series A would then owe a non-recourse debt to Series B. However, Redleaf never understood that this section would allow the calling of Redleaf's Series B capital commitment to repay leverage attributable to Series A investments if Aspen III failed.

13. I have reviewed Exhibit C to the Declaration of Richard Moser: Exhibit C is a term sheet that Redleaf considered at its November 14, 2001 Board meeting, in connection with the proposed investment in Aspen III. I attended that Board meeting. I did not understand Exhibit C to mean that Redleaf's capital commitment could be called to repay Series A leverage, and there was

no discussion of that possibility at the Board meeting. To my knowledge, this possibility did not occur to any of Redleaf's Directors or Officers.

14. I have reviewed Exhibit E to the Declaration of Richard Moser. Exhibit E is a summary of key terms that Redleaf discussed at its February 13, 2002, Board meeting. I attended that Board meeting. Exhibit E provides, in part, that "the laws and regulations applicable to the Old Fund and the New Fund as SBICs provide for cross-liability between these series under certain circumstances" and later, discusses this in more detail. Again, I did not understand Exhibit E to mean that Redleaf's capital commitment could be called to repay Series A leverage, and there was no discussion of this possibility at the meeting. To my knowledge, this possibility did not occur to any of Redleaf's Directors or Officers.

15. I have reviewed Exhibit F to the Declaration of Richard Moser. Exhibit F is the minutes of Redleaf's Board of Directors meeting for February 13, 2002. The minutes reflect discussion of the summary of the terms in Exhibit E, discussed in the previous paragraph. There was no discussion at that meeting of the possibility that the SBA could call Redleaf's Capital Commitment to repay Series A leverage.

16. I have reviewed Exhibit G to the Declaration of Richard Moser. Exhibit G is an e-mail from Thad Whalen to me, attaching a draft letter to the Redleaf limited partners about the Redleaf investment. The statement, which was drafted by Whalen, provides in part:

> The SBA will have the right to satisfy liabilities associated with leverage against either series, regardless of the fact that the general partner and the limited partners view such liabilities as belonging to a particular series. In short, the SBA will have the right to seek Aspen III-A assets in order to satisfy Aspen III-B leverage liabilities, thereby potentially reducing Aspen III-A returns or delaying the distribution of such returns to the Series A Limited Partners (and vice versa).

I understood this to be referring to the 2002 Amendment's treatment of distributions, as discussed above. I did not understand this to be referring to a risk that Redleaf's Series B capital commitment could be used to repay Series A leverage.

17. In practice, the Series A/Series B structure created problems for Redleaf. For example, the separation between the Redleaf managing members and the Series A Investments meant that the Redleaf Series B managing members had no way to participate in decision-making and valuations with regard to the Series A Investments, or the requests for and utilization of SBA leverage. In fact, Redleaf's managing members were excluded from Series A partnership meetings. John Kohler and Lloyd Mahaffey, who were admitted as Series B managing members of Aspen, have specifically represented to me that they were excluded from the Series A or Old Fund partnership meetings and were excluded from investment decisions and valuations with respect to Series A.

18. Moreover, between April 2002, and January 2004, the Third-Party Defendants failed to provide Redleaf with reports regarding the value of the Series A Investments. I personally requested these reports from Debby Schilling, then CFO of Aspen, but was unable to obtain them consistently until after January 2004. Ms. Schilling's stated reason for refusing me the information prior to January 2004 was that the operations and investments of Series A did not concern Redleaf.

19. In November and December 2003, I, along with John Kohler and Lloyd Mahaffey, negotiated with Thad Whalen and David Crockett an Operating Plan and budget for the Series B fund. The Operating Plan called for a final Redleaf capital call of $1.5M. The Operating Plan was designed to meet the investment and operating needs of Aspen III to its conclusion. This Plan was agreed to by Messrs. Whalen, Crockett, Cilento and the Redleaf Board of Directors on the basis that it capped Redleaf's capital contributions to the Series B fund and that Aspen would have sufficient assets to successfully run the fund to a conclusion. Mr. Whalen again asserted at this time that Series A assets would be sufficient to repay outstanding Series A leverage and Series A capital. As part of the Operating Plan, in January 2004, John Kohler resigned as an employee of Redleaf and joined Aspen as an employee.

20. In March of 2004, I received a report for Aspen III investors indicating that the value of the Aspen III's portfolio was $29.2 million. A true and correct copy of this report is attached hereto as Exhibit A.

21. Shortly after June 30, 2004, I received a report dated June 30, 2004, for Aspen III investors indicating that the valuation of the same investments had dropped to $12.9 million. A true and correct copy of this report is attached hereto as Exhibit B.

22. Until I received the information contained in the June 30, 2004, report, I did not have knowledge of the true financial condition of the Series A fund and the magnitude of the devaluation in the Aspen III portfolio. Prior to receiving the information contained in the June 30, 2004, report, the Aspen Series A Managing Members provided Redleaf with inaccurate representations regarding the value of the Series A investments.

23. Redleaf only made two capital contributions to Aspen III—the original one in April 2001 and the second one (represented to be the final one in the amount of $1.5M) in January 2004. Redleaf received no other capital calls from Aspen.

24. On October 11, 2005, I met with David Crockett, Alex Cilento, John Kohler and Debby Schilling of Aspen in Saratoga, California. In that meeting, the Aspen representatives, specifically Crockett and Cilento, agreed that Aspen III did not need any additional capital to manage an orderly liquidation of the portfolio and the fund.

25. On or about May 10, 2007, I learned for the first time that the SBA intended to call the balance of Redleaf's capital commitment, then and now $10.6 million, to repay leverage, without regard to whether the leverage related to Series A or Series B investments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 2, 2008, at Pittsburgh, Pennsylvania.

                                         /s/ Michael J. Tomana
                                         Michael J. Tomana