1  MATTHEW G. BALL (CA BAR 208881)
   DEIRDRE M. DIGRANDE (CA BAR 199766)
2  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   55 Second Street, Suite 1700
3  San Francisco, CA  94105-3493
   Tel:   (415) 882-8200
4  Fax:   (415) 882-8220
   matthew.ball@klgates.com
5  deirdre.digrande@klgates.com

6
   MARTIN D. TECKLER (*pro hac vice*)
7  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   1601 K Street, NW
8  Washington, DC  20006-1600
   Tel:   (202) 778-9000
9  Fax:   (202) 778-9100
   martin.teckler@klgates.com
10
   Attorneys for Defendant
11 REDLEAF GROUP, INC.

12                **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                     **SAN JOSE DIVISION**

15  UNITED STATES SMALL BUSINESS           Case No. C-07-05350 JW (PVT)
    ADMINISTRATION in its capacity as
16  Receiver for Aspen Ventures III,

17                            Plaintiffs,
                                          **DEFENDANT REDLEAF GROUP,**
18       v.                               **INC.'S OPPOSITION TO MOTION FOR**
                                          **SUMMARY JUDGMENT, OR IN THE**
19  REDLEAF GROUP, INC.,                  **ALTERNATIVE SUMMARY**
                                          **ADJUDICATION ON THE RECEIVER'S**
20        Defendant and Third-Party Plaintiff,  **CLAIM FOR BREACH OF CONTRACT**

21       v.

22  ASPEN VENTURES MANAGEMENT III,
    LLC, a Delaware Limited Liability Company,  Complaint Filed:  October 19, 2007
23  ALEXANDER P. CILENTO, a California         Trial Date:       Not Set
    resident, and DAVID CROCKETT, a            Hearing Date:     June 23, 2008
24  California resident, and DOES 1-10,        Judge:            Hon. James Ware

25                   Third-Party Defendants.

26

27

28

## TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................1

II. SUMMARY OF ARGUMENT .....................................................................................1

III. ISSUES TO BE DECIDED ...........................................................................................2

IV. FACTS .........................................................................................................................2

   A.   In Mid-2001, the SBA Discovered, But Ignored, Serious Violations of Regulations
       Designed to Ensure the Financial Soundness of Aspen III.......................................2

   B.   After Excusing Aspen III's Regulatory Violations, the SBA Discovered That Aspen III
       Was in Serious Financial Trouble. ..........................................................................4

   C.   In Mid-2001, Aspen III's Management Approached Redleaf for an Investment in Aspen
       III, and Misrepresented Aspen III's Financial Status to Redleaf............................5

   D.   Aspen III, Redleaf, and the SBA Agreed to Divide Aspen III into the Series A/B
       Investments to Assuage Redleaf's Leverage Concerns............................................6

   E.   In the 2002 Amendment, the Parties and the SBA Agreed That Redleaf's Series B
       Capital Commitment Could Not Be Called to Repay Series A Leverage. .....................6

     1.   The 1999 Agreement. ......................................................................................6

     2.   Rather Than Admit Redleaf to Aspen III Under the 1999 Agreement, Aspen III,
         Redleaf, and the SBA Amended the 1999 Agreement.....................................8

     3.   The 2002 Amendment Insulated Redleaf's *Capital Commitment* From Existing
         Leverage, But Allowed *Distributions* to Be Paid to the SBA from Either Series A or
         Series B When Necessary...................................................................................9

     4.   None of the Exhibits Attached to the Moser Declaration Address Treatment of
         Redleaf's Capital Commitment.....................................................................11

   F.   The Series A/B Structure Was a Violation of SBA Regulations, and Allowed Aspen III's
       Management to Continue to Defraud Redleaf..................................................12

   G.   After a Drastic Decline in Portfolio Value, the SBA Put Aspen III into Liquidation
       Status and Refused To Recognize the Series A/B Structure. ............................13

**V.    LEGAL STANDARD** ...................................................................................... **13**

**VI.    ARGUMENT** ............................................................................................... **14**

  **A.    This Court Should Deny the SBA's Motion Because the SBA Agreed to Not to Call Redleaf's Series B Capital Commitment to Repay Series A Leverage** ............................ **14**

  **B.    Redleaf's Affirmative Defenses Raise Genuine Issues of Material Fact That Independently Preclude Summary Judgment.** ................................................... **17**

    **1.    Even If The SBA Annex Controls, It Does Not Prevent Redleaf From Raising Its Affirmative Defenses.** ....................................................................... **17**

    **2.    Redleaf's Contract-Related Affirmative Defenses Raise Genuine Issues of Material Fact That Preclude Summary Judgment.** ..................................... **18**

    **3.    Redleaf's Conduct-Related Affirmative Defenses Raise Genuine Issues of Material Fact That Preclude Summary Judgment.** ..................................... **20**

**VII.    CONCLUSION** ........................................................................................... **25**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

## **CASES**

A & A Air Services, Inc. v. Jane Richardson,  2006 WL 2382433 (Del. Com'n Pleas 2006) ...... 18

Active Crane Rentals v. Envir. Health Research & Testing, Inc., 1992 WL 91143 (Del.
Super. 1992) ........................................................................................................... 19

Anderson v. Liberty Lobby, 477 U.S. 242 (1986) ........................................................ 14

Biasotto v. Spreen, 1997 WL. 527956 (Del.Super.,1997) ............................................. 18

Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc., 2008 WL 902406 (Del. Ch.
2008) ..................................................................................................................... 14

Cox v. Kurt's Marine Diesel of Tampa, Inc., 785 F.2d 935 (11th Cir. 1986) ............... 21

Dervaes v. H.W. Booker Construction Co., 1980 WL 333053 (Del.Super.,1980) ....................... 18

FDIC v. O'Melveny & Meyers, 61 F.3d 17 (9th Cir. 1995) ........................................... 19

Hudson v. D & V Mason Contractors, Inc., 252 A.2d 166 (Del. 1969) ......................... 19

Kallop v. McAllister, 678 A.2d 526 (Del.Supr.,1996) .................................................. 18

Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 398 (Del.Supr.,1996) ............... 14

Kassbaum v. Steppenwolf Products, Inc., 236 F.3d 487 (9th Cir. 2000) ...................... 14

Nakahara v. NS 1991 American Trust, 718 A.2d 518 (Del. Ch. 1998) ........................ 22

RTC v. Greenwood, 798 F. Supp. 1391 (D. Minn. 1992) ............................................ 25

Rhone-Poulenc Basic Chemical Co. v. America Motorists Insurance Co.,
616 A.2d 1192 (Del. 1992) ..................................................................................... 14

U.S. Small Business Administration v. Chimicles, 447 F.2d 207 (3rd Cir. 2006) ................. 15, 20

Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885 (9th Cir. 2003) ................ 14

Suzuki Motor Corp. v. Consumers Union of United States, Inc., 330 F.3d 1110 (9th Cir.
2003) ..................................................................................................................... 13

United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007) ............... 14

United States Small Business Administration v. Propper, 2004 U.S. LEXIS 23363 (2004) ........ 21

United States v. Acorn Technology Fund, 429 F.3d 438 (3rd Cir. 2005) ..................... 21

1  United States v. Gamboa-Cardenas, 508 F.3d 491 (9th Cir. 2007)........................................... 24, 25

2                              **FEDERAL STATUTES**

3  15 U.S.C. § 661 ..................................................................................................................... 3

4  U.S.C. § 687b ........................................................................................................................ 3

5                               **STATE STATUTES**

6  13 C.F.R. § 107.1150 ............................................................................................................. 7

7  13 C.F.R. § 107.1820 ......................................................................................... 4, 10, 15, 22

8  13 C.F.R. § 107.1910 ........................................................................................................... 24

9  13 C.F.R. § 107.503 ..................................................................................................... 2, 3, 12

10  13 C.F.R. § 1500 .................................................................................................................. 7

11                             **TREATISE AUTHORITY**

12  10 Del. Code Ann. § 9536 (West 2007) .............................................................................. 18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  **INTRODUCTION**

In this case, Redleaf Group, Inc. was fraudulently induced to make a multi-million dollar investment – and a promise to invest millions more – in Aspen Ventures III, L.P. ("Aspen III"), what turned out to be a failing Small Business Investment Company ("SBIC").  Three managing members of the General Partner of Aspen III, Thaddeus Whalen and Third-Party Defendants Alexander P. Cilento and E. David Crockett, were primarily responsible for the fraud.  However, the fraud could not have occurred without the misfeasance of the United States Small Business Administration ("SBA"), which colluded with the managing members of Aspen III's General Partner to persuade Redleaf to invest millions of dollars to prop up the failing SBIC, and commit the millions more that SBA now seeks in order to repay the leverage it advanced which allowed Aspen III to remain in existence, make its terrible investments, and pay management fees to the managing members.

# II.  **SUMMARY OF ARGUMENT**

The SBA has an impossible burden on this Motion.  It must show that its construction of the Agreements at issue is the only reasonable one, that there are no genuine issues of material fact as to the wrongful conduct of Aspen III's management and the SBA's collusion therein, and that this Court should enter a multi-million dollar judgment against Redleaf.  The SBA cannot do so.

To succeed on its claim for breach of contract against Redleaf, the SBA must demonstrate that the 1999 Aspen III Partnership Agreement and the 2002 Amendment to that Agreement unquestionably give the SBA right to call the balance of Redleaf's $15 million Series B capital commitment to repay SBA leverage associated with Series A investments.  The SBA cannot do so, however, because the SBA, in acquiescing to the 2002 Amendment, also agreed to limit its right to call Redleaf's Series B capital commitment; the SBA may now only call the Series B capital commitment to repay <u>Series B</u> leverage.

Even if the SBA can convince the Court that the 1999 Agreement and 2002 Amendment should be interpreted its way, the SBA must also demonstrate that no trial is needed on any of Redleaf's affirmative defenses.  This also the SBA cannot do.  There are genuine issues of material fact as to whether Redleaf's fraud and other affirmative defenses bar the SBA's claim because (1)

SF-144579 v1

the SBA is subject to all defenses to which Aspen III's management would be subject, given the SBA's current role as Aspen III's receiver; and (2) the SBA's own collusion in Aspen III's management's wrongful conduct.  For these reasons, Redleaf respectfully requests that this Court deny the SBA's Motion.

### III.  ISSUES TO BE DECIDED

(1)  Whether this Court should deny the SBA's Motion because the SBA agreed not to call Redleaf's Series B capital commitment to repay Series A leverage, or, at minimum, genuine issues of material fact exist.

(2)  Whether this Court should deny the SBA's Motion because genuine issues of material fact exist as to Redleaf's fraud and other affirmative defenses.

### IV.  FACTS

**A.    In Mid-2001, the SBA Discovered, But Ignored, Serious Violations of Regulations Designed to Ensure the Financial Soundness of Aspen III.**

In mid-2001, the SBA discovered that Aspen III's management had committed serious violations of SBIC regulations designed to ensure the financial soundness of Aspen III.  Declaration of Martin D. Teckler ("Teck. Dec.") ¶ 2 & Exh. A, p. 4.[1]  Specifically, in early 2001, SBA examiners conducted an on-site examination of Aspen III for the twelve-month period ending December 31, 2000.  Id. at p. 1.  The Examination Report, issued on May 4, 2001, found that Aspen had not adequately substantiated Aspen III's portfolio valuations – a violation of SBA regulations 13 C.F.R. § 107.503(a) & (b), as well as the SBA's Valuation Guidelines for SBICs which were incorporated into the Aspen III Ventures, L.P. Amended and Restated Limited Partnership Agreement (the "1999 Agreement").  Id. at p. 4; 1999 Agreement § 9.2(a), Doc. 66-3, 1 p. 12; Declaration of Ronald C. Cibolski ("Cib. Dec.") ¶ 17.  To understand how serious these violations were, it is necessary to understand exactly what an SBIC is, what it does, and how and why the SBA regulates it.

An SBIC is a private venture capital fund with a special license from the SBA that enables it

---

[1]  The SBA stipulated to the admissibility of Exhibits A-C to the Teckler Declaration, and Exhibits A-B to the Declaration of Michael J. Tomana for the purposes of this Motion.  Declaration of Matthew G. Ball ¶ 2 & Exh. A.

to "draw leverage" from the SBA at a 2:1 ratio to the private capital invested in the SBIC. Cib. Dec. at ¶ 4. As a simplified example, imagine an SBIC called RiskFund has private capital of $2 million in cash. Then, imagine RiskFund wants to make an investment in a private start-up called "risky.com," by purchasing 3 million shares of stock in risky.com for one dollar per share. RiskFund can invest $1 million of its own capital, along with $2 million from the SBA to "leverage" RiskFund's investment in risky.com. RiskFund now owns 3 million shares of risky.com, 1 million of which it purchased with its own private capital, and 2 million shares it purchased with SBA "leverage." Id. at ¶ 5.

RiskFund could do the same thing by borrowing $2 million from a bank. However, one reason why RiskFund may want to draw leverage from the SBA is because SBIC regulations limit the profit the SBA can make on an investment, in favor of the private investors. Id. at ¶ 6. Indeed, the idea behind this regulated investment scheme is to provide incentives to private investors to ensure a flow of capital to small business interests. See 15 U.S.C. § 661.

Even though the SBA may receive less return on its investment in risky.com than the private investors, the SBA can protect itself from investment risk. The SBA may conduct detailed on-site inspections RiskFund to ensure that RiskFund is financially sound and operating within the SBIC regulations. The results of these inspections are provided to the analyst responsible for RiskFund. See U.S.C. § 687b(b)-(c) and 13 C.F.R. § 107 et seq.

One issue that the SBA will examine is how the management of RiskFund is valuing its portfolio. In our example, because risky.com is an investment in a private start-up company, it may be difficult to value. To deal with this risk, the SBA has issued guidelines that RiskFund's management must follow to ensure that its valuation of risky.com is as accurate as possible. These SBA valuation guidelines are required to be included in every SBIC agreement. 13 C.F.R. § 107.503; Valuation Guidelines, Doc. 73-3; Cib. Dec. ¶ 9.

In our RiskFund example, it may be that RiskFund's management follows the regulations, and reports to the SBA that the true value of risky.com has declined so much that RiskFund no longer has sufficient capital to meet regulatory capital requirements, and is thus "capitally impaired."

If so, and if RiskFund cannot right its financial condition, the SBA can protect itself and other potential investors by putting RiskFund into "restricted operations," which means, among other things, that RiskFund can no longer solicit additional investors nor make additional investments. 13 C.F.R. § 107.1820(e). Often, an SBIC does not emerge from restricted operations, but instead proceeds to liquidation, and then receivership. 13 C.F.R. § 107.1820(d); Cib. Dec. ¶ 10.

But, if RiskFund fails to follow proper valuation procedures, and provides to the SBA a portfolio valuation for risky.com anyway, the SBA cannot know whether the valuation is correct, and does not have sufficient information to protect itself, or other investors. It does not know whether RiskFund is in danger of financial collapse, or should be allowed to draw additional leverage from the SBA to make further investments in risky.com. Cib. Dec. ¶ 11. In mid-2001, this is the situation in which the SBA and Aspen III's management found themselves.

The SBA Analyst assigned to Aspen III was David Gerogosian. Cib. Decl. ¶ 3. On or about July 2, 2001, Gerogosian reviewed the Examination Report, and improperly excused the violation of the SBA regulations. Teck. Dec. Exh. B. Gerogosian apparently did so without the review of his supervising Area Chief – an act that itself was a violation of SBA policies preventing an analyst from unilaterally resolving an issue raised in an Examination Report. Cib. Dec. ¶ 17-18. Moreover, his actual decision to excuse the violation was itself riddled with improprieties. Id. at ¶ 17.

### B.    After Excusing Aspen III's Regulatory Violations, the SBA Discovered That Aspen III Was in Serious Financial Trouble.

On October 30, 2001, and after the SBA's casual excuse of the Aspen III regulatory violations, Thaddeus Whalen, one of the managing members of Aspen III's general partner, disclosed to Gerogosian that Aspen III was actually in serious financial trouble, and could not survive without new private capital that could be further leveraged with funds from the SBA. Teck. Dec. at ¶ 4 & Exh. C, p. M043-44 (noting that portfolio companies were using short term debt to survive, longer-term financing was uncertain, and many companies would be forced to shut down without additional funding). At the same time, Whalen disclosed to Gerogosian that Aspen Ventures Management II ("Aspen II") – an SBIC managed by the same people as Aspen III – was also in

serious financial trouble, and that three of Aspen II's portfolio concerns had been written down by $27 million.  Id. at p. M042.  At this point, Aspen III had drawn $23.1 million in SBA leverage, and Aspen II had drawn millions more.  Request for Judicial Notice ("RJN") Exh. 1 ¶ 16; Doc. 73-2, p.6 (¶ 16).

Thus, in late 2001, Gerogosian was in the position of having overseen two SBICs managed by Whalen, Cilento and Crockett which had drawn millions of dollars of SBA leverage – that now appeared to be at significant risk – and had also unilaterally excused a significant deviation from SBA's valuation regulations by Aspen III without involving his Area Chief, as he was required to do.  There is no doubt that the violation of SBA procedure, coupled with the imminent financial collapse of Aspen II and III, could subject him to internal discipline.  Cib. Dec. ¶ 17-19.

**C.    In Mid-2001, Aspen III's Management Approached Redleaf for an Investment in Aspen III, and Misrepresented Aspen III's Financial Status to Redleaf.**

Meanwhile, in mid-2001, as Aspen III's financial condition was becoming clear to Aspen III's management, Aspen III's management approached Redleaf with a scheme by which Redleaf would make an investment in Aspen III.  Declaration of Michael J. Tomana ("Tom. Dec.") ¶ 4-5.  At that point, Redleaf knew that Aspen III had drawn $23 million in leverage to make investments, and that the SBA had committed an additional $10 million.  Id. at ¶ 7.  Given Aspen III's leverage, Redleaf was concerned about making a substantial investment in Aspen III.  Id.

Aspen III's Management represented that Aspen III was a good investment, and that the value of Aspen III's investments was sufficient to repay the $23 million in leverage, that the investments would realize a profit, and that the limited partners who had previously invested in Aspen III would receive a complete return of capital.  Tom. Dec. ¶ 5.  Given management's contemporaneous disclosures to the SBA, the representations regarding Aspen III's financial condition were false.  Teck. Dec. ¶ 3 & Exh. C.  Redleaf relied on management's representations in deciding to invest.  Tom. Dec. ¶ 11. Had Redleaf known the true financial condition of Aspen III, Redleaf would not have invested.  Tom Dec. ¶ 11.  Indeed, to stave off a finding of regulatory capital impairment appears to have been one reason for the misrepresentations.  Cib. Dec. ¶ 13.

**D.    Aspen III, Redleaf, and the SBA Agreed to Divide Aspen III into the Series A/B Investments to Assuage Redleaf's Leverage Concerns.**

To further assuage Redleaf's concerns about the outstanding leverage, Aspen III's management proposed a new structure for the investment, which would divide Aspen III into two series of investments – Series A and Series B.  Tom. Decl. ¶ 8.  Redleaf intended that one of the purposes of this structure was to insulate Redleaf from having its $15 million capital commitment used to repay existing leverage should Aspen III fail.  Id.  Aspen III's management represented to Redleaf that this would indeed be the effect of the Series A/B structure.  Id.  Redleaf relief on Aspen's representations, and would not have invested without a structure to insulate Redleaf's capital from having to repay the existing leverage.  Id.

As discussed more fully below, to accomplish this result, the parties would have to amend the 1999 Agreement with the SBA's approval.  On April 1, 2002, the parties accomplished the amendment, resulting in the Aspen Ventures III, L.P. First Amendment to Amended and Restated Limited Partnership Agreement (the "2002 Amendment").  2002 Agreement, Doc. 66-13 through 66-15.

**E.    In the 2002 Amendment, the Parties and the SBA Agreed That Redleaf's Series B Capital Commitment Could Not Be Called to Repay Series A Leverage.**

To fully understand how the 2002 Amendment altered the rights of the SBA to force Redleaf to contribute the full amount of its capital commitment to repay the SBA leverage that SBA drew, regardless of whether Aspen III drew that leverage to make Series A or Series B investments – it is necessary to understand (1) how the 1999 Agreement was intended to work within the SBIC regulatory scheme, (2) the amendment process, and (3) how the 2002 Amendment did and did not change the rights of the SBA under its regulatory scheme.

**1.    The 1999 Agreement.**

The 1999 Agreement in general created a Delaware Limited Partnership, Aspen III, where the general partner was Third-Party Defendant Aspen Ventures Management III LLC, a Delaware

Limited Liability Company.  1999 Agreement, Doc. 66-2, p. 6, Doc. 66-4, p. 12.

To gain admission to the Aspen III limited partnership, a prospective limited partner had to agree to make a Capital Commitment – meaning a sum of money that a limited partner agrees to commit to the Aspen III partnership.  1999 Agreement § 3.2, Doc. 66-2, p. 3-4.  The signature pages that the limited partners executed generally state the amount of the Capital Commitment each limited partner was willing to make.  1999 Agreement, Doc. 66-4, p. 13, et seq.

The 1999 Agreement did not require all of the Capital Commitment to be paid in at once.  A limited partner was required to pay in an initial sum of money up front, and then, on 15 days written notice, the general partner could require further capital contributions, up to a certain maximum percentage of the total Capital Commitment.  1999 Agreement, Doc. 66-2, p. 3-4.

Generally speaking, Aspen III used the paid-in capital to obtain SBA leverage and make investments, as discussed above in the "risky.com" example.  An SBIC like Aspen III cannot draw leverage without paid-in capital, and can only obtain leverage at a ratio of 2:1 to the capital that the limited partners have already paid – not just committed, but actually paid – to the limited partnership.  13 C.F.R. § 107.1150.

As discussed above, the SBA has various means to protect itself from the risks associated with its investment, even though according to the regulatory scheme, it earns less return on its investment.  Chiefly, the SBA's means involve making sure the SBA is paid first in case of success or disaster.

For example, if Aspen III's investments were successful, then the gains were to be returned to the SBA and the other limited partners through mandatory or discretionary "distributions."  1999 Agreement §§ 6.3-6.4, Doc. 66-2, p. 18-19.  The SBA Annex, which is incorporated into the 1999 Agreement (§ 2.5, Doc. 66-2, p. 3), required the SBA to paid distributions before Aspen III could make distributions to the other limited partners.  See SBA Annex, Article VI, Doc. 66-7, p. 12-14.

If Aspen III was a failure and had to be liquidated, then the SBA was entitled under SBIC regulations and the 1999 Agreement to require the repayment of its outstanding leverage before any private limited partner received anything in the liquidation.  13 C.F.R. § 1500(4).  Moreover, under

7

the 1999 Agreement, (1) the limited partners must pay in the amount of their respective Capital Commitments upon liquidation if the other assets of the partnership are insufficient to repay outstanding leverage and (2) if Aspen III were subject to Restricted Operations, the SBA could require the limited partners to contribute their respective Commitments that have not yet been paid in Aspen III.  SBA Annex, Article VII, §§ 7.1 and 7.2, Doc. 66-7, p.15-16.  It is this latter provision of the Annex that the SBA relies upon here to force Redleaf to pay the balance of its capital commitment.

**2.    Rather Than Admit Redleaf to Aspen III Under the 1999 Agreement, Aspen III, Redleaf, and the SBA Amended the 1999 Agreement.**

Rather than negotiating and agreeing to the 2002 Amendment, Redleaf could have simply sought admission to Aspen III under the 1999 Agreement.  1999 Agreement, § 7.6(a), Doc. 66-3, p. 4.  Instead, Redleaf chose to proceed under the Series A/B structure because Aspen III's management represented, and Redleaf believed, that the Series A/B structure would insulate Redleaf's Capital Commitment from having to repay leverage associated with existing investments. Tom. Dec. ¶ 7-8.

Certainly the 1999 Agreement itself could be amended to achieve this result – the 1999 Agreement explicitly provided that it could be amended with the written consent of the general partner, Two-Thirds Interest of the Limited Partners, and the SBA.  1999 Agreement § 10.7, Doc. 66-3, p. 15; SBA Annex § 10.2, Doc. 66-7, p. 20.  The SBA Annex itself even provided that the partners could reduce the obligation of partners to make capital contributions.  SBA Annex § 7.2, Doc. 66-7, p. 16.

Here, this is exactly what occurred.  On February 13, 2002, the SBA wrote to Aspen III's general partner, letting him know that the SBA had "no objection" to the proposed amendments which became the 2002 Amendment, so long as the consent of the limited partners was obtained. Moser Decl. Exh. D, Doc. 66-9, p. 2-3.  The parties obtained such consent.  2002 Amendment signature pages, Doc. 66-13, p. 12 through Doc. 66-14, p. 36.

8

1

2       **3.**    **The 2002 Amendment Insulated Redleaf's *Capital Commitment* From**
3              **Existing Leverage, But Allowed *Distributions* to Be Paid to the SBA from**
              **Either Series A or Series B When Necessary.**

4          The broad purpose of the 2002 Amendment, which Aspen III's counsel drafted (Tom. Dec. ¶

5   8), was to divide the assets and liabilities of Aspen III into two separate series.  "Series A" consisted

6   of the assets and liabilities of the Partnership as they existed before the execution; "Series B"

7   consisted of the capital contributions of Redleaf, as well as any other assets acquired and liabilities

8   incurred thereafter.  2002 Amendment, Recitals, Doc. 66-13, p. 2.  In general, except as specifically

9   provided in the 2002 Amendment, or the SBIC Act, the debts of each series would be enforceable

10  against that series only.  2002 Amendment, § 1(a), Doc. 66-13 p. 3.

11         The 2002 Agreement amended the 1999 Agreement in different ways, depending on whether

12  Aspen III was successful or unsuccessful, and whether the question was what could happen to

13  Redleaf's "capital commitment" if Aspen III was unsuccessful, or how distributions would be paid is

14  Aspen III was successful.

15         Specifically, with respect to Redleaf's Capital Commitment, the 2002 Agreement provided

16  that

17     •    "[a]ny Outstanding Leverage as of the time immediately prior to execution of this
           First Amendment shall be Leverage associated with Series A."  2002 Amendment §
18         1(c)(i), Doc. 66-13, p. 3.

19     •    With regard to "capital calls" – what the SBA is attempting to do to Redleaf here –
           the agreement is unequivocal:  "capital calls shall be made separately with respect to
20         each series."  2002 Amendment, § 2(a)(i), Doc. 66-13, p. 4.

21         These provisions were intended to amend the SBA Annex Article VII, discussed above,

22  which generally allow the SBA to call unfunded capital commitments in certain situations.  Again,

23  the SBA Annex itself specifically provided that the SBA could consent to a term reducing Redleaf's

24  obligation to make a capital commitment.  SBA Annex, § 7.2(c), Doc. 66-7, p. 16.  In the 2002

25  Amendment, leverage predating the 2002 Amendment unquestionably relates only to Series A

26  investments, while capital calls must be made separately as to each series.  There is nothing in the

27  2002 Amendment to undercut this unequivocal result.

28

Moreover, the SBIC Act bolsters this interpretation.  The only regulation in the SBIC Act that gives the SBA the right to call unfunded capital commitments is § 107.1820(f)(3).  This section provides that the SBA may only require the commitments to be funded <u>in accordance with the SBIC's articles.</u>  Here, pursuant to the 2002 Amendment, which SBA expressly approved, Aspen III amended its Articles of Limited Partnership on file with the Delaware Secretary of State to specifically recognize the Series A/B structure's limitation on enforcement of the debts of one series against another series.  RJN Exh. 2.

Unlike the 2002 Amendment's treatment of capital calls, the 2002 Amendment's treatment of distributions specifically recognizes that the 2002 Amendment itself creates exceptions to the Series A/B structure.  The 2002 Amendment provides:

> "distributions (liquidating and nonliquidating) with respect to each series shall be made . . . solely from the assets of such series (<u>except as specifically set forth to the contrary in this First Amendment.</u>)

2002 Amendment, § 2(a)(iv), Doc. 66-13, p. 4 (emphasis added).  This section refers to Section 2(h) of the 2002 Amendment, entitled "Interseries Loans."  That Section recognizes that while:

> It is the intent of the parties that all distributions to the Limited Partners of one series shall be made solely from the assets of such series . . . the parties acknowledge that in the event the General Partner makes a distribution to the Limited Partners of one series, or in certain other circumstances, the General Partner may be required to make a distribution to the Preferred Limited Partners [the SBA] pursuant to Article VII of the SBA Annex. . . .[2]

2002 Amendment § 2(h), Doc. 66-13, p. 6-7.  The section goes on to detail that a <u>distribution</u> – again, <u>not</u> a capital call – may have to be made out of the assets of one series with respect to leverage attributable to another series, and that in such case one series would essentially owe the other.  <u>Id.</u> at Doc. 66-13, p. 7.

---

[2]  The reference to Article VII of the SBA Annex in this section appears to be a scriveners' error.  Article VI, not Article VII of the Annex, deals with distributions, and the SBA's priority therein.  <u>See</u> SBA Annex Article VI, Doc. 66-7, p. 12-14.  In contrast, Article VII addresses capital commitments, not distributions, except for Section 7.11, which addresses distributions on withdrawal of private limited partners, and which does not seem to have any application to Section 2(h) of the 2002 Amendment.  <u>Id.</u> at Doc. 66-7, p. 14-18.  Accordingly, the reference to Article VII here should have been to Article VI.  Pursuant to Rule 56(f), one of the issues that Redleaf would pursue in discovery is whether the reference to Article VII in Section 2(h) is a scriveners' error as it appears.

10

4.    **None of the Exhibits Attached to the Moser Declaration Address Treatment of Redleaf's Capital Commitment.**

The SBA attaches a number of Exhibits to the Declaration of Richard Moser for the proposition that Redleaf understood that the Series A/B structure would not protect its Capital Commitment from having to repay Series A leverage in certain circumstances. None of the Exhibits, however, address this issue.

Exhibit C: This is a term sheet that Aspen III presented to Redleaf in connection with the proposed investment. Tom. Dec. ¶ 13; Doc. 66-8, p. 2. Nothing in the term sheet addresses the issue of Redleaf's capital commitment. Rather, in the section titled "Existing Aspen III Fund; SBA Leverage", the term sheet identifies the distribution issue discussed above. Id.

Exhibit D: This is a letter from the SBA to Thaddeus Whalen, one of the managing members of Aspen Ventures Management, the general partner of Aspen III. Doc. 66-9. In the letter, the SBA says nothing about Redleaf's Capital Commitment, and whether it could be used to repay Series A leverage. Doc. 66-9, p. 3.

Exhibit E: This is a summary of key terms that Redleaf discussed at a board meeting before proceeding with the Aspen investment. Tom. Dec. ¶ 14; Doc. 66-10. It provides that "the laws and regulations applicable to the Old Fund and the New Fund as SBICs provide for cross-liability between these series under certain circumstances" and later, discusses this in more detail. Doc. 66-10, p. 4. Redleaf understood this to refer to the section on the 2002 Amendment on "interseries loans" addressing distributions discussed above, not anything to do with the treatment of Redleaf's Capital Commitment. Tom. Dec. ¶ 12, 15. Indeed, this document also discusses the allocation of SBA leverage, and notes, consistent with the 2002 Amendment, that outstanding leverage will be allocated to the "old fund." Doc. 66-10, p. 4.

Exhibit F: Exhibit F is the minutes of a meeting of Redleaf's Board of Directors. Tom. Dec. ¶ 15. The minutes reflect discussion of the summary of the terms in Exhibit E. There was no discussion at that meeting of the possibility that the SBA could call Redleaf's Capital Commitment to repay Series A leverage, because Redleaf did not believe this could occur. Id.

1    Exhibit G:  Exhibit G is a draft statement to the Limited Partners of Aspen III.  Doc. 66-12.

2    The statement, drafted by Whalen, provides:

3          The SBA will have the right to satisfy liabilities associated with
           leverage against either series, regardless of the fact that the general
4          partner and the limited partners view such liabilities as belonging to a
           particular series.  In short, the SBA will have the right to seek Aspen
5          III-A assets in order to satisfy Aspen III-B leverage liabilities, thereby
           potentially reducing Aspen III-A returns or delaying the distribution of
6          such returns to the Series A Limited Partners (and vice versa).

7

8    Doc. 66-12, p. 5.  Again, Redleaf understood this to be referring to the 2002 Amendment's treatment

9    of distributions.  Tom. Dec. ¶ 16.  Exhibit J, which purports to be the audited financial statements for

10   Aspen III Series B, makes the same point.  Doc. 66-16, p. 7.

11          In short, nowhere in the Exhibits that the SBA submitted is there an indication that Redleaf

12   agreed and understood that its Capital Commitment could be called to satisfy Series A leverage.

13   This is because Redleaf understood that the 2002 Amendment provided otherwise, and because the

14   2002 Amendment did explicitly provide otherwise.  Tom. Dec. ¶ 8; see supra Section IV.E.

15          **F.    The Series A/B Structure Was a Violation of SBA Regulations, and Allowed
                    Aspen III's Management to Continue to Defraud Redleaf.**
16

17          This Series A/B structure was itself inconsistent with SBA regulations and procedures, in that

18   the structure excluded Redleaf's management representatives from anything having to do with Series

19   A investments, and even prevented them from learning anything about the Series A investments.

20   Aspen Ventures Management III, LLC First Amendment to Second Amended and Restated Limited

21   Liability Company Agreement, § 3(c), Doc. 73-7, p.4-5; Cib. Dec. ¶ 20-23; 13 C.F.R. § 107.503(c).

22          For example, the separation between the Redleaf managing members and the Series A

23   Investments meant that the Redleaf Series B managing members had no way to participate in

24   decision-making and valuations with regard to the Series A Investments, or the requests for and

25   utilization of SBA leverage.  Tom. Dec. ¶ 17-18.  In fact, Redleaf's managing members were

26   excluded from Series A partnership meetings.  Id.  Moreover, between April 2002, and January

27   2004, the Third-Party Defendants failed to provide Redleaf with any reports regarding the value of

28

the Series A Investments.  Id. at ¶ 18.  What reports were provided were misleading.  Id.

This kept Redleaf wholly in the dark about the true state of the disastrous Series A investments, allowing Aspen III to make capital calls on Redleaf – to support further SBA leverage – without resistance from Redleaf. Tom. Decl. ¶ 23.

This Series A/B structure was extremely unusual.  In fact, during a lengthy SBA career, Ronald Cibolski, who was Director of SBIC Operations for 10 years, has never seen an SBIC structured this way before.  Cib. Dec. ¶ 20.

## G.  After a Drastic Decline in Portfolio Value, the SBA Put Aspen III into Liquidation Status and Refused To Recognize the Series A/B Structure.

In March of 2004, Redleaf received a report for investors indicating that the value of the Aspen III's portfolio was $29.2 million. Tom Dec. ¶ 20 & Exh. A.  On or about June 30, 2004, Redleaf learned the valuation of the same investments had dropped to $12.9 million." Id. at ¶ 21 & Exh. B.

Having found that Aspen had a capital impairment of 123.19 percent, the SBA placed it on restricted status on March 16, 2005.  RJN ¶ Exh.1 ¶ 20.  As Aspen III could not cure its capital impairment during the 15 days provided, the SBA then placed it into liquidation status on April 19, 2005 and thereafter filed Case No. C06-4032 JW against Aspen III seeking imposition of receivership and injunction against disbursing or encumbering its assets ("Receivership Action"). Id. at ¶ 25.  SBA later announced that it would not recognize the Series A/B structure, and demanded the full extent of Redleaf's Capital Commitment.  Moser Decl. Exh. M, Doc. 66-19.  This litigation followed.

## V.  LEGAL STANDARD

On a summary judgment motion, this Court must view the evidence in the light most favorable to Redleaf.  Suzuki Motor Corp. v. Consumers Union of United States, Inc., 330 F.3d 1110, 1140 (9th Cir. 2003).  Redleaf's evidence is to be believed, and all justifiable inferences are to be drawn in Redleaf's favor, including questions of credibility, and the weight to be accorded particular evidence.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  The Court's function is

13

not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Id.</u> at 249. In terms of a contractual dispute where the parties argue for competing constructions, where the construction of the opposing party is correct, summary judgment is of course not appropriate. <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 888-89 (9th Cir. 2003).

# VI.    <u>ARGUMENT</u>

### A.    This Court Should Deny the SBA's Motion Because the SBA Agreed Not to Call Redleaf's Series B Capital Commitment to Repay Series A Leverage.

This Court should deny SBA's Motion because it is clear that the SBA agreed to not to call Redleaf's Series B Capital Commitment to repay Series A leverage, by approving the 2002 Amendment. <u>See supra</u>, §§ IV.D., IV.E. At the very least, genuine issues of material fact exist.

The task of this Court is construe the 2002 Amendment's effect on the 1999 Agreement. Only if this Court concludes that the 1999 Agreement and 2002 Amendment unambiguously support the SBA's construction is it appropriate to grant summary judgment. <u>United Rentals, Inc. v. RAM Holdings, Inc.</u>, 937 A.2d 810, 830 (Del. Ch. 2007); <u>Kassbaum v. Steppenwolf Prods., Inc.</u>, 236 F.3d 487, 491 (9th Cir. 2000). If the Court concludes that the Agreements support Redleaf's construction, then summary judgment should be denied. <u>Id.</u> If this Court concludes that the Agreements are subject to two reasonable interpretations, then summary judgment should be denied. <u>Id.</u>; <u>Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992) (contract language must be susceptible to two or more reasonable interpretations to be deemed ambiguous).

Here, the 1999 Agreement and the 2002 Amendment, read as a whole, support Redleaf's construction, not the SBA's. <u>See</u> <u>Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc.</u>, 2008 WL 902406,*3 (Del. Ch. 2008). Specifically, the 2002 Amendment provides:

- The liabilities of each Series will be enforceable only against that particular Series (with an exception for distributions, as discussed <u>supra</u>), 2002 Amendment § 1(a), Doc. 66-13, p. 3;

- Any leverage outstanding at the time of the 2002 Amendment will be associated with Series A, <u>id.</u> at § 1(c)(i), Doc. 66-13, p. 3; and

- Capital calls shall be made separately as to each Series, <u>Id.</u> at § 2(a)(i), Doc. 66-13,

14

p. 4.

Read together, these sections amended the SBA's right to call Redleaf's Series B Commitment to repay Series A leverage, to the extent Article VII can even be interpreted to extend such a right.

Bolstering this conclusion is the SBIC regulations themselves. Section 1820(f)(3) provides that the SBA does have the right to call capital commitments in case the SBA places an SBIC into restricted operations, but only in accordance with the Articles of an SBIC. Here, the Articles were amended to reflect the Series A/B structure. See supra, § IV.E.3.

To the extent the 2002 Amendment is subject to two reasonable interpretations (Redleaf's and the SBA's), and is thus ambiguous, the 2002 Amendment should be interpreted as against the drafter Aspen III (Tom. Dec. ¶ 8), and thus against the SBA, as its receiver. See Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 398 (Del.Supr.,1996); FDIC v. O'Melveny & Meyers, 61 F.3d 17, 19 (9th Cir. 1995) (defenses good against original party are good against that party's receiver).

The SBA's arguments to the contrary are without merit or, at most, raise material issues of fact. Specifically, the SBA argues at pages 8 through 10 of its Motion that Redleaf's capital commitment is absolute. The SBA is wrong. As set forth in Section IVE.2. & IV.E.3, it is clear that the SBA Annex can be, and was, amended. To the extent the SBA relies on a vague reference to the SBIC Act and its regulations, it is equally clear that the only regulation that is on point – § 107.1820(f)(3), supports Redleaf's position. See supra § IV.E.3.

As a result, the SBA's citation to U.S. Small Business Administration v. Chimicles, 447 F.2d 207 (3rd Cir. 2006), (M'tn at 9:9-23), is unavailing. In Chimicles, unlike here, the SBA Annex was completely in effect, and had not been amended.

The SBA next argues in pages 10-12 of its Motion that the SBA Annex and the regulatory scheme cannot be amended, and was not amended here. For the "was not amended" portion of its argument, the SBA relies on the Exhibits to the Moser Declaration. The SBA argues that "Redleaf acknowledged that if the circumstances set out on the Act and Regulations arose, Redleaf's capital would be liable for, or cross-collateralize, all outstanding Leverage, regardless of when it was incurred." M'tn at 10:6-9. This is an utterly disingenuous argument. As set forth in detail in

1  Section IV.E.4, <u>supra</u>, none of the Exhibits to the Moser Declaration provide that Redleaf's unpaid

2  Capital Commitment could be called to repay Series A leverage, and there is certainly no evidence

3  that Redleaf is "acknowledging" that.  If anything, the only evidence is to the contrary.  Tom. Dec. ¶

4  8; Declaration of James R. Cummins ("Cum. Dec.") ¶ 4-5.

5       At most, the documents attached to the Moser Declaration show the discussion of what

6  would happen if Aspen III was successful – it was possible that a <u>distribution</u> – again, <u>not</u> a capital

7  call – could have to be made out of the assets of one series with respect to leverage attributable to

8  another series, and that in such case one series would essentially owe the other.  <u>See</u>, <u>supra</u>, § IV.E.4.

9       The SBA further argues on page 12-14 that the 2002 Amendment does not excuse Redleaf's

10  obligation to pay its capital commitment.  Redleaf has refuted this point already, and here only

11  addresses four particularly disingenuous points.

12       First, the SBA asserts that Redleaf's contractual construction does not "address when and

13  how Redleaf is required to make its capital commitment."  First of all, the issue is when and how

14  limited partners are to make <u>capital contribution</u>, and the 2002 Amendment addresses that quite

15  clearly and unequivocally – separately as to each Series.  2002 Amendment § 2(a)(i), Doc. 66-13 p.

16  4.  Read together with the provisions regarding allocation of outstanding leverage to Series A, and

17  the prohibition on enforcing liabilities of one series against another series, and the intent of the 2002

18  Amendment is clear.

19       Second, the SBA asserts that "the First Amendment explicitly acknowledges that the SBA

20  Annex may require the General Partner to apply assets attributable to one series to pay Leverage

21  attributable to the other series."  M'tn at 13:13-15.  The SBA further asserts that "Redleaf knew and

22  agreed that the Act, Regulations and SBA Annex may require Aspen Ventures to ignore the Series

23  A/B distinction and use Series B capital to pay series A Leverage."  <u>Id.</u> at 13:24-26.  For this, the

24  SBA cites the language on <u>distributions</u> and inter-series loans, as discussed above.  M'tn at 13:16-

25  21; <u>see</u> <u>supra</u> § IV.E.3.  This argument is disingenuous because the section of the 2002 Amendment

26  does not address calling capital to repay Series A leverage, or even calling capital at all.  Rather, this

27  section addresses the necessity to make <u>distributions</u> to SBA "with respect to leverage attributable to

28

1    another Series."[3]  In other words, the parties specifically agreed that SBA would be entitled to its

2    distributions based on the leverage it advanced to Redleaf, regardless of whether that leverage

3    related to Series A or Series B investments.

4        Third, the SBA characterizes an October 2005 e-mail exchange between Jim Cummins,

5    consultant to the Redleaf Group, and Debra Schilling, CFO of Aspen Ventures Management (the

6    Aspen III general partner) as a "reminder" that Series B capital could repay Series A leverage.  M'tn

7    at 13:26-27 (citing Moser Decl. Exh. K, Doc. 66-17, p. 2.).  Not only is the e-mail not susceptible to

8    this construction, but this was not the context of the exchange at all.  Cum. Dec. ¶ 2-5.

9        Fourth, the SBA asserts if there was a limitation on the SBA's right to call Redleaf's capital,

10   it would be in Section 2(i) of the 2002 Amendment, entitled "Repayment of Outstanding Leverage."

11   M'tn at 14:1-4.  This is disingenuous because one would expect the very point of the 2002

12   Amendment – to insulate Series B capital from having to repay Series A leverage – would be spelled

13   out in the very beginning of the 2002 Amendment.  In fact, it is.  See 2002 Amendment, §§ 1-2;

14   Doc.66-13, p. 3-4.

15       Redleaf respectfully submits that its construction of the 1999 Agreement and the 2002

16   Amendment is the correct one.  At minimum, Redleaf has demonstrated that there are genuine issues

17   of material fact precluding summary judgment in the SBA's favor.

18       **B.    Redleaf's Affirmative Defenses Raise Genuine Issues of Material Fact That
19              Independently Preclude Summary Judgment.**

20       Redleaf has generally raised two types of affirmative defenses against the SBA's claim:  (1)

21   contract-related defenses; and (2) defenses based on the misconduct of Aspen III's management

22   and/or the SBA's collusion in that misconduct.  Before discussing these defenses in detail, however,

23   an analysis of the SBA Annex, and how it applies to affirmative defenses – if at all – is necessary.

24       **1.    <u>Even If The SBA Annex Controls, It Does Not Prevent Redleaf from
25             Raising Its Affirmative Defenses.</u>**

26       The SBA relies in large part on Paragraph 7.1 of the Annex for its assertions that all of

27

28   ───────────────
     [3]  Again, the reference to Article VII appears to be a scrivener's error.  See note 2.

Redleaf's affirmative defenses are barred.  Specifically, the SBA relies on the language that no
limited partner "shall have any right to delay, reduce or offset any capital contribution obligation to
the Partnership called under this Section 7.1 by <u>reason of any</u> **counterclaim** <u>or right to</u> **offset** . . . ."
E.g., M'tn at 8:18 – 9:1 (quoting Paragraph 7.1, emphasis added).  This language does not help the
SBA.  Redleaf has brought no counterclaim against SBA.  Nor has Redleaf asserted the affirmative
defense of setoff, or offset, which is recognized as a distinct affirmative defense under Delaware
law.  10 Del. Code Ann. § 9536 (West 2007) ("In every action…the defendant, if he or she has
against the plaintiff any account, demand, or cause of action, cognizable before a justice of the
peace, shall bring it forward and plead it as a setoff….").

  If the SBA's assertion is that Redleaf agreed to waive affirmative defenses (other than offset)
by this language the SBA's assertion must fail.  A waiver under Delaware law requires a clear,
unequivocal and decisive act of the party showing such intent and purpose. <u>Dervaes v. H.W. Booker</u>
<u>Constr. Co</u>., 1980 WL 333053, *7 (Del.Super.,1980); <u>Biasotto v. Spreen</u>, 1997 WL 527956, *10
(Del.Super.,1997).  It requires more than mere inaction; the facts supporting waiver must be
unequivocal in character. <u>Kallop v. McAllister</u>, 678 A.2d 526, 532 (Del.Supr.,1996).  Here Redleaf –
at most – waived the right to bring certain counterclaims and the specific affirmative defense of
offset.  There is no justification for finding a further waiver.

   **2.**  **<u>Redleaf's Contract-Related Affirmative Defenses Raise Genuine Issues of</u>**
       **<u>Material Fact That Preclude Summary Judgment.</u>**

  Redleaf next addresses its first, eighth, tenth, and eleventh defenses, for failure to state a
cause of action, breach, performance, and failure to fulfill conditions precedent.

  1<u>st</u>:  <u>Failure to State a Claim</u>:  Redleaf's first affirmative defense for failure to state a claim
survives.  As set forth above in great detail, the SBA has no contractual right to call Series B capital
to repay Series A leverage, or, at least, there are genuine issues of material fact that preclude
summary judgment here.

  8<u>th</u>:  <u>Breach of Contract</u>:  Redleaf's eighth affirmative defense for breach of contract
precludes summary judgment on the SBA's claim.  As with its other defenses, Redleaf's affirmative

defense of "breach of contract" is good against the SBA as receiver if it is good against the original parties. O'Melveny & Meyers, 61 F.3d at 19. Moreover, under Delaware law, a party who commits a material breach of contract may not proceed against another party if the other party subsequently refuses to perform. A & A Air Services, Inc. v. Jane Richardson, 2006 WL 2382433, *7 (Del. Com'n Pleas 2006); Hudson v. D & V Mason Contractors, Inc., 252 A.2d 166, 170 (Del. 1969).

The SBA attempts to escape this conclusion by arguing that Redleaf's breach of contract defense is a "counterclaim" or "offset" that is barred by paragraph 7.1 of the SBA Annex. M'tn at 14:17-22. The SBA is wrong. To be clear, Redleaf's position is that the SBA's decision to call the balance of its capital commitment, without regard to the Series A/B structure of the 2002 Amendment and the Admission Agreement, is a breach of both of those agreements. As discussed above in detail, the 2002 Amendment which SBA agreed to trumps the 1999 Partnership Agreement, and the SBA Annex. Thus, Redleaf's first response to this argument is that the SBA Annex does not apply here at all, and provides no assistance to the SBA. However, even if it did apply, Redleaf's affirmative defense for material breach of contract is neither a "counterclaim" nor an "offset", but an affirmative defense by which Redleaf avoids liability on the SBA's claim. Delaware permits defendants to assert a breach of contract as an affirmative defense, and do not require defendants to plead such allegations as counterclaims, or as an offset. Active Crane Rentals v. Envir. Health Research & Testing, Inc., 1992 WL 91143 at *1 (Del. Super. 1992). Accordingly, this defense precludes summary judgment here.

8th: Performance: Redleaf's tenth affirmative defense for performance survives. The SBA has not even managed to shift the burden to Redleaf on this defense in any event, because the SBA has not put forth a prima facie case of breach – because the 1999 Agreement and the 2002 Amendment do not allow Redleaf's capital to be called to repay Series A leverage.

11th: Failure of Conditions Precedent: Redleaf's eleventh affirmative defense for failure of conditions precedent precludes summary judgment on the SBA's claim. The SBA as Receiver is subject to the defense of failure of conditions precedent. See O'Melveny & Meyers, 61 F.3d at 19. Here, under the 2002 Amendment, the SBA's right to call Redleaf's entire capital commitment is

conditioned upon a demonstration that that the capital call is to be made only to repay debts (including SBA leverage) relating to Series B investments.  2002 Amendment, §§ 1(a), (c), 2(a)(i), Doc. 66-13, p. 3-4.

The SBA again attempts to rely on the SBA Annex and the <u>Chimicles</u> case.  Again, the Third Circuit's opinion in <u>Chimicles</u>, has no application here.  As the SBA admits, in <u>Chimicles</u>, the limited partners defending against the SBA's claim for unfunded commitments sought to rely on an arbitration provision that the Third Circuit held was a condition of the partnership agreement.  There was no suggestion in the <u>Chimicles</u> case that the SBA approved the amendment of the agreement, or the SBA Annex in that case.

### 3. <u>Redleaf's Conduct-Related Affirmative Defenses Raise Genuine Issues of Material Fact That Preclude Summary Judgment.</u>

<u>Fraud & Rescission:</u>  Redleaf's fifth affirmative defense for fraud, and its seventh affirmative defense for rescission are both based on the fraudulent conduct by Aspen III's management, and the SBA's collusion therein.

"[I]n general, a receiver occupies no better position than that which was occupied by the person or party for whom he acts . . . and any defense good against the original party is good against the receiver."  <u>O'Melveny & Meyers</u>, 61 F.3d at 19 (internal quotations omitted).  The SBA has failed to demonstrate why this principle should apply here.

Here, Redleaf has introduced evidence sufficient to raise triable issues that Aspen III's management made representations to Redleaf concerning Aspen III's financial condition and the effect of the Series A/B structure, that Aspen III's management knew those representations were false, that those representations were material, and that Aspen III relied upon them.  <u>See supra</u>, §§ IV C., IV.D.  Additionally, Redleaf has introduced evidence of the collusion of the SBA in management's desperate plan to keep Aspen III afloat, in that they approved an extremely unusual structure that led Redleaf to invest with full knowledge of Aspen III's disastrous financial condition, and having excused Aspen III's serious regulatory violations shortly before that.  <u>See supra</u>, §§ IV.B., IV.F.

1    The SBA's arguments in opposition are without merit.  First, the SBA attempts to draw a

2   distinction between "the SBA as Receiver" and the "SBA as Regulator" and takes Redleaf to task for

3   "ignoring" this purportedly critical distinction.  The problem with this argument is that the SBA fails

4   to point this Court to any authority for this alleged distinction, or why it might be important.  If

5   anything, the participation in the SBA "as regulator" and the assumption by the SBA "as Receiver"

6   of the defenses that Redleaf would be able to assert against Aspen III's management expands

7   Redleaf's defenses and make summary judgment less appropriate.

8    Second, the SBA relies on <u>United States v. Acorn Technology Fund</u>, 429 F.3d 438 (3rd Cir.

9   2005), and the Federal Tort Claims Act's discretionary function exception, asserting that neither

10  <u>Acorn</u>, nor the Federal Tort Claims Act allows Redleaf to bring ***claims*** against the SBA.  M'tn at

11  16:19 – 18:27.  Regardless of whether this is true it is irrelevant.  Redleaf is not seeking to bring ***any***

12  ***CLAIMS against the SBA.  Rather, Redleaf is merely raising AFFIRMATIVE DEFENSES***  The

13  SBA has attempted to confuse ***claims*** and ***affirmative defenses*** in three different briefs now,

14  including this one, but has ***still*** not even attempted to distinguish Redleaf's authority, <u>Cox v. Kurt's</u>

15  <u>Marine Diesel of Tampa, Inc.</u>, 785 F.2d 935, 936 (11th Cir. 1986), which holds that the Federal Tort

16  Claims Act did not bar a defense of misrepresentation because the defendant raised it only to avoid

17  liability, rather than make a claim.  The case of <u>United States Small Business Administration v.</u>

18  <u>Propper</u>, 2004 U.S. LEXIS 23363 (2004), is distinguishable for the same reason.

19   The SBA further argues that Redleaf somehow agreed to waive any fraud defense to payment

20  of its full capital commitment, should the SBA decide to put Aspen III in restricted operations.  M'tn

21  at 19:1-14.  This argument makes no sense even upon repeated readings.  In any event, it fails

22  because it relies on the SBA Annex.  The argument further  relies on 13 C.F.R. § 107.1820(b)(5),

23  which is curious given that the regulation appears to support Redleaf's theory of the case.  Under

24  107.1820(b)(5), the SBA may put an SBIC into restricted operations if an SBIC "commit[s] a

25  fraudulent act which causes serious detriment to SBA's position as a guarantor or investor."  Here,

26  one of Redleaf's theories is that Aspen III's fraudulent inducement of Redleaf <u>improved</u> the SBA's

27  position as a guarantor or investor, in that Redleaf's investment offered the SBA the chance of

28

keeping Aspen III afloat, or, at worst, a potential source of capital that SBA could use to repay some of its outstanding leverage.  In fact, Redleaf believes that this is precisely why the SBA approved the Series A/B structure, even though the structure itself was inconsistent with SBA regulations.

<u>Unclean Hands:</u>  The SBA argues that Redleaf's unclean hands defense should be barred, because it is nothing more than an innocent party who is stepping into Aspen III's shoes as receiver, and that courts do not allow parties to assert equitable defenses in these circumstances.  M'tn at 19:21 – 23:2.  The SBA is again wrong.  As the SBA admits, this Court has discretion to allow Redleaf to assert its unclean hands and rescission defenses, and should do so.

Of course it makes no sense to assert, as the SBA does, that Redleaf's unclean hands and rescission defenses are barred as a matter of law.  In fact, the SBA admits that under Delaware law, courts have "extraordinarily broad discretion" to allow a party to assert equitable defenses to the point where courts are "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."  M'tn at 21:18-20 (quoting <u>Nakahara v. NS 1991 American Trust</u>, 718 A.2d 518, 522-23 (Del. Ch. 1998)).

Acknowledging the weakness of its substantive argument, SBA halfheartedly asserts that "SBA as federal agency is not a party to this action, nor has Redleaf asserted any claims against SBA with respect to these matters."  M'tn at 22:18-22.  The SBA provides no basis or authority as to why Redleaf may not assert affirmative defenses against the SBA in its capacity as receiver, based on the SBA's previous misconduct.  In fact, in casting itself as the innocent receiver in this case, rather than acknowledging its true role, the SBA invites this Court to "elevate form over substance" – something the Ninth Circuit in <u>O'Melveny & Meyers</u> expressly refused to do.  61 F.3d at 20.

In fact, the Ninth Circuit in <u>O'Melveny & Meyers</u> specifically recognized that in certain appropriate circumstances, defenses based on inequitable conduct <u>can</u> apply against a receiver.  <u>Id.</u> at 19 ("defenses based on a party's unclean hands do not <u>generally</u> apply against that party's receiver"; "it does not necessarily follow that equitable defenses can never be asserted against . . . a receiver.") (emphasis added).  The facts of this case cry out for the exercise of this Court's discretion in Redleaf's favor.  Even though formal discovery has not yet begun, the facts now available raise

1  strong inferences that the SBA colluded with Aspen III's management to defraud Redleaf, and thus

2  should be subject to a fraud defense based on its own conduct, as well as the imputed conduct of

3  Aspen III's management.

4        Specifically, the picture that emerges from Redleaf's investigation is that of an SBA analyst

5  who was too close to Aspen III, and helped to defraud Redleaf in a desperate attempt to keep

6  Redleaf afloat and avoid consequences for its earlier misfeasance.  For example, he excused serious

7  regulatory violations that went directly to Aspen III's stability, and without involving his supervisor

8  as he was required to do.  Then, when he learned of the financial disaster that Aspen III had become,

9  and facing the loss of at least $23 million in SBA funds and possible discipline, he passed on an

10  investment structure that was inconsistent with any other, and which allowed Aspen III's

11  management to continue to conceal Aspen III's desperate financial situation from Redleaf.  This

12  allowed Aspen III to call millions of dollars in capital to support millions more in SBA leverage.

13  See Section IVB. & IV.F, supra.

14        Accordingly, unlike in O'Melveny & Meyers, the SBA is no "innocent entity that steps into

15  the party's shoes pursuant to court order or operation of law", as the receiver apparently was in that

16  case; it is instead a "party to the original inequitable conduct . . . ."  61 F.3d at 19.  Moreover, the

17  SBA here is unlike the receiver in O'Melveny & Meyers, who was not "in a position to take action

18  prior to [the receivership]. . . ."  Rather, the SBA could have chosen to avoid this situation and take

19  its losses, but instead chose to try to keep Aspen III afloat with an unsuspecting new investor.

20        Under these circumstances, the balance of equities favors Redleaf.  Although it is true that

21  preventing the SBA from collecting the $10.6 million from Redleaf will have a miniscule effect on

22  the taxpayer now, stripping Redleaf of its equitable and other defenses could have an even worse

23  impact on the taxpayer over time.  If this Court accepts the SBA's position, there would be no

24  incentive for the SBA in future cases not to do exactly what it did here, with the concomitant injury

25  to the public fisc.  Moreover, in cases where, unlike here, Redleaf prevented the SBIC from drawing

26  further leverage, in future cases the taxpayer might not be so fortunate.

27        Estoppel:  The SBA next asserts that Redleaf's estoppel defense is barred.  Again the SBA

28

DEFENDANT REDLEAF GROUP, INC.'S OPP'N TO SBA'S MT'N FOR SUMMARY JUDGMENT
CASE NO. C 07-05350 JW PVT

relies on O'Melveny v. Meyers.  M'tn at 23:3-13.  The SBA's reliance is misplaced for the same reasons as discussed above.

The SBA further argues that the SBIC act and its regulations expressly prevent Redleaf from attempting to assert waiver or estoppel, quoting 13 C.F.R. § 107.1910, which provides in relevant part:  "SBA's failure to exercise or delay in exercising any right or remedy under the Act or the regulations in this part does not constitute a waiver of such right or remedy."  M'tn at 23:11-14. This regulation is inapposite, because Redleaf does not claim that the SBA waived a right or remedy by failing to exercise it, or delaying to exercise it.  Rather, Redleaf's claim is that the SBA engaged in affirmative misconduct, in that, among other things, it approved the Amended Aspen III Agreement with the Series A/B structure, while at the same time knowing of Aspen III's financial distress, that the Series A/B structure was inconsistent with SBA practice, and that approval of Aspen's method for establishing portfolio valuations also failed to comply with SBA regulations and procedures.  See Section IV.B, IV.F., supra.

Redleaf's position is that these facts set forth above will support a claim for estoppel against the SBA, meeting the following elements:  (1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be ignorant of the true facts, and (4) he or she must detrimentally rely on the former's conduct."  United States v. Gamboa-Cardenas, 508 F.3d 491, 502 (9th Cir. 2007).   Redleaf believes the SBA's conduct further satisfies the additional elements needed to support a claim of estoppel against the government:  (1) "the government has engaged in affirmative misconduct going beyond mere negligence" and (2) "the government's act will cause a serious injustice and the imposition of estoppel will not unduly harm the public interest.'"  Gamboa-Cardenas, 508 F.3d at 502.  Assuming that these elements are met, courts have recognized that it is possible to assert a defense of estoppel against an agency that engaged in misconduct, and then brings a claim as a receiver against a party arising out of that misconduct.  See RTC v. Greenwood, 798 F. Supp 1391, 1398 (D. Minn. 1992).

Laches:  With regard to Redleaf's laches defense, genuine issues preclude summary

1  judgment.  Despite having informed Redleaf as early as 2005 that the SBA might to seek the balance

2  of Redleaf's capital commitment, the SBA did not make a formal demand on Redleaf until May 10,

3  2007, and did not bring suit against Redleaf until October 19, 2007.  See Tom. Dec. ¶ 25.  The

4  Third-Party Defendants have raised a statute of limitations as to Redleaf's claim against them.

5  Should the Third-Party Defendants' be successful, the SBA's delay in bringing suit will have

6  prejudiced Redleaf.  Accordingly, the SBA's Motion should be denied.

7  ## VII.   CONCLUSION

8  In accordance with the foregoing, Redleaf Group, Inc. respectfully requests that the SBA's

9  Motion be denied.

10  Respectfully submitted,

11  Dated:  June 2, 2008          KIRKPATRICK & LOCKHART PRESTON GATES ELLIS
12                                 LLP

13  By:   Matthew G. Ball /s/
14        Matthew G. Ball, Esq. (CA Bar 208881)
        55 Second Street, Suite 1700
15        San Francisco, CA  94105
        Telephone:  (415) 882-8200
16        Facsimile:  (415) 882-8220
        (matthew.ball@klgates.com)

17

18        Martin D. Teckler (pro hac vice)
        1601 K Street, NW Washington, DC, 20006-1600

19        Attorneys for Defendant/Third-Party Plaintiff
20        Redleaf Group, Inc.

21

22

23

24

25

26

27

28