MATTHEW G. BALL (CA BAR 208881)
DEIRDRE M. DIGRANDE (CA BAR 199766)
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Tel: (415) 882-8200
Fax: (415) 882-8220
matthew.ball@klgates.com
deirdre.digrande@klgates.com

MARTIN D. TECKLER (*pro hac vice*)
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9000
Fax: (202) 778-9100
martin.teckler@klgates.com

Attorneys for Defendant
REDLEAF GROUP, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES SMALL BUSINESS ADMINISTRATION in its capacity as Receiver for Aspen Ventures III, | Case No. C-07-05350 JW (PVT) |
| Plaintiffs, | |
| v. | **DECLARATION OF RONALD C. CIBOLSKI IN SUPPORT OF REDLEAF GROUP, INC.'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION, ON THE RECEIVER'S CLAIM FOR BREACH OF CONTRACT** |
| REDLEAF GROUP, INC., | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| ASPEN VENTURES MANAGEMENT III, LLC, a Delaware Limited Liability Company, ALEXANDER P. CILENTO, a California resident, and DAVID CROCKETT, a California resident, and DOES 1-10, | Date: June 23, 2008<br>Time: 9:00 a.m.<br>Judge: Hon. James Ware |
| Third-Party Defendants. | |

1.      I, Ronald C. Cibolski, am a paid consultant to Redleaf Group, Inc. I make this Declaration in support of Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract. I have personal knowledge of the facts stated herein except where stated and, if called as a witness, I could testify competently thereto.

2.      Between 1993 and 2003, I was employed by the U.S. Small Business Administration. My title was Director of SBIC Operations. In that position I was responsible through staff for the regulatory oversight, financial oversight, and leveraging of licensed Small Business Investment Companies (SBICs). This was accomplished through 4 subordinate area chiefs, each supervising a staff of from 5 to 7 financial analysts. Each analyst was assigned from 18 to 30 SBICs. I chaired the Credit Committee which approved or denied all leverage requests from SBICs. Generally SBICs were allowed to leverage their private capital with two tiers of SBA leverage.

3.      As Director of SBIC Operations, from early 1993 through the end of 2003, I indirectly supervised David Gerogosian, the SBIC analyst responsible for overseeing the Small Business Investment Company ("SBIC") known as Aspen Ventures III, L.P., and directly supervised his Area Chief, Walter C. Peterson.

4.      In general, an SBIC is a private venture capital fund that has obtained a license from the SBA. Obtaining an SBIC license generally entitles an SBIC to "draw leverage" from the SBA at a 2:1 ratio to the private capital invested in the SBIC.

5.      As a simplified example, imagine an SBIC called RiskFund has private capital of $2 million in cash. Then, imagine RiskFund wants to make an investment in a private start-up called "risky.com," through purchasing 3 million shares of stock in risky.com for one dollar per share. RiskFund can invest $1 million of its own capital, along with $2 million from the SBA to "leverage" RiskFund's investment in risky.com. RiskFund now owns 3 million shares of risky.com purchased with its own private capital and SBA leverage.

6.      RiskFund could have accomplished the same thing by borrowing $2 million from a bank, hedge fund, or wealthy individual. However, one of the reasons why RiskFund may want to

draw leverage from the SBA is because SBIC regulations limit the profit the SBA can make on an investment in favor of the private investors.

7.      The SBA may receive less return on its investment in risky.com than the private investors; however, the SBA has a number of ways to protect itself from investment risk.  At the outset, it subjects RiskFund and its management to a lengthy and rigorous qualification process, including a thorough reference and background check of the proposed managing members.

8.      Moreover, the SBA is empowered to conduct detailed on-site examinations of RiskFund to ensure that RiskFund is financially sound and operating within the SBIC regulations. The results of these examinations are provided to the analyst responsible for RiskFund.

9.      One of the issues that the SBA will examine in its examination of RiskFund is how the management of RiskFund is valuing its portfolio.  In our example, because risky.com is an investment in a private start-up company, it may be difficult to value.  To deal with this risk, the SBA has promulgated regulations and valuation guidelines that RiskFund's management must follow to ensure that its valuation of risky.com is as accurate as possible.  These SBA valuation guidelines are required to be included in every SBIC operating agreement.

10.     In our RiskFund example, it may be that RiskFund's management followed the regulations, and reported to the SBA that the true value of risky.com has declined so much that RiskFund no longer has sufficient capital to meet regulatory capital requirements, and is thus "capitally impaired."  If so, and if RiskFund cannot right its financial condition, the SBA can protect itself and other investors in RiskFund by putting RiskFund into "restricted operations," which means, among other things, that RiskFund can no longer solicit additional investors nor make additional investments.  Often, an SBIC does not emerge from restricted operations, but instead proceeds to liquidation, and then receivership.

11.     But, imagine that instead of following the regulations, RiskFund fails to follow proper valuation procedures, and provides to the SBA a portfolio valuation for risky.com anyway.  In such case, the SBA cannot know whether the valuation is correct, and does not have sufficient information to protect itself, or other investors.  It does not know whether RiskFund is in danger of

3

financial collapse, or should be allowed to draw additional leverage from the SBA to make further investments in risky.com or other ventures.

12.    If RiskFund in fact is, or is in danger of becoming "capitally impaired," one way that it can cure the condition, or ensure that it does not become capitally impaired is to obtain new capital that could support further SBA leverage.  Under the SBA regulations, depending on the financial condition of RiskFund, it may be that the capital commitment of a new investor alone plus the potential leverage can change the financial profile of RiskFund such that RiskFund, even though its investments have declined disastrously, may not in fact be in danger of becoming "capitally impaired" under the regulations and may continue to operate, and pay management fees to RiskFund's management.

13.    Thus, applying this example to Aspen III, assuming Aspen III was slipping towards regulatory capital impairment just before the Redleaf investment, there would have been an incentive for Aspen III's management to misvalue the investment portfolio, with the dual purpose of (a) making Aspen III look better to the SBA, in hopes of staving off a finding that Aspen III was capitally impaired and (b) making Aspen III look better to a potential new investor, which would in turn make it more likely that Aspen III's management could obtain new capital, thereby in fact improving the financial condition of Aspen III from a regulatory perspective.

14.    This incentive is one reason why it is so important for SBICs to follow the SBA valuation guidelines, and why it is so important that the SBA regulators assigned to the SBICs ensure that they are doing so.

15.    I have reviewed the Examination Report of Aspen Ventures III dated May 4, 2001, and attached to the Declaration of Martin D. Teckler as Exhibit A.  I have also reviewed the letter of David Gerogosian for Walter Peterson dated July 2, 2001, related to that Examination Report, attached as Exhibit B to the Declaration of Martin D. Teckler.

16.    With regard to the Examination Report, the SBA found that the portfolio valuations of Aspen III were not adequately substantiated or confirmed by Aspen III's management, as required by 13 C.F.R. § 107.503(c), or the SBA's Valuation Guidelines.  This was no mere technical

4

violation. As discussed above in the RiskFund example, the accuracy of the valuations of the investments of an SBIC is absolutely essential to the integrity of an SBIC's relationship with its private investors, and critical to the ability of the SBA to properly regulate an SBIC and determine whether an SBIC should be entitled to draw SBA leverage. Without proper valuation procedures, the money of private investors and the American taxpayer is placed at unacceptable risk.

17.     With regard to the letter that Mr. Gerogosian signed in Exhibit B, I disagree with the conclusion expressed in that letter and find it inconsistent with applicable SBA regulations and Valuation Guidelines. It is inconsistent with the plain language of the valuation guidelines and regulations to accept valuations which were not agreed to by all of the managing members of the General Partner of Aspen III. See 13 C.F.R. §107.503(c) and Appendix B to the Limited Partnership Agreement of Aspen III at pp. 2 and 3. Although the analyst stated in his letter that he was satisfied with the procedures for "general partner signoff" that the Aspen III General Partner employed, there was no statement of what evidence he relied on for that conclusion referenced in that letter, and no such evidence has subsequently been produced by SBA in the exchange of documents which took place between SBA and Redleaf in 2007. In this regard, I have personally reviewed all such documents. Instead, all Aspen III valuations produced for Redleaf show only the signature of one member of the General Partner, Thad Whalen. As such, they are not consistent with SBA requirements in effect at the time the letter was written.

18. In addition, I find it inconsistent with regular practice employed by the Operations Division of SBA that David Gerogosian would sign the letter for Walter Peterson rather than me or another Area Chief. When I was Director of SBIC Operations, I instituted a rule of policy that an analyst such as David Gerogosian could not have unilaterally excused a violation found in an Examination Report. Rather, it would have required the approval of his Area Chief, Walter Peterson, to do so. My policies further prohibited an analyst from signing for his Area Chief, as Gerogosian appears to have done – even at the Area Chief's instruction. If the Area Chief himself or herself were not available to sign off on the resolution of an issue found in the Examination Report personally, an analyst was required to report the situation to me, at which time I would instruct the

analyst to wait for the Area Chief's return, to seek approval from another Area Chief that I would assign, or to seek approval from myself.

19.    It was not my policy to discipline my analysts simply because an SBIC under their regulatory authority failed.  However, in this case, David Gerogosian's unilateral resolution of a very serious violation of SBA valuation policy, together with the subsequent failure of Aspen III and the subsequent loss of millions of dollars of SBA leverage, could well have subjected him to discipline. Although I cannot speak to Mr. Gerogosian's state of mind on this issue, in my opinion, this possibility of discipline would have given Mr. Gerogosian under the circumstances an incentive to prevent Aspen III's collapse that would not have been present without Mr. Gerogosian's violation of SBA policy.

20.    I am aware of the Series A/Series B structure of Aspen Ventures III.  In my 11 years of experience as Director of SBIC Operations and 4.5 years as an SBIC consultant, I am not aware that any other SBIC was ever structured in such a manner.  The Aspen Ventures III structure was very unusual.  The original capitalization of the Fund became Series A with separate capitalization and investments and the commitment from RedLeaf became Series B capital with separate capitalization and investments.  This is not how SBICs are normally structured.

21    The Series A/Series B structure to the extent found in the Aspen Ventures Management III, LLC First Amendment to Second Amended Restated Limited Liability Company Amendment (the "2002 LLC Amendment") also appears to have resulted in additional regulatory violations.

22.    I have reviewed portions of the 2002 LLC Amendment, and know that it contains the following language:

> Any matters which clearly affect only a particular Series shall require the vote or consent of only Managing Members of such Series, and any action by the LLC in its capacity as General Partner of the Fund [SBIC], to the extent such action affects only a particular series of the Fund, shall require the vote or consent of only the Managing Members of the corresponding series of the LLC (e.g., actions by the LLC in its capacity as General Partner of the Fund, to the extent such action affects only the Series A Fund, shall require the vote or consent of only the Series A Managing Members).

6

1
2
3
4
5
6
7

> Notwithstanding anything to the contrary . . . (1) the determination by
> the LLC in its capacity as General Partner of the Fund to draw down
> Leverage (as such term is defined in the Fund Agreement) which is
> attributable to the Series A Fund shall require the vote or consent of
> only a Majority in Interest of the Series A Managing Members and (2)
> the determination by the LLC in its capacity as general Partner of the
> Fund to draw down Leverage (as such term is defined in the Fund
> Agreement) which is attributable to the Series B Fund shall require the
> vote or consent of only a Majority in Interest of the Series B Managing
> Members."

8
9
10
11

I further understand that, during the operation of the Aspen III SBIC, that Aspen III's Management relied on this language to exclude the Series B Managing Members C. Lloyd Mahaffey and John Kohler from meetings regarding Series A investments, drawing leverage relating to Series A Investments, and the valuation of Series A investments.

12
13
14
15

23.     To the extent the 2002 LLC Amendment allowed the Series A Managing Members to exclude the Series B Managing Members from valuation of the Series A investments, it facilitated the violations of the SBA regulations and Valuation Guidelines and should not have been approved.

16
17
18

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June ___, 2008, at North Point, Florida.

19
20
21

_____

Ronald C. Cibolski.

22
23
24
25
26
27
28

DECLARATION OF R. CIBOLSKI ISO OPP'N TO RECEIVER'S MSJ
CASE NO. C 07-05350 JW PVT

1
2        Notwithstanding anything to the contrary . . . (1) the determination by
         the LLC in its capacity as General Partner of the Fund to draw down
3        Leverage (as such term is defined in the Fund Agreement) which is
         attributable to the Series A Fund shall require the vote or consent of
4        only a Majority in Interest of the Series A Managing Members and (2)
         the determination by the LLC in its capacity as general Partner of the
5        Fund to draw down Leverage (as such term is defined in the Fund
         Agreement) which is attributable to the Series B Fund shall require the
6        vote or consent of only a Majority in Interest of the Series B Managing
7        Members."

8     I further understand that, during the operation of the Aspen III SBIC, that Aspen III's Management

9     relied on this language to exclude the Series B Managing Members C. Lloyd Mahaffey and John

10    Kohler from meetings regarding Series A investments, drawing leverage relating to Series A

11    Investments, and the valuation of Series A investments.

12        23.    To the extent the 2002 LLC Amendment allowed the Series A Managing Members to

13    exclude the Series B Managing Members from valuation of the Series A investments, it facilitated

14    the violations of the SBA regulations and Valuation Guidelines and should not have been approved.

15

16        I declare under penalty of perjury under the laws of the United States of America that the

17    foregoing is true and correct.  Executed on June 2, 2008, at North Port, Florida.

18

19

20                                   _____
                                     Ronald C. Cibolski.
21

22

23

24

25

26

27

28

                                         7