1  MATTHEW G. BALL (CA BAR 208881)
   DEIRDRE M. DIGRANDE (CA BAR 199766)
2  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   55 Second Street, Suite 1700
3  San Francisco, CA  94105-3493
   Tel:   (415) 882-8200
4  Fax:  (415) 882-8220
   matthew.ball@klgates.com
5  deirdre.digrande@klgates.com

6
   MARTIN D. TECKLER (*pro hac vice*)
7  **KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
   1601 K Street, NW
8  Washington, DC  20006-1600
   Tel:   (202) 778-9000
9  Fax:  (202) 778-9100
   martin.teckler@klgates.com
10
   Attorneys for Defendant
11 REDLEAF GROUP, INC.

12                **UNITED STATES DISTRICT COURT**

13               **NORTHERN DISTRICT OF CALIFORNIA**

14                     **SAN JOSE DIVISION**

| | |
|---|---|
| 15  UNITED STATES SMALL BUSINESS ADMINISTRATION in its capacity as Receiver for Aspen Ventures III, | Case No. C-07-05350 JW (PVT) |
| 16 | |
| 17                                    Plaintiffs, | |
| | **DEFENDANT REDLEAF GROUP, INC.'S OPPOSITION TO THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 18           v. | |
| 19  REDLEAF GROUP, INC., | |
| 20           Defendant and Third-Party Plaintiff, | |
| 21           v. | Hearing Date:    June 23, 2008 |
| 22  ASPEN VENTURES MANAGEMENT III, LLC, a Delaware Limited Liability Company, | Time:               9:00 a.m. |
| 23  ALEXANDER P. CILENTO, a California resident, and DAVID CROCKETT, a | Judge:             Hon. James Ware |
| 24  California resident, and DOES 1-10, | |
| 25           Third-Party Defendants. | |

26

27

28

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................................... 1

II. SUMMARY OF ARGUMENT ................................................................................. 1

III. ISSUES TO BE DECIDED ...................................................................................... 3

IV. FACTS ...................................................................................................................... 3

   A.  Redleaf's Investment in Aspen III Was Induced Through Fraud. .................... 3

   B.  The Series A/Series B Structure Allowed Third-Party Defendants To Conceal Facts From Redleaf. .......................................................................................... 4

   C.  Redleaf Became Disillusioned with Aspen III Management and Attempted to Extricate Itself from Its $15 Million Commitment. .......................................... 5

   D.  Redleaf Received Reassurances Regarding Aspen III's Financial Condition in Late 2003, and Made a $1.5 Million Capital Contribution in Reliance on Those Reassurances in January 2004. .................................................................. 6

   E.  Redleaf Received Its First Indication of Aspen III's Financial Troubles in June of 2004, But Had No Way of Knowing That Aspen II Had Been Capitally Impaired At the Time Redleaf Was Discussing the Aspen Investment.. .......... 6

   F.  The SBA Put Aspen III into Liquidation Status, Then Receivership, Announced It Would Not Recognize the Series A/Series B Structure, and Enjoined All Litigation, Including Litigation That Could Have Been Brought Against the Third-Party Defendants. .................................................................................... 7

   G.  In 2007, Redleaf, through Discussions with the SBA, Learned for the First Time about Third-Party Defendants' Fraudulent Concealment, and Other Wrongful Acts. ............... 8

   H.  The SBA Lifted the Stay on Litigation to Bring This Action Against Redleaf. ................. 9

V. LEGAL STANDARD ............................................................................................. 10

VI ARGUMENT ......................................................................................................... 10

   A.  *Coleman v. Pricewaterhousecoopers* is Factually and Legally On Point and Controls the Inquiry Notice Issue Here. ...................................................... 10

**B.    Third-Party Defendants Have Not Demonstrated That Their Three Alleged Facts Were Sufficient as a Matter of Law to Impose Upon Redleaf a Duty of Further Inquiry. ...... 12**

    **1.    Aspen II's Capital Impairment .................................................................. 13**

    **2.    Failure to Obtain Other Investors ............................................................ 14**

    **3.    Series B Investment in Reasoning ............................................................ 14**

    **4.    Attempt to Negotiate Release of Commitment ......................................... 14**

**C.    Third-Party Defendants Have Not Demonstrated as a Matter of Law That a More Diligent Investigation, Even if Pursued, Would Have Uncovered Facts Sufficient to Enable Redleaf to Discover Its Claims. ..................................................................... 15**

    **1.    Third-Party Defendants Have Not Demonstrated As a Matter of Law That a More Diligent Investigation Would Have Led Redleaf to Discover Its Fraud, Negligent Misrepresentation, or Conspiracy Claims as of June 2003. ........................... 15**

    **2.    Third-Party Defendants Have Not Demonstrated As a Matter of Law That a More Diligent Investigation Would Have Led Redleaf to Discover Its Fraud, Negligent Misrepresentation, or Conspiracy Claims as of June 2003. ........................... 16**

**D.    Assuming Redleaf's Claims Accrued at the Earliest on June 30, 2004, Redleaf's Claims Are Timely Because They Were Fraudulently Concealed by Redleaf's Fiduciaries, and This Court's Consent Order of Receivership Tolled the Applicable Statutes. ................ 17**

    **1.    The Fraudulent Concealment By Redleaf's Fiduciaries Tolled The Statute of Limitations At Least Until June 30, 2004. ........................................................ 18**

    **2.    Redleaf's Claims Are Timely Even if They Accrued on June 30, 2004, Because the Consent Order Equitably Tolled the Statute of Limitations. ........................... 19**

**E.    Third-Party Defendants' Laches Defense Fails for the Same Reason As Its Statute of Limitations Defense. ......................................................................................................... 21**

**CONCLUSION ........................................................................................................................ 22**

REDLEAF GROUP, INC.'S OPP'N TO 3rd PARTY DEFENDANTS' MT'N FOR SUMMARY JUDGMENT
CASE NO. C 07-05350 JW PVT

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby,

     477 U.S. 242 (1986) ................................................................................. 10, 13

In re Application for Order Authorizing Interception of Wire Communications,

     413 F. Supp. 1321 (E.D. Pa. 1976) ................................................................ 20

Braun v. Sauerwein,

     10 Wall. 218, 77 U.S. 218, 19 L. Ed. 895 (1870) ........................................... 20

Matter of Burger,

     125 B.R. 894 (Bankr. D. Del. 1991) ............................................................... 20

Coleman v. Pricewaterhousecoopers, LLC,

     854 A.2d 838 (Del. 2004)...................................................................... passim

In re Dean Witter Partnership Litigation,

     1998 WL 442456 (Del. Ch. 1998) .................................................................. 18

Fike v. Ruger,

     752 A.2d 112 (Del. 2000)............................................................................... 21

Krahmer v. Christie's, Inc.,

     911 A.2d 399 (Del. 2007)............................................................................... 18

Mergenthaler v. Asbestos Corporation of America,

     500 A.2d 1357 (Del. Super. 1985) ................................................................. 20

Ostrer v. Aronwald,

     434 F. Supp. 379 (S.D.N.Y 1977)................................................................... 20

Pomeranz v. Museum Partners, L.P.,

     2005 WL 217039 (Del. Ch. Jan. 24, 2005) .................................................... 18

Suzuki Motor Corp. v. Consumers Union of United States, Inc.,

     330 F.3d 1110 (9th Cir. 2003) ....................................................................... 10

1

Wilson v. King,

2      673 A.2d 1228 (Del. Super. 1996) ...................................................................... 20

3                              **FEDERAL STATUTES**

4   11 U.S.C. § 108 ............................................................................................................ 20

5                            **FEDERAL REGULATIONS**

6   13 C.F.R. § 107.503 ........................................................................................................ 8

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDLEAF GROUP, INC.'S OPP'N TO 3rd PARTY DEFENDANTS' MT'N FOR SUMMARY JUDGMENT
CASE NO. C 07-05350 JW PVT

# I. **INTRODUCTION**

This is a case in which Redleaf Group, Inc. was fraudulently induced to make a multi-million dollar investment – and a promise to invest millions more – in Aspen Ventures III, L.P. ("Aspen III"), what turned out to be a failing Small Business Investment Company ("SBIC").[1]  Primarily responsible for the fraud were three managing members of Aspen III's general partner, Aspen Ventures Management III, LLC ("AVM").[2]  One of those managing members, Thaddeus Whalen, is deceased.  The other two, Alex Cilento and E. David Crockett, are Third-Party Defendants in this action along with AVM.   Third-Party Defendants are also responsible for breaches of contract and torts arising out of Third-Party Defendants' management of Aspen III after admitting Redleaf as a member.

# II. **SUMMARY OF ARGUMENT**

Third-Party Defendants' Motion is based on one wrong idea:  that <u>all</u> of Redleaf's claims accrued no later than June 2003 solely because Redleaf allegedly knew three facts, (1) that Aspen II, a companion SBIC in which Redleaf had <u>no</u> interest, was capitally impaired in 2003; (2) that AVM made no efforts to solicit further investors, despite representations to the contrary; and (3) that AVM made the very first Series B investment into an Aspen II portfolio concern.

Third-Party Defendants' argument betrays a fundamentally incorrect understanding of the concept of "inquiry notice."  Indeed, the Third-Party Defendants' brief fails to cite or distinguish controlling precedent of the Delaware Supreme Court that is devastating to their motion.

Specifically, the Delaware Supreme Court has held that in order to obtain summary judgment on a theory that a claimant had inquiry notice, a defendant must demonstrate, <u>as a matter of law</u>, that (1) the fact in question was sufficient to arouse the suspicions of a prudent person of ordinary intelligence to a degree sufficient to impose a duty of further inquiry; and (2) that a more diligent

---

[1]  Generally, an SBIC is a private venture capital or private equity fund that is licensed by the United States Small Business Administration ("SBA") and "leveraged" with funds provided by the SBA. For a more complete discussion, please see Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract, Doc. 84.

[2]  As set forth in the accompanying Opposition to the SBA's Motion for Summary Judgment, the SBA was heavily involved in the fraud as well.

investigation, if pursued, would have uncovered facts sufficient to enable the plaintiff to discover the basis of the claim.  <u>Coleman v. Pricewaterhousecoopers, LLC</u>, 854 A.2d 838, 842-43 (Del. 2004).

As to the first <u>Coleman</u> factor, the three alleged facts are not sufficient <u>as a matter of law</u> to arouse the suspicions of a prudent person of ordinary intelligence to a degree sufficient to impose a duty of further inquiry.  As in <u>Coleman</u>, "[a] person of ordinary intelligence and prudence could draw competing inferences" from these facts, especially given the primary focus of what became Redleaf's claims.  <u>Id.</u>

As to the second <u>Coleman</u> factor, even if the three facts somehow <u>could</u> be said to have aroused Redleaf's suspicions, the Third-Party Defendants have not even attempted to demonstrate "from the present record whether a more diligent investigation, even if pursued, would have uncovered facts sufficient to enable [Redleaf] to discover the basis of its claims as a matter of law." <u>Id.</u>  Just as an example, in order for any 2003 discovery of Aspen II's capital impairment to have any bearing on Redleaf' fraud and misrepresentation claims at all, Third-Party Defendants would have to show that an investigation by Redleaf would have revealed Aspen II's capital impairement <u>2001-2002</u> – <u>i.e.</u>, that representations regarding Aspen II's financial condition were false when made. There is absolutely no evidence in the record that any amount of diligent investigation by Redleaf could have discovered this.

In contrast, the record is clear that Redleaf had no objective reason to know of any of its claims, at the earliest, until June 30, 2004, when the drastic decline in Aspen III's portfolio value suggested that something was terribly amiss at Aspen.  Up to that point, Redleaf's claims had been fraudulently concealed by its fiduciaries.  However, even if one picks June 30, 2004 for the accrual of Redleaf's claims, Redleaf filed its complaint well within the three-year statute, given this Court's Consent Decree that tolled the statutes applicable to Plaintiffs' claims.

Finally, the Third-Party Defendants' laches defense fails because Redleaf did not unreasonably delay bringing its claims, and Third-Party Defendants did not suffer prejudice.  Here, Redleaf was, at the earliest, on notice of its claims only <u>after</u> Thaddeus Whalen died.

# III.  ISSUES TO BE DECIDED

(1)  Should this Court deny Third-Party Defendants' Motion because the three facts that Third-Party Defendants cite in support of their Motion were insufficient to arouse Redleaf's suspicions to a degree sufficient to impose upon Redleaf a duty of further inquiry?

(2)  Should this Court deny Third-Party Defendants' Motion because, even assuming Redleaf did have a duty of further inquiry as of June of 2003, it is impossible to determine from the present record whether a more diligent investigation, even if pursued, would have uncovered facts sufficient to allow Redleaf to discover the basis for its claims?

(3)  Should this Court deny Third-Party Defendants' Motion because Redleaf's claims were tolled by the fraudulent concealment of its fiduciaries and this Court's Consent Order in the Aspen III Receivership Action?

(4)  Finally, does Third-Party Defendants' laches defense fail because Redleaf was not on notice of its claims before Thaddeus Whalen died?

# IV.  FACTS

## A.     Redleaf's Investment in Aspen III Was Induced Through Fraud.

In mid-2001, Aspen III's management approached Redleaf with a scheme by which Redleaf would become a limited partner in Aspen III in exchange for a $15 million commitment ("Commitment").  Declaration of Michael J. Tomana in Support of Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract ("Tomana SBA Dec.") ¶ 4, Doc. 79.

Although Redleaf had concerns about risking such a substantial sum in light of the $33 million in leverage that the SBA had committed to Aspen ($23 million of which Aspen III had already drawn), the assurances of Aspen III's management assuaged Redleaf's concerns.  Id. at ¶ 5-8.

For example, in response to questions from Redleaf personnel on or about November 28, 2001, Whalen described the current financial condition of Aspen III.  Id. at ¶ 6.  Whalen stated that Aspen III had remaining capital available from current investors, as well as remaining SBA leverage.

3

Id.  Whalen further stated that he was confident that the Aspen III portfolio would provide value sufficient to repay all outstanding leverage and investment capital as well as provide a profit to the original investors.  Id.

Additionally, Whalen assured Redleaf that as a means to insulate it from any detrimental effect of the Series A Investments – particularly as to the outstanding SBA leverage – Aspen's future investments, to be known as "Series B Investments", would be treated separately, and that Redleaf's $15 million capital commitment would not be used to repay existing leverage should Aspen III fail. Id. at ¶ 8.

Based in part on the assurances from Aspen III's management as to the financial condition of Aspen III, and the effect of the Series A/B Structure, Redleaf on April 1, 2002 agreed to make a $15 million commitment to Aspen III by entering into the First Amended and Restated Limited Partnership Agreement (the "2002 Amendment").  Id. at ¶ 9-10; see 2002 Amendment, Doc. 73-4.

**B.    The Series A/Series B Structure Allowed Third-Party Defendants To Conceal Facts From Redleaf.**

Although Aspen III's management represented the Series A/Series B structure as beneficial to Redleaf, in effect it allowed Third-Party Defendants to conceal material information from Redleaf.  For example, the separation between the Redleaf managing members and the Series A Investments meant that the Redleaf Series B managing members had no way to participate in decision-making and valuations with regard to the Series A Investments, or the requests for and utilization of SBA leverage.  Tomana SBA Dec. ¶ 17, Doc. 79.  In fact, Redleaf's managing members were excluded from Series A partnership meetings.  Id.

Moreover, between April 2002, and January 2004, Aspen III's management failed to provide Redleaf with any reports regarding the value of the Series A Investments.  Id.  Instead, Third-Party Defendants provided Redleaf with inaccurate representations regarding the value of the Series A Investments.  Id.

**C.    Redleaf Became Disillusioned with Aspen III Management and Attempted to Extricate Itself from Its $15 Million Commitment.**

Third-Party Defendants make much of Redleaf's allegation in Paragraph 36 of the Complaint that "Redleaf discovered irregularities and problems at Aspen in 2002-2003" and later sought approval to be released from its capital commitment.  Third-Party Defendants Motion for Summary Judgment ("M'tn") at 3:4 – 4:3, Doc. 69.  Among these irregularities and problems were (1) Aspen III's management's failure to obtain new investors and (2) the Series B investment into an Aspen II portfolio company.  Declaration of Michael J. Tomana in Support of Redleaf Group, Inc.'s Opposition to Third-Party Defendants' Motion for Summary Judgment ("Tomana 3rd Party Dec.") ¶ 6.

With regards to Aspen III's management's failure to obtain new investors, Redleaf's current belief that this was part of the fraud that induced them into the investment is a product of hindsight.  Tomana 3rd Party Dec. ¶ 4.  Although the failure to obtain investors was a source of irritation to Redleaf at the time, the failure could have been caused by the fact that Aspen III was unable to obtain new investors, or that Aspen III's management changed his mind about doing so.  Id.

As to the Series B investment into an Aspen II portfolio company – Reasoning, as described in the Declaration of Debra Schilling in Support of Third-Party Defendants' Motion for Summary Judgment ("Schilling Dec.") (Doc. 72) – there was nothing that was necessarily suspicious about the investment at the time.  The problem was one of management procedure.  Tomana 3rd Party Dec. ¶ 3, 5.  Redleaf and Aspen III's management had an understanding that Aspen III's management would seek the approval of Redleaf before making a Series B investment where the target was not a Redleaf portfolio company.  Id. at ¶ 5.  Aspen III's management did not do so.  Id.

These issues, along with other factors, caused Redleaf to begin to lose faith in Aspen III's management.  Id. at ¶ 6.  This led Redleaf to attempt to negotiate a way out of the $15 million capital commitment, only $3 million of which was drawn at the time.  Id. at ¶¶ 6-7.

**D.    Redleaf Received Reassurances Regarding Aspen III's Financial Condition in Late 2003, and Made a $1.5 Million Capital Contribution in Reliance on Those Reassurances in January 2004.**

In November and December of 2003, Redleaf and Aspen III's Management, including Third-Party Defendants Cilento and Crockett, negotiated an agreement whereby Redleaf would contribute $1.5 million of additional capital to Aspen III.  Tomana 3rd Party Dec. ¶ 7.  In return, Redleaf's capital contribution would be capped.  Id.  In connection with this agreement, Redleaf received further assurances about Aspen III's financial condition.  Specifically, Whalen again asserted that Series A assets would be sufficient to repay outstanding Series A leverage and Series A capital.  Id.  On that basis, and the basis that the final $1.5 million capital contribution would be sufficient to run the Aspen III fund successfully to a conclusion, Redleaf agreed to contribute what it believed would be its final $1.5 million capital contribution.  Id.

**E.    Redleaf Received Its First Indication of Aspen III's Financial Troubles in June of 2004, But Had No Way of Knowing That Aspen II Had Been Capitally Impaired At the Time Redleaf Was Discussing the Aspen Investment.**

In March of 2004, Redleaf received a report for investors indicating that the value of Aspen III's portfolio was $29.2 million.  Tomana SBA Dec. ¶ 20 & Exh. A, Doc. 79.  On or about June 30, 2004, Redleaf had its first indication of the financial disaster at Redleaf.  Id. at ¶ 21 & Exh. B.  On that day, Redleaf received a report for Aspen III investors indicating that the value of Aspen III's portfolio was $12.2 million – a writedown of more than 56%.

Even if someone at Redleaf had found out that Aspen II was capitally impaired in 2003, there would have been no way for Redleaf to realistically discover whether that impairment status had existed at the time Aspen III's management was in discussions with Redleaf.  Id.  Aspen II was a private limited partnership, and Redleaf had no investments in Aspen II.  Id.  As set forth above, Aspen III's management would not even consent to give Redleaf information about the Series A Investments made by Aspen III, even though Redleaf was a limited partner in Aspen III.  Id.; Tomana SBA Dec. ¶ 18.  Moreover, the capital impairment of Aspen II in 2003 would not necessarily say much about the financial health of Aspen II in 2001-2002.  Declaration of Ronald C. Cibolski in Support of Redleaf Group, Inc.'s Opposition to Third-Party Defendants' Motion for

Summary Judgment ¶ 11-12.  Capital Impairment is computed on a periodic basis.  Id.  It is not a static condition; rather, it can be cured.  In other words, if an SBIC is capitally impaired at one point, it may cure the condition. Conversely, a healthy SBIC may become capitally impaired.

      **F.**    **The SBA Put Aspen III into Liquidation Status, Then Receivership, Announced It Would Not Recognize the Series A/Series B Structure, and Enjoined All Litigation, Including Litigation That Could Have Been Brought Against the Third-Party Defendants.**

Having found that Aspen had a capital impairment of 123.19 percent, the SBA placed it on restricted status on March 16, 2005.[3]  As Aspen III could not cure its capital impairment during the 15 days provided, the SBA then placed it into liquidation status on April 19, 2005,[4] and thereafter filed Case No. C06-4032 JW against Aspen III seeking imposition of receivership and injunction against disbursing or encumbering its assets ("Receivership Action").[5]  After that, in 2005, Redleaf learned for the first time that the SBA might not recognize the protection that Aspen III's management represented would be the effect of the Series A/Series B structure.  Tomana SBA Dec. ¶ 8, Doc. 79; Declaration of James R. Cummins in Support of Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract. ("Cummins SBA Dec.") ¶ 4-5, Doc. 80.

As part of the Receivership Action, the parties stipulated to an order that, among other things, appointed the SBA as a receiver and enjoined the commencement or continuation of any civil proceedings involving Aspen by or against its partners ("Consent Order").[6]  Paragraph 7 of the Consent Order entered October 4, 2006 provides in relevant part:

> The parties to any and all civil legal proceedings of any nature . . . involving the Licensee [Aspen] or any assets of the Licensee . . . involving the Licensee, the Receiver, or any of the Licensee's past or present officers, directors, managers, agents, or general or limited

---

[3]  Paragraphs ¶¶ 19-20 of Complaint for Receivership and Injunction filed June 29, 2006 ("Receivership Complaint") in the action entitled United States of America v. Aspen Ventures III, Case No. C06-04032 JW, United States District Court for the Northern District of California, San Jose Division ("Receivership Action").  Request for Judicial Notice Exh. A.

[4]  Receivership Complaint ¶¶ 20-21.

[5]  Receivership Complaint at ¶¶. 6-7.

[6]  See accompanying Request for Judicial Notice and Exhibit B thereto, Stipulation to Consent Order ("Consent Order") entered October 04, 2006 in the Receivership Action, Doc. 67.

7

partners sued for, or in connection with, any action taken by them
while acting in such capacity of any nature . . . are enjoined from
commencing or continuing any such legal proceeding, or from taking
any action, in connection with any such proceeding or any such asset.
All civil legal proceedings of any nature . . . involving the Licensee or
any assets of the Licensee involving the Licensee, the Receiver, or any
of the Licensee's past or present officers, directors, managers, agents,
or general or limited partners sued for, or in connection with, any
action taken by them while acting in such capacity of any nature are
stayed in their entirety, and all Courts having any jurisdiction thereof
are enjoined from taking or permitting any action until further Order of
this Court. . . .

G.    **In 2007, Redleaf, through Discussions with the SBA, Learned for the First Time
about Third-Party Defendants' Fraudulent Concealment, and Other Wrongful
Acts.**

On or about October 26, 2005, Redleaf entered into discussions with the SBA regarding

Redleaf's unfunded capital commitment.  Declaration of Martin D. Teckler in Support of Redleaf

Group's Opposition to Third-Party Defendants' Motion for Summary Judgment ("Teckler 3rd Party

Dec.") ¶ 2.  These discussions ultimately led to an exchange of documents during the spring and

summer of 2007.  Id. at ¶ 5.  In the documents, Redleaf learned the following facts, which Redleaf

had not known up to that point, and had no way of discovering.

In early 2001, an SBA examiner conducted an on-site examination of Aspen III for the

twelve-month period ending December 31, 2000.  The Examination Report, issued on May 4, 2001,

indicated that Aspen had not adequately substantiated or confirmed Aspen III's portfolio valuations

– a violation of SBA regulations 13 C.F.R. § 107.503(a), (b), as well as the SBA's valuation

Guidelines for SBICs which were incorporated in the Aspen III Limited Partnership Agreement.

These violations were serious.  Proper portfolio valuation procedures are essential for understanding

the financial health and stability of any SBIC.  However, the SBA analyst responsible for overseeing

both Aspen II and Aspen III excused the violation of SBA regulations.  See Declaration of Martin D.

Teckler in Support of Redleaf Group, Inc.'s Opposition to Motion for Summary Judgment, or in the

Alternative Summary Adjudication, on the Receiver's Claim for Breach of Contract ("Teckler SBA

Dec.") ¶ 2-3 & Exhs. A-B, Doc. 84; Declaration of Ronald C. Cibolski in Support of Redleaf Group,

1   Inc.'s Opposition to Motion for Summary Judgment, or in the Alternative Summary Adjudication,

2   on the Receiver's Claim for Breach of Contract ("Cibolski SBA Dec.") ¶ 15-17, Doc. 82.

3           In late 2001, and after the SBA's casual excuse of the Aspen III regulatory violations,

4   Thaddeus Whalen, one of the managing members of AVM, disclosed to the same analyst that Aspen

5   III was in serious financial trouble, and could not survive without new private capital that could be

6   further leveraged with funds from the SBA.  Teckler SBA Dec. ¶ 4 & Exh. C, Doc. 82.  Redleaf did

7   not, and could not have obtained this information, because Aspen III's management misrepresented

8   and concealed the information from Redleaf, both before Redleaf's investment in Aspen, and again

9   just before the final capital call in January 2004.  Tomana SBA Dec. ¶ 6, 17, Doc. 79.  Even after the

10  SBA placed Aspen III into liquidation, Defendants Cilento and Crockett still represented to Redleaf

11  that Aspen III did not need any further capital from Redleaf to manage an orderly liquidation of

12  Aspen III.  Tomana 3rd Party Dec. ¶ 11.

13          Additionally, the documents received from the SBA revealed that, during the time Third-

14  Party Defendants kept information from Redleaf regarding the Series A/Series B investments, Third-

15  Party Defendants failed to follow proper SBIC portfolio valuation procedures.  For example, the

16  Third-Party Defendants failed to observe the SBA valuation guidelines as required by the regulations

17  and the Aspen III Partnership Agreement.  Declaration of Ronald C. Cibolski in Support of

18  Redleaf's Opposition to Third-Party Defendants' Motion for Summary Judgment ("Cibolski 3rd

19  Party Dec.") ¶ 6-9.

20          **H.      The SBA Lifted the Stay on Litigation to Bring This Action Against Redleaf.**

21          The injunction imposed by the Consent Order remained in effect until October 3, 2007, when

22  this Court, in response to the SBA's stipulated motion, issued an order modifying it to allow the

23  SBA to bring the present action against Redleaf ("Modified Stay Order").[7]  The SBA brought the

24  present case in its capacity as receiver for Aspen on October 19, 2007.  Redleaf answered the

25  Complaint on December 17, 2007, and at the same time filed the Complaint against Third-Party

26  Defendants.

27  _____

28  [7]  Request for Judicial Notice in Support of Motion for Summary Judgment, or in the Alternative
    Summary Adjudication, on the Receiver's Claim for Breach of Contract ("SBA RJN") Exh. B.

## V.  LEGAL STANDARD

On a summary judgment motion, this Court must view the evidence in the light most favorable to Redleaf.  Suzuki Motor Corp. v. Consumers Union of United States, Inc., 330 F.3d 1110, 1140 (9th Cir. 2003).  Redleaf's evidence is to be believed, and all justifiable inferences are to be drawn in Redleaf's favor, including questions of credibility, and the weight to be accorded particular evidence.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  The Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Id. at 249.

The Delaware Supreme Court has held that in order to obtain summary judgment on a statute of limitations defense based on an "inquiry notice" theory, a defendant must demonstrate, as a matter of law, that (1) the fact of which the plaintiff had knowledge was sufficient to arouse the suspicions of a prudent person of ordinary intelligence to a degree sufficient to impose a duty of further inquiry; and (2) that a more diligent investigation, if pursued, would have uncovered facts sufficient to enable the plaintiff to discover the basis of the claim.  Coleman, 854 A.2d at 842-43.

## VI  ARGUMENT

**A.**    ***Coleman v. Pricewaterhousecoopers* is Factually and Legally On Point and Controls the Inquiry Notice Issue Here.**

The Delaware Supreme Court's decision in Coleman is so much on all fours with the one before the Court that it is surprising that Third-Party Defendants did not attempt to meet it head on and distinguish it in their opening brief.  Redleaf submits that the reason Coleman is absent from Third-Party Defendants' opening brief is that Third-Party Defendants cannot distinguish it, and that it is fatal to Third-Party Defendants' Motion.[8]

---

[8]  Third-Party Defendants may take the position on their reply that Coleman does not apply because it addresses the "discovery rule" applicable in cases of accounting malpractice and negligence.  This would be incorrect.  Although the Coleman case does involve the "discovery rule," (854 A.2d at 842), the holding of Coleman case concerns when a litigant is entitled to summary judgment based on an "inquiry notice" theory – the precise question involved in Third-Party Defendants' Motion.  Id. at 842-43.

10

In Coleman, the plaintiffs sold their company to another company that was ultimately found to have engaged in fraudulent accounting practices. Id. at 839. Because the fraudulent accounting practices led to the purchaser's bankruptcy, the purchaser was unable to pay the remainder of the purchase price for plaintiffs' company. Id. Plaintiffs sought to recover damages from Pricewaterhousecoopers ("PWC"), on the ground that PWC had failed to uncover the fraud during the audit of the purchaser's financial statements. Id.

As Third-Party Defendants do here, PWC moved for summary judgment on the basis that the three-year statute of limitations barred plaintiffs' claim. PWC claimed that an e-mail sent from the purchasing company to the plaintiffs' company put plaintiffs on inquiry notice of their claims against PWC. Id. The e-mail, authored by the assistant comptroller of the purchasing company, provided in relevant part:

> [N]ote the $800,000 posted to 'accrued expenses.' . . . proper GAAP would have been to record the entire amount as reduction of goodwill. however I have elected an aggressive accounting approach . . . . take $400,000 of the $800,000 and record into income in December. i don't really care where you put it so long as it is not obvious to the auditors should they look at your numbers. . . .

Id. at 840.

The Coleman plaintiffs immediately asked for an explanation of the e-mail from the purchasing company's CEO. The CEO reassured the plaintiffs, telling them – in a conversation reminiscent of Aspen III's reassurances regarding Aspen III's financial condition before Redleaf made its January 2004 capital contribution – that the accounting transaction would have PWC's blessing. Id. at 840-41.

Following that conversation, the purchaser company's stock price dropped; the purchasing company's CEO again assured plaintiffs that the company's financial condition was strong. Id. at 841. When the purchasing company informed plaintiffs that they were reviewing the current status of the agreement and relationship with plaintiffs, plaintiffs became concerned about the purchasing company's "troubling" business practices and met with one of the purchasing company's directors, who again assured plaintiffs. The purchasing company then disclosed significant accounting

1  irregularities in the company's earlier financial statements.  Id.  Several months thereafter, the

2  purchasing company filed for bankruptcy and its executives were indicted for fraud.  Id.

3         The trial court granted PWC's motion for summary judgment on a statute of limitations

4  theory, holding that the e-mail was sufficient to put plaintiffs on notice of problems between the

5  purchasing company and PWC, and had plaintiffs investigated the facts, they would have discovered

6  their claims against PWC.  Id.

7         The Delaware Supreme Court reversed the decision, holding that there was not sufficient

8  evidence in the record to decide the issue as a matter of law.  After setting forth the two-factor

9  analysis as discussed above, the Court found that "a person of ordinary intelligence and prudence

10 could draw competing inferences from the statements made in the e-mail" and the follow-up

11 response from the purchaser's CEO.  Id. at 843.  Thus, the Court said, there was no "'red flag' that

12 clearly and unmistakably would have led a prudent person of ordinary intelligence" to inquire

13 whether PWC had been negligent.  Id.  (Emphasis added).  The Delaware Supreme Court recognized

14 that "[t]o be sure an inference to that effect could be drawn" but that an opposite inference could be

15 drawn as well.  Id.  "The issue, therefore, was clearly one of disputed fact, the resolution of which

16 require[d] a trial."  Id.

17        The Delaware Supreme Court further held that the trial court's grant of summary judgment

18 had to be reversed for the separate and independent ground that the record did not show as a matter

19 of law that a diligent inquiry by plaintiffs would have uncovered facts sufficient for them to assert an

20 accounting malpractice claim.  Id.  The Court held that (1) the false reassurances, (2) plaintiffs'

21 limited access to information, and (3) the difficulty of uncovering the accounting fraud even given

22 access to full information alone precluded summary judgment as a matter of law that a more diligent

23 inquiry would have enabled plaintiffs to discover their claims.  Id.

**B.      Third-Party Defendants Have Not Demonstrated That Their Three Alleged
Facts Were Sufficient as a Matter of Law to Impose Upon Redleaf a Duty of
Further Inquiry.**

26        Applying Coleman to the facts of this case, it is clear that the three facts were not, in and of

27 themselves, sufficient as a matter of law to impose upon Redleaf a duty of further inquiry.

28

1. **Aspen II's Capital Impairment**

The Third-Party Defendants assert that Redleaf discovered the capital impairment of Aspen II by 2003, and that discovery was sufficient to constitute "inquiry notice" of Redleaf's claims. <u>E.g.</u>, at 7:4-13, Doc. 69. The Third-Party Defendants are wrong.

Even if Redleaf knew about Aspen II's capital impairment status in 2003, the discovery of Aspen II's capital impairment would not as a matter of law put Redleaf on a further duty of inquiry. As Third-Party Defendants point out, the financial status of Aspen II relates, if at all, to the inducement of Redleaf's investment on April 1, <u>2002</u>. M'tn at 7:4-13, Doc. 69.

However, the discovery that Aspen II was capitally impaired in <u>2003</u> would not necessarily be a "'red flag' that <u>clearly and unmistakably</u> would have led a prudent person of ordinary intelligence" to inquire whether Aspen III's management had lied about the financial condition of Aspen II at the time Redleaf was considering the Aspen III investment. <u>Coleman</u>, 854 A.2d at 843 (emphasis added). To understand why, it is necessary to understand that capital impairment is not a static condition – it can be cured. Cibolski 3rd Party Dec. ¶ 12. In other words, an SBIC may be capitally impaired at one time, but not capitally impaired at another, and vice versa. Moreover, it would not have been possible to obtain historical financial information about Aspen II. Aspen II was a separately licensed SBIC, Redleaf had no investments in Aspen II, and no right to be given information relative to the operations of Aspen II, including information regarding capital impairment. Tomana 3rd Party Dec. ¶ 3.

Third-Party Defendants want to draw the inference that knowledge of Aspen II's capital impairment in 2003 was a "red flag that clearly and unmistakably" would have led Redleaf to inquire whether Aspen III's management had lied about the condition of Aspen II in 2001-2002, prior to the Redleaf investment. <u>Coleman</u>, 854 A.2d at 843. "To be sure an inference to that effect could be drawn . . . ." <u>Id.</u> However, the inference could be drawn as well that Aspen II simply became capitally impaired in 2003. <u>Id.</u> As in <u>Coleman</u>, "[t]he issue, therefore, [is] clearly one of disputed fact, the resolution of which requires a trial." <u>Id.</u>; <u>see</u> <u>also</u> <u>Anderson</u>, 477 U.S. 242 at 255 (justifiable inferences are to be drawn in the nonmoving party's favor).

1

### 2.    Failure to Obtain Other Investors

2    Similarly, the Third-Party Defendants argue that Redleaf's discovery that Aspen III's failure

3 to obtain new investors put Redleaf on inquiry notice of its current claims.  Again, wrong.

4    Although Redleaf knew in 2003 that Aspen III had not obtained additional investors, it is not

5 possible to say that this was not a "red flag that clearly and unmistakably" would have led a prudent

6 person of ordinary intelligence to inquire as to whether Aspen III's management had lied about the

7 ability to get other investors.  At the time, a competing inference would be that Aspen III's

8 management was simply unable to get other investors to induce Redleaf to invest in Aspen III, or

9 that Aspen III had changed its mind about seeking other investors.  Tomana 3rd Party Dec. ¶ 4.

10 Indeed, these are inferences that can be drawn from Exhibit A to the Declaration of David Crockett.

11 Doc. 70, p. 6 ("They [meaning the Series A partners] see IIIb as an initiative that didn't work out . . .

12 I think this means they are not looking to raise more money into IIIb.").  These competing inferences

13 render it impossible to say that this fact as a matter of law imposed a further duty of inquiry.

14

### 3.    Series B Investment in Reasoning

15    Further, the Series B investment in Reasoning was not, viewed at the time, a "red flag that

16 clearly and unmistakably would have led a prudent person of ordinary intelligence" to inquire into

17 whether Aspen III's management was engaging in self-dealing.  Redleaf's problem with the Series B

18 investment in Reasoning was not that it was an Aspen II portfolio company, it was that Redleaf and

19 Aspen III's management would seek approval from Redleaf's management for Series B investments

20 in entities other than Redleaf portfolio companies, which Aspen III's management failed to do.  Id.

21 at ¶ 5.  Thus, a competing inference to be drawn at the time was that this was a disagreement as to

22 how the Series B investments were to be made, not necessarily that Aspen III's management was

23 engaged in self-dealing.  Again, this renders it impossible to say that Redleaf had a further duty of

24 inquiry as a matter of law.

25

### 4.    Attempt to Negotiate Release of Commitment

26    Third-Party Defendants do not appear to assert that Redleaf's attempt to negotiate a release

27 of its commitment is a separate "fact" that put Redleaf on inquiry notice.  Rather, Third-Party

28

Defendants appear to argue that Redleaf's action is an admission that Redleaf knew of its claims. M'tn at 3:11-16, Doc. 69. Again, this is subject to a competing inference. Redleaf's decision to negotiate a release of its capital commitment was driven by a general loss in faith of Aspen III's management, including its failure to obtain other investors, and the way the Series B Investment was handled – not by any suspicions of fraud. Tomana 3rd Party Dec. ¶ 6. This allegation therefore cannot support summary judgment.

      **C.**    **Third-Party Defendants Have Not Demonstrated as a Matter of Law That a More Diligent Investigation, Even if Pursued, Would Have Uncovered Facts Sufficient to Enable Redleaf to Discover Its Claims.**

      To be entitled to summary judgment on their inquiry notice theory, <u>Coleman</u> also requires Third-Party Defendants to demonstrate that, as a matter of law, if Redleaf <u>had</u> pursued a more diligent investigation, it would have uncovered facts sufficient to enable Redleaf to discover its claims. 854 A.2d at 843. Here, the record simply does not allow such a finding.

      **1.**    **Third-Party Defendants Have Not Demonstrated As a Matter of Law That a More Diligent Investigation Would Have Led Redleaf to Discover Its Fraud, Negligent Misrepresentation, or Conspiracy Claims as of June 2003.**

      Even assuming that the three facts discussed above would have given Redleaf a duty to pursue a more diligent investigation, the record does not demonstrate as a matter of law that Redleaf would have discovered its claims for fraud, negligent misrepresentation, or conspiracy. Again, Redleaf's fraud-based claims are based on misrepresentations regarding Aspen III's financial condition at the time of the investment, and the effect of the Series A/B structure. Tomana SBA Dec. ¶ 11, Doc. 79.

      Here, Redleaf was prevented from discovering any problems at all with the financial condition of Aspen III until, at the earliest, Redleaf received the June 30, 2004 report disclosing the drastic write-down of the investments. <u>Id.</u> at ¶ 21-22. Redleaf was not able to discover financial problems any earlier because: (1) Aspen III's management had kept information regarding the Series A investments from Redleaf; (2) Whalen had reassured Redleaf of Aspen III's sound financial condition in late 2003, and the fact that it would need no further capital contributions beyond a $1.5

million contribution made in January 2004; and (3) information about Aspen III's pre-Redleaf

finances was not available until the Spring of 2007, when the SBA exchanged documents with

Redleaf as part of its negotiations for its capital commitment.  See Tomana SBA Dec. ¶ 17-19;

Teckler SBA Dec. Exhs. A-C, Doc. 84.

        In this, Redleaf was in a similar, if not identical situation to the plaintiffs in Coleman, who

did not have access to the critical books and records that would have allowed plaintiffs to discover

their claims, and were given false assurances by executives who were later indicted for fraud.  854

A.2d at 843.  On that record, the Delaware Supreme Court held that summary judgment should be

denied.  Id.  The result should be the same here.

> **2.      Third-Party Defendants Have Not Demonstrated As a Matter of Law
> That a More Diligent Investigation Would Have Led Redleaf to Discover
> Its Fraud, Negligent Misrepresentation, or Conspiracy Claims as of June
> 2003.**

        Similarly, the record does not demonstrate as a matter of law that Redleaf would have

discovered its claims for breach of contract, breach of the covenant of good faith and fair dealing, or

breach of fiduciary duty.

        Central to Redleaf's contractual claims for breach of contract and breach of fiduciary duty is

the fact that Third-Party Defendants utterly failed to follow SBA valuation procedures.  Cibolski 3rd

Party Dec. ¶ 3-9.  Redleaf asserts that the Aspen Ventures III, L.P. Amended and Restated Limited

Partnership Agreement ("1999 Agreement"), the Aspen Ventures Management III, L.L.C. Second

Amended and Restated Limited Liability Company Agreement ("1999 LLC Agreement"), the 2002

Agreement, and the First Amendment to Second Amended and Restated Limited Liability Company

Agreement (the "2002 LLC Agreement") together require AVM and its managing members to

participate in the portfolio valuation and sign off on the portfolio valuation.  Third-Party Complaint ¶

45, Doc. 10.  Redleaf further takes the position that Third-Party Defendants' failure to do so is a

breach of their fiduciary duty to Redleaf, as well as a violation of SBA regulations.  Cibolski 3rd

Party Dec. ¶ 5.

Redleaf did not discover Third-Party Defendants' failure to participate in and sign off on the valuation of Aspen III portfolio as required until Redleaf received documents from the SBA in 2007, and then only through an absence of what should have been in the documents Redleaf received – evidence that Third-Party Defendants Cilento and Crockett participated in or signed off on the valuation of Aspen III portfolio concerns.  Id. at ¶ 6-9.  Up to then, Redleaf had no reason to suspect that Third-Party Defendants had not been participating, as required.  Tomana 3rd Party Dec. ¶ 12. The Third-Party Defendants have utterly failed to demonstrate how anything the Third-Party Defendants knew in 2003 could have prompted an investigation that could have revealed these claims for breach of contractual obligations and breach of fiduciary duty.  Accordingly, under Coleman, Third-Party Defendants' motion must be denied.  854 A.2d at 843.[9]

> **D.    Assuming Redleaf's Claims Accrued at the Earliest on June 30, 2004, Redleaf's Claims Are Timely Because They Were Fraudulently Concealed by Redleaf's Fiduciaries, and This Court's Consent Order of Receivership Tolled the Applicable Statutes.**

As set forth above, the earliest possible date that any of Redleaf's claims could have accrued was on June 30, 2004, when Redleaf became aware of the 56% writedown in portfolio value from the first quarter of that year.  See Tomana SBA Dec.  ¶¶ 22-23 & Exhs. A-B, Doc. 79.  Previously, Aspen III's management had refused to provide Redleaf with information pertaining to Series A investments (id. at ¶ 17), and had again offered false assurances as to Aspen III's financial condition in late 2003 that led to a January 2004 capital contribution (id. at ¶ 19).

---

[9]  Since Third-Party Defendants fail to cite or discuss the key Delaware case that governs the outcome of this Motion, Third-Party Defendants' discussion of bits and pieces of inquiry notice cases on page 5-6 of their Motion is necessarily incomplete and essentially unhelpful.  The only discussion of any case at length is Pomeranz v. Museum Partners, L.P., 2005 WL 217039 (Del. Ch. Jan. 24, 2005) (M'tn at 6:21 – 7:3, Doc. 69), which is distinguishable from this one.  In Pomeranz, the basis for plaintiffs' claims was the withdrawal of a majority-interest limited partner from a limited partnership, which plaintiffs alleged was wrongful.  Id. at *8.  The Delaware Chancery Court held the plaintiffs' claims time-barred because the plaintiffs had received financial information and other documents that would have enabled them to deduce that the partner had withdrawn within the statute of limitations.  Id. at *8-12.  Here, Redleaf did not receive information that might put it on notice of its claims until June 30, 2004.  Tomana SBA Dec. ¶ 17-19, Doc. 79.

1.    **The Fraudulent Concealment By Redleaf's Fiduciaries Tolled The Statute of Limitations At Least Until June 30, 2004.**

To prevail on fraudulent concealment under Delaware law, a plaintiff must prove that the defendant "knowingly acted to prevent [the] plaintiff from learning facts or otherwise made misrepresentations intended to 'put the plaintiff off the trail of inquiry." See Krahmer v. Christie's, Inc., 911 A.2d 399, 407 (Del. 2007). The statute of limitation is suspended until the plaintiff's "rights are discovered or until they could have been discovered by the exercise of reasonable diligence." Id. Additionally, under the theory of equitable tolling, Redleaf was entitled to rely on the competence and good faith of the Third-Party Defendants as fiduciaries. In re Dean Witter Partnership Litig., 1998 WL 442456, *8 (Del. Ch. 1998).

Moreover, "the relatively generous" approach Delaware "has taken to tolling doctrines must be borne in mind. Pomeranz v. Museum Partners, L.P., 2005 WL 217039, *15 (Del. Ch. Jan. 24, 2005). In general, Delaware law does not begin the running of the statute of limitations at all when a tolling doctrine applies . . . until the plaintiff is on inquiry notice, giving the plaintiff the full limitations period to file after receiving that notice." Id.

Here, Redleaf has sufficiently set forth that wrongdoing was concealed at least until June 30, 2004, when Aspen III's management revealed the drastic portfolio decline. Before that, the combination of the misrepresentations, the effect of the Series A/Series B structure, and the failure to provide Redleaf with information on the disastrous performance of the Series A investments kept Redleaf wholly ignorant of its claims. Accordingly, the earliest the statute can begin running is June 30, 2004.

Even as of June 30, 2004, the most that can be said of Redleaf's knowledge of its claims is that Redleaf could be forgiven for thinking that the value of Aspen III's portfolio had been misrepresented, given the drastic decline over one quarter. As discussed below in more detail, it took Redleaf until 2007 to obtain sufficient evidence of its claims to bring them, and, given the fact that the Consent Order barred Redleaf from suing and getting discovery from them, the information was available only through informal discovery with the SBA.

Additionally, Redleaf did not find out that the SBA would not recognize the Series A/Series B structure until after the SBA placed Aspen III into liquidation status in April 19, 2005.  Even without the tolling effect of the Consent Order, a misrepresentation claim would still be timely.

Finally, Third-Party Defendants Cilento and Crockett again offered assurances on October 11, 2005, that Aspen III did not need any additional capital to manage an orderly liquidation of the fund.  Tomana SBA Dec. ¶ 24, Doc. 79.  It was not until May 10, 2007, that Redleaf learned that the SBA intended to call the balance of Redleaf's capital commitment – $10.6 million.  Id. at ¶ 25.

### 2.    Redleaf's Claims Are Timely Even if They Accrued on June 30, 2004, Because the Consent Order Equitably Tolled the Statute of Limitations.

The effect of the Consent Order was to toll the statute of limitations on Redleaf's claims and provide Redleaf with an additional 364 days in which to bring its action against Third-Party Defendants.  Using June 30, 2004, as the accrual date, the time that elapsed until Redleaf's filing of the Third-Party Complaint is still under the three-year limit:

| Date | Event | Time Accrual |
|---|---|---|
| • June 30, 2004 | Redleaf's claims accrue | 0 |
| • October 4, 2006 | Entry of Consent Order in Case No. C06-4032 JW enjoining all litigation against Aspen and its partners, agents, managers, etc.[10] | 2 years, 3 months, 4 days    (826 days) |
| • April 10, 2007 | Redleaf obtains evidence from the SBA of the wrongdoing. | 2 years, 3 months, 4 days (826 days) – no time elapsed because the Consent Order ahs tolled the statutes |
| • October 3, 2007 | Entry of Modified Stay Order in Case No. C06-4032 JW lifting injunction against commencing civil actions against Aspen's partners | 2 years, 3 months, 4 days (826 days) – no time elapsed because the Consent Order has tolled the statutes |

---

[10]  RJN Exh. B.

19

| | | |
|---|---|---|
| • October 19, 2007 | The SBA files the instant action against Redleaf alleging breach of contract. | 2 years, 3 months, 20 days (842 days) |
| • December 17, 2007 | Redleaf files the Third-Party Complaint | **2 years, 5 months, 18 days (901 days)** |

The equitable tolling doctrine is recognized in Delaware.  See, e.g., Mergenthaler v. Asbestos Corporation of America, 500 A.2d 1357, 1365 (Del. Super. 1985) (defining equitable tolling as when a court uses its inherent authority to "engraft implied exceptions upon the statute of limitations where the legislative purpose of the statute is not contravened"); Wilson v. King, 673 A.2d 1228, 1232 (Del. Super. 1996).  The rationale for application of equitable tolling "hinges on the concept that statutes of limitations should be tolled where a paramount authority prevents the exercise of a legal remedy by a plaintiff."  Wilson, 673 A.2d at 1232.  Thus, "the time during which the plaintiff is . . . precluded from exercising [its] legal remedy is not to be counted against [it] in determining whether the applicable statute of limitations has barred the plaintiff's right of action."  54 C.J.S. Limitations of Actions § 156 (2008) (citing, inter alia, Wilson, 673 A.2d at 1232).  See also, Matter of Burger, 125 B.R. 894 (Bankr. D. Del. 1991) (Delaware's three-year statute of limitations for breach of contract actions will be tolled until the termination of the automatic stay imposed by 11 U.S.C. § 108 if the prescribed statutory period has not yet expired prior to the bankruptcy filing); Ostrer v. Aronwald, 434 F. Supp. 379, 388-89 (S.D.N.Y.), aff'd, 567 F.2d 551 (2d Cir. 1977) (limitations period governing right of action to recover damages for government's unlawful electronic surveillance is tolled during period when "claimant is prevented by court order from discovering the wiretap materials he needs in order to pursue such a claim") (quoting In re Application for Order Authorizing Interception of Wire Communications, 413 F. Supp. 1321, 1335 (E.D. Pa. 1976) (citing Braun v. Sauerwein, 10 Wall. 218, 77 U.S. 218, 19 L. Ed. 895 (1870)).

Delaware recognizes two elements necessary to the application of equitable tolling, both of which are met here:  the action of the court itself prevented the exercise of Redleaf's legal remedies and Redleaf has acted with due diligence.  See Wilson, 673 A.2d at 1232.  Here, the Consent Order

1  prevented Redleaf from bringing suit after October 4, 2006. Indeed, the SBA has taken the position

2  that the Complaint is a violation of the Consent Order. M'tn to Strike at 12:26, n.5 (Doc. No. 40);

3  Joint Case Management Conference Statement at 6:19-26 (Doc. No. 36). It is further apparent that

4  Redleaf exercised diligence. When the SBA obtained an order lifting the stay and filed its

5  complaint, Redleaf promptly filed the Third-Party Complaint. The statutes were tolled, and Third-

6  Party Defendants' Motion should be denied.

7      Third-Party Defendants argued in their reply brief in support of their Motion to Dismiss,

8  which discussed similar issues, that the Consent Order did not bar claims against Third-Party

9  Defendants Cilento and Crockett. Reply of Third-Party Defendants in Support of Motion to Dismiss

10 Redleaf Group, Inc.'s Third-Party Complaint at 3:18 – 4:15, Doc. 49. Third-Party Defendants are

11 wrong. The Court's Consent Order applies to, among other things, "agents" of Aspen III. RJN Exh.

12 B ¶ 7. Third-Party Defendant David Crockett signed the Consent Order as an authorized

13 representative – i.e., an "agent" of Aspen III. Id. at signature page. Alexander Cilento had the

14 responsibility, along with Thad Whalen and David Crockett, to manage Aspen III. 1999 Agreement

15 §§ 7.1, 11.5, Doc. 73-3, p. 26, 52; 1999 LLC Agreement § 3.1-3.2, Doc. 73-5, p. 15. Of course they

16 were covered by this Court's consent decree.

17      **E.    Third-Party Defendants' Laches Defense Fails for the Same Reason As Its**
18          **Statute of Limitations Defense.**

19      Third-Party Defendants' laches defense depends on a finding, as a matter of law, that Redleaf

20 had notice of its claims before Thad Whalen's death. M'tn at 7:23 – 10:1, Doc. 69. Here, the record

21 shows that Redleaf could have been on inquiry notice, at the earliest, on June 30, 2004. Thad

22 Whalen died nearly a month earlier, on June 5, 2004. Declaration of David Crockett in Support of

23 Third-Party Defendants' Motion for Summary Judgment ¶ 9, Doc. 70. Accordingly, Third-Party

24 Defendants cannot demonstrate either of the key elements of laches – unreasonable delay or

25 prejudice. See Fike v. Ruger, 752 A.2d 112, 113 (Del. 2000).

26

27

28

1

## <u>CONCLUSION</u>

2        In accordance with the foregoing, Redleaf Group, Inc. respectfully requests that the SBA's

3   Motion for Summary Judgment be denied.

4                                        Respectfully submitted,

5
    Dated:  June 6, 2008                 KIRKPATRICK & LOCKHART PRESTON
6                                        GATES ELLIS LLP

7                                  By:    Matthew G. Ball /s/
                                         Matthew G. Ball, Esq. (CA Bar 208881)
8                                        55 Second Street, Suite 1700
                                         San Francisco, CA  94105
9                                        Telephone:  (415) 882-8200
                                         Facsimile:  (415) 882-8220
10                                       (matthew.ball@klgates.com)

11
                                         Martin D. Teckler (*pro hac vice*)
12                                       martin.teckler@klgates.com
                                         Kirkpatrick & Lockhart Preston Gates Ellis
13                                       LLP
                                         1601 K Street, NW Washington, DC, 20006-
14                                       1600
                                         Telephone: (202) 778-9000
15                                       Facsimile: (202) 778- 9100
16

17
                                         Attorneys for Defendant/Third-Party Plaintiff
18                                       Redleaf Group, Inc.

19

20

21

22

23

24

25

26

27

28

REDLEAF GROUP, INC.'S OPP'N TO 3rd PARTY DEFENDANTS' MT'N FOR SUMMARY JUDGMENT
CASE NO. C 07-05350 JW PVT